**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) <br> ) <br> Aralez Pharmaceuticals US Inc., *et al.*,[1] ) <br> ) <br> Debtors. ) <br> ) | **NOT FOR PUBLICATION** <br><br> Chapter 11 <br><br> Case No. 18-12425 (MG) <br><br> (Jointly Administered) |

**MEMORANDUM OPINION GRANTING DEBTORS' MOTION FOR ORDER
AUTHORIZING IMPLEMENTATION OF KEY EXECUTIVE INCENTIVE PLAN**

Aralez Pharmaceuticals US Inc. and its affiliates (collectively, "Debtors") move the Court for an order authorizing the implementation of a key executive incentive plan ("KEIP"). ("KEIP Motion," ECF Doc. # 253.)[2] The Unsecured Creditors Committee ("Committee") opposes approval of the KEIP. ("Opposition," ECF Doc. # 259.) Approval of the KEIP must also be obtained by the Court in Canada, where separate insolvency proceedings concerning the Debtors' Canadian affiliates are pending. For the reasons set forth below, the KEIP Motion is conditionally granted, subject to approval of the KEIP by the Court in Canada.

## I. BACKGROUND

The Debtors are a global specialty pharmaceutical company that sells pharmaceutical products in cardiovascular and other specialty areas. ("Stipulated Facts," ECF Doc. # 283 ¶ 1.) On August 10, 2018 ("Petition Date"), the Debtors filed a voluntary petition for relief under

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer identification number and/or its equivalent are as follows: Aralez Pharmaceuticals Holdings Limited (5824); Aralez Pharmaceuticals Management Inc. (7166); POZEN Inc. (7552); Aralez Pharmaceuticals Trading DAC (1627); Aralez Pharmaceuticals US Inc. (6948); Aralez Pharmaceuticals R&D Inc. (9731); Halton Laboratories LLC (9342). For the purposes of these chapter 11 cases, the Debtors' mailing address is: Aralez Pharmaceuticals, c/o Prime Clerk, P.O. Box 329003, Brooklyn, NY 11232.

[2] Capitalized terms not defined herein have the meanings given to them in the KEIP Motion.

chapter 11 of the Bankruptcy Code. (*Id.* ¶ 4.) As of the Petition Date, the Debtors employed 22 full-time employees in the United States. (ECF Doc. # 4 ¶ 12.) They now employ 16 U.S. employees. (Stipulated Facts ¶ 3.)

On the Petition Date, the Debtors signed non-binding letters of intent to enter into purchase agreements to sell its main assets, Toprol-XL and Vimovo, to two separate stalking horse purchasers. (*Id.* ¶ 8-9.) The letters of intent stated that the Toprol-XL sale was valued at $140 million and that the Vimovo sale plus the sale of the Canadian Debtors operations was valued at $110 million. (*Id.* ¶ 9.) On September 18, 2018, the Debtors entered into proposed purchase agreements with these bidders. (*Id.* ¶ 10.) Under the proposed purchase agreements, the purchase price for Toprol-XL is a $130 million credit bid by Deerfield, the Debtors' pre-petition and post-petition lenders. (*Id.* ¶ 11.) The purchase price for the Vimovo sale is $47.5 million in cash and the purchase price of the Canadian Debtors operations is for $62.5 million. (*Id.*) These bids are subject to higher or otherwise better bids at auction. (*Id.* ¶ 12.) The combined purchase price for these sales is $240 million, plus some assumed liabilities. (*Id.* ¶ 13.) As of the Petition Date, the Debtors had approximately $280 million in principal amount of secured debt outstanding. (*Id.* ¶ 14.) The Debtors are also shopping additional assets that are not included in the stalking horse bids. But unless higher prices are achieved in the auction sales, unsecured creditors are unlikely to obtain any recovery unless they can recharacterize or subordinate any of the secured debtor, something they say they will try to do.

The KEIP was prepared by the Debtors' independent financial advisors at Alvarez & Marsal Healthcare Industry Group, LLC ("A&M"), a restructuring advisory services firm. (*Id.* ¶ 19.) The Debtors and A&M started working on the KEIP before the Petition Date. The Debtors filed a motion for the approval of the KEIP on October 6, 2018. On November 4, 2018,

18-12425-mg    Doc 298    Filed 11/19/18    Entered 11/19/18 08:09:18    Main Document
Pg 3 of 12

following negotiations with the U.S. Trustee, the Debtors filed an amended version of the KEIP, reducing the proposed payout formulas. (Stipulated Facts ¶ 22.) The Court held an evidentiary hearing regarding the KEIP Motion on November 13, 2018.

Nine individuals are eligible to receive payments under the KEIP. (Debtors' Ex. 2 at 37.) They are: the Chief Executive Officer; the President and Chief Business Officer; the Chief Financial Officer; the Executive Vice President, Human Resources; the General Counsel and Chief Compliance Officer; the Vice President, Business Development; the Treasurer; the Vice President & General Manager, Ireland; and the Executive Director, Managed Markets (collectively, the "KEIP Participants"). (*Id.*) Other than the Treasurer and the Vice President of Business Development, each of the KEIP Participants is an insider, as that term is defined by section 101(31) of the Bankruptcy Code. (Debtors' Ex. 1 ¶ 8.)

The KEIP Participants are eligible to receive payments based on a financial performance target ("Net Operating Cash Flow Target") and an asset and/or stock sales target ("Asset Sale Target"). (Stipulated Facts ¶ 23.) The Net Operating Cash Flow Target is based on the net operating cash flow projected in the Debtors' rolling 13-week budget ("DIP Budget"). (*Id.* ¶ 24.) This budget is required under the Debtors' DIP financing facilities. (*Id.*) The DIP Budget projected a total Net Operating Cash Flow of negative $9.9 million over an 18 week period. (*Id.* ¶ 25.) The KEIP provides that the KEIP Participants will receive a payout of 25% of their annual salary for meeting Net Operating Cash Flow at 100% of the DIP Budget, for a total payout of $811,672; with a payout of 37.5% of their salary for meeting Net Operating Cash Flow at 100% of the DIP Budget plus $2.4 million in positive cash flow, for a total payout of $1,217,508; and with a payout of 62.5% of their salary for meeting 100% of the DIP Budget plus $4.1 million in positive cash flow, for a total payout of $2,029,180. (*Id.* ¶ 27.)

The Asset Sale Target is based on the Debtors' ability to: (a) consummate one or more sales, (b) generate incremental value above the purchase price consideration set forth in the bids made by the Stalking Horse Purchasers (inclusive of the bid for the Canadian business), and/or (c) sell the Debtors' assets not included as part of the Toprol-XL sale and Vimovo sale in a timely fashion. (*Id.* ¶ 31.) The KEIP provides the KEIP Participants with a payout of 18.75% of their annual salary for asset sales between $230 and $249.99 million, for a total of $608,754; with a payout of 25% of their salary for asset sales between $250 and $259.99 million, for a total of $811,672; with a payout of 37.5% of their salary for asset sales between $260 and $279.99, for a total of $1,217,508; and 62.5% of their salary for asset sales over $280 million, for a total payout of $2,029,180. (*Id.* ¶ 33.)

## II.    **LEGAL STANDARD**

The Committee argues that the KEIP must be analyzed under section 503(c)(1) of the Bankruptcy Code. That section states:

> (1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that—
> (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
> (B) the services provided by the person are essential to the survival of the business; and
> (C) either—
> > (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is
> > made or the obligation is incurred; or
> > (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of

4

>such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred . . . .

11 U.S.C. § 503(c)(1). The Debtors do not attempt to satisfy the evidentiary requirements of this section. Thus, if section 503(c)(1) applies, the KEIP Motion must be denied.

Section 503(c)(1) applies to payments made by a debtor to an insider of the debtor for the primary purpose of inducing the insider to remain with the debtor. *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (reading section 503(c)(1) to mean a transfer made to an insider of the debtor for the primary purpose of inducing such person to remain with the debtor's business because any payment made to an employee, including regular wages, has at least a partial retentive effect). The Debtors admit that the KEIP Participants include insiders. Thus, the only question is whether the KEIP is primarily retentive in nature. *In re Velo Holdings Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012).

The Debtors argue that the KEIP is primarily incentivizing, not retentive. A plan is primarily incentivizing if it presents "targets that are difficult to achieve, forcing the executives to work hard to achieve their bonuses." *In re Residential Capital, LLC*, 491 B.R. 73, 86 (Bankr. S.D.N.Y. 2013). A purported KEIP will not be deemed retentive simply because it contains "some retentive effect." *Velo Holdings*, 472 B.R. at 210. "Attempts to characterize what are essentially prohibited retention programs as "incentive" programs in order to bypass the requirements of section 503(c)(1) are looked upon with disfavor . . . ." *Id.* at 209.

If the Debtors succeed in showing that the KEIP is primarily incentivizing, then it will be analyzed under sections 503(c)(3) or 363(b) of the Bankruptcy Code, instead of section 503(c)(1). Section 363(b) states "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." Business transactions outside the ordinary course of business are reviewed under a business judgment standard. *In re*

*Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) (hereinafter *"Dana II"*). Section 503(c)(3) states that plans "that are outside the ordinary course of business" will not be allowed unless they are "justified by the facts and circumstances of the case." This section requires the same analysis as section 363(b). *In re Borders Grp., Inc.*, 453 B.R. 459, 474 (Bankr. S.D.N.Y. 2011) ("[T]he legal standard under section 363(b) is no different than section 503(c)(3) . . . ."). In *Dana II,* Judge Lifland listed several factors that courts consider when determining if a compensation proposal may be granted under these sections:

> (1) Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?
> (2) Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
> (3) Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
> (4) Is the plan or proposal consistent with industry standards?
> (5) What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?
> (6) Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Dana II*, 358 B.R. at 576.

### III.    DISCUSSION

#### A.    The KEIP is Primarily Incentivizing

The Court finds that the KEIP is primarily incentivizing. At the time the KEIP was developed, its targets appeared difficult to achieve and likely to incentivize the KEIP Participants to work hard for the benefit of the estate.

6

The Net Operating Cash Flow Target establishes targets that are difficult to achieve. It is tied to the net operating cash flow line of the DIP Budget. The KEIP awards a payout if its participants meet the projected net operating cash flow, and additional payouts if the participants substantially outperform the DIP Budget. When the KEIP was developed, it was not certain that the Debtors would be able to achieve the DIP Budget's projections. Moreover, it was far from certain that the Debtors would be able to significantly outperform these projections.

Meeting or exceeding the Net Operating Cash Flow Target requires significant work on the part of the KEIP Participants. In particular, the KEIP Participants must handle the uncertainty created when two new generic pharmaceutical products entered the market for the Debtors' most profitable asset. (Debtors' Ex. 3 ¶ 7.) The new generics threatened to decrease cash flow because the Debtors could lose sales to their new competitors or be forced to lower the price of their products to remain competitive. (*Id.* ¶ 8.) The KEIP Participants also must maintain the Debtors' relationships with its primary clients and its distributor. When the Debtors filed for bankruptcy, their clients were understandably concerned about whether the Debtors would be able to maintain a reliable supply of medication. (*Id.* ¶ 10-11.) The Debtors' clients are not legally obligated to continue purchasing the Debtors' products. (*Id.*) The KEIP Participants spoke with the Debtors' top clients and were able to allay their concerns.[3] (*Id.*) Following these conversations, one of the Debtors' clients has increased the inventory it is purchasing from the Debtors. (*Id.* ¶ 11.) The Net Operating Cash Flow Target incentivizes the KEIP Participants to meet these challenges and improve the Debtors' net operating cash flow.

---

[3] The Committee notes that these meetings were by phone and that at least some of the KEIP Participants have been working at home since the Debtors rejected their office space leases. The Court does not discount the work performed by the KEIP Participants because it was done telephonically from their homes.

The Asset Sales Target also establishes targets that are difficult to achieve. The KEIP awards payouts if the Debtors sell their assets for more than $230 million, and additional payouts if the KEIP Participants obtain significantly higher bids. While the current stalking horse bids total $240 million, which would result in the KEIP awards, there remains a risk that the transactions will not close. Thus, like the Net Operating Cash Flow Target, it is uncertain that the Debtors will succeed in selling their assets for more than $240 million. The Debtors' KEIP Participants are incentivized to do everything possible to assure that, at a minimum, the stalking horse sales close, or still higher sales prices are achieved.

The KEIP Participants were required to perform, and must continue to perform, significant work to consummate the asset sales and receive payouts under the Asset Sales Target. As of the Petition Date, the Debtors had non-binding letters of intent with regard to its primary assets for $240 million. In the first month of this case, the KEIP Participants worked to convert these letters into stalking horse bids. (*Id.* ¶ 15.) This required the KEIP Participants to handle intellectual property issues, obtain the consent of a foreign company, and participate in the diligence process. (*Id.* ¶ 16-18.) The KEIP Participants will likely have to perform similar work to help the Debtors prepare for the auction of their assets. The Asset Sales Target may reward the KEIP Participants for this work. Thus, this metric is incentivizing as well.

The Committee argues that the KEIP amounts to no more than a "layup." At the evidentiary hearing, the Committee claimed that several of the KEIP targets now appear achievable. They note that the Debtors now have $240 million of bids in hand and now estimate that they are on track to outperform the DIP Budget by increasing cash flow by $7-10 million. These figures would translate to payments of 81% of the KEIP Participants' base salaries. (ECF Doc. # 295 at 9.)

The Court is unpersuaded that the targets are not sufficiently challenging because some of these targets now appear achievable in hindsight. The Debtors explain that the KEIP Motion was not filed until roughly two months after the Petition Date because their post-petition financing facility required the Debtors to obtain the approval of their post-petition lenders before presenting the KEIP to the Court, and the post-petition lenders asked the Debtors to obtain stalking horse bids before seeking approval of the KEIP. (ECF Doc. 274 ¶ 1.) Once the KEIP Motion was filed, the hearing was delayed further to allow the Debtors to negotiate the terms of the KEIP with the U.S. Trustee. The Court will not punish the Debtors for this delay by discounting the work the KEIP Participants have already performed. The Debtors and their financial advisors developed the KEIP in August 2018 and the KEIP Participants operated with the understanding that the Debtors would be seeking authority to implement the KEIP. The Court sees no issue with reviewing a KEIP that was designed to incentivize work that is already partially performed. *See In re Mesa Air Grp., Inc.*, No. 10-10018, 2010 WL 3810899, at *3 (Bankr. S.D.N.Y. Sept. 24, 2010) (approving incentive plan that awarded payments for services already rendered).

The Committee also argued that the lowest targets under the KEIP were too likely to be achieved to be considered incentivizing. While the Court is not convinced that this is the case, even if it were true, a plan may be permitted even if it has some retentive effect. *Velo Holdings*, 472 B.R. at 210 (quoting *In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006)). The KEIP established a range of targets and it is clear that most, if not all, of the targets would be difficult to achieve. Taken as a whole, the KEIP as originally developed is primarily incentivizing.

The Committee also emphasizes the size of the payouts proposed in this case. While the Court acknowledges that the payouts under the KEIP may be a large percentage of the KEIP Participants' annual salaries, the size of the payouts does not make this KEIP primarily retentive. The prospect of a large bonus is just as likely to incentivize an employee to perform the work necessary to receive the bonus as it is to encourage the employee to remain at the company. *See Velo Holdings*, 472 B.R. at 211 (finding KEIP to be incentivizing when it awarded an employee 0.5% of a $20 million credit bid or 1% of sales proceeds from a third-party purchaser).

Finally, the Committee also suggests that the Debtors intentionally created a conservative DIP Budget so that the Net Operating Cash Flow Target would be easier to hit. The Court disagrees and finds, based on all of the evidence, that the DIP Budget was reasonable when prepared.[4] Moreover, a DIP budget may be an appropriate basis for a KEIP. *See Velo Holdings*, 472 B.R. at 210.

### B.     The KEIP Satisfies the Business Judgment Standard

A plan that is primarily incentivizing is reviewed under sections 503(c)(3) or 363(b). Under these sections an incentive plan will be approved so long as it is within the Debtors' sound business judgment. *See Borders*, 453 B.R. at 474 (approving KEIP because the debtors exercised sound business judgment); *Mesa Air*, 2010 WL 3810899 at *3 (approving KEIP because Debtors established that their incentive plan was a valid exercise of business judgment). The Court finds that the KEIP is a valid exercise of the Debtors' business judgment.

---

[4] The Committee argues that the fact that the Debtors have not needed to borrow under the $5 million DIP loan shows that the DIP Budget was not reasonable or reliable. The Court disagrees. The Debtors actual results have exceeded the Budget but that does not indicate the Budget was unreasonable. Additionally, an undrawn DIP loan is often important in demonstrating to customers and vendors that debtors have sufficient liquidity to continue to operate as debtors in possession.

10

In *Dana II,* Judge Lifland listed several factors that courts should consider when determining if an incentive plan satisfies the business judgment standard. These factors weigh in favor of granting the KEIP Motion. A reasonable relationship exists between the KEIP and the results to be obtained. The KEIP awards payouts based on two metrics that are closely tied to the wellbeing of the Debtors' estate and are within the control of the KEIP participants. The cost of the plan is also reasonable in the context of the Debtors' assets, liabilities, and earning potential. The maximum possible payout under the KEIP is $4,058,360.00. This amounts to 1.69% of the stalking horse credit bids. Moreover, if the higher targets of the KEIP are met, then the KEIP will be self-funding. Additionally, the KEIP does not unfairly discriminate between the Debtors' employees. Rather, it covers employees that are reasonably likely to have an effect on the two metrics identified by the KEIP. Finally, the Debtors exercised proper diligence in formulating the KEIP. The Debtors' financial advisor, A&M, reviewed the Debtors' pre-petition incentive plans and the post-petition incentive plans in comparable cases. See *Velo Holdings*, 472 B.R. at 213 (finding that *Dana* factors weighed in favor of approving KEIP that was developed with the guidance of the debtors' financial advisor); *see also Borders*, 453 B.R. at 477. The Debtors and A&M developed a plan that is designed to incentivize the Debtors' key employees to maximize the value of the Debtors' estate.

## IV. **CONCLUSION**

For the reasons stated above, the Court finds that the proposed KEIP is primarily incentivizing and is a valid exercise of the Debtors' business under sections 363(b) and 503(c)(3). Accordingly, the KEIP Motion is conditionally granted, subject to approval of the KEIP by the Court in Canada.

Dated:   November 19, 2018
         New York, New York

                                            ___*Martin Glenn*_____
                                               MARTIN GLENN
                                            United States Bankruptcy Judge