**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
In re:                                             :         Chapter 11
                                                   :
Aralez Pharmaceuticals US Inc., <u>et al.</u>,[1]  :         Case No. 18-12425 (MG)
                                                   :
                        Debtors.                   :         (Jointly Administered)
--------------------------------------------------------x

**ORDER (A) AUTHORIZING AND APPROVING
(I) SALE OF ZONTIVITY RELATED ASSETS FREE AND CLEAR
OF LIENS, CLAIMS AND ENCUMBRANCES; (II) ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS;
AND (III) SETTLEMENT WITH LICENSOR OF RELATED
<u>INTELLECTUAL PROPERTY; AND (B) GRANTING RELATED RELIEF</u>**

Upon the motion [Docket No. 113] (the "**<u>Motion</u>**") of the debtors and debtors in possession

in the above-captioned cases (collectively, the "**<u>Debtors</u>**") for the entry of an order (this "**<u>Order</u>**")

pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**<u>Bankruptcy</u>**

**<u>Code</u>**"), Rules 2002, 6004, 6006 and 9019 of the Federal Rules of Bankruptcy Procedure (the

"**<u>Bankruptcy Rules</u>**"), Rules 6004-1 and 6006-1 of the Local Bankruptcy Rules for the Southern

District of New York (the "**<u>Local Rules</u>**"), and the Amended Guidelines for the Conduct of Asset

Sales (the "**<u>Guidelines</u>**"):

    (i)    approving the private sale (the "**<u>Sale</u>**") of certain assets (as set forth in Section 2.1.1 of the Purchase Agreement (as defined below), the "**<u>Purchased Assets</u>**") of Aralez Pharmaceuticals Trading DAC (the "**<u>Zontivity Seller</u>**") to Toprol Acquisition LLC (the "**<u>Zontivity Buyer</u>**"), pursuant to that certain Asset Purchase Agreement dated as of April 12, 2019 (attached hereto as <u>Exhibit 1</u>, and as amended from time to time, including all schedules, exhibits, and ancillary documents, the "**<u>Purchase Agreement</u>**"),[2] free and clear of all liens, claims, and encumbrances, to the fullest

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer identification number are as follows:  Aralez Pharmaceuticals Holdings Limited (5824); Aralez Pharmaceuticals Management Inc. (7166); POZEN Inc. (7552); Aralez Pharmaceuticals Trading DAC (1627); Aralez Pharmaceuticals US Inc. (6948); Aralez Pharmaceuticals R&D Inc. (9731); Halton Laboratories LLC (9342).  For purposes of these chapter 11 cases, the Debtors' mailing address is Aralez Pharmaceuticals, c/o Prime Clerk LLC, P.O. Box 329003, Brooklyn, NY 11232.

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Motion or the Purchase Agreement, as applicable.

extent permitted by law and except where the Zontivity Seller has agreed to transfer, and the Zontivity Buyer has expressly agreed to permit or assume, certain encumbrances and certain liabilities of the Zontivity Seller (as set forth and defined in the Purchase Agreement, the "**Permitted Encumbrances**" and the "**Assumed Liabilities**");

(ii)    authorizing the assumption and assignment to the Zontivity Buyer of certain executory contracts of the Debtors as set forth in Schedule 2.1.1(a) of the Purchase Agreement (as set forth and defined in the Purchase Agreement, the "**Purchased Contracts**");

(iii)    approving settlement by and between the Seller and MSD International GmbH (as assignee of Schering Plough (Ireland) Unlimited Company successor to Schering-Plough (Ireland) Company) ("**MSD**"), the licensor of certain intellectual property, pursuant to Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code; and

(iv)    granting certain related relief;

and the Court having held a hearing to approve the Sale on May 6, 2019, at which time all interested parties were offered an opportunity to be heard with respect to the Motion (the "**Sale Hearing**"); and the Court having reviewed and considered the Motion, the Declaration of Sanjay Subramanian filed in support of the Motion, any objections to the Motion, and any replies in further support of the Motion; and upon the record of the Sale Hearing; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and this being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue of these cases and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and due and sufficient notice having been given; and it appearing that no other or further notice need be provided; and the Court having found that the settlement between the Seller and MSD is reasonable, fair and equitable and supported by adequate consideration; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation and sufficient cause appearing therefor; it is hereby

**FOUND AND DETERMINED THAT**:

A.    **Legal Predicates.**  The statutory predicates for the relief sought in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, as complemented by Bankruptcy Rules 2002, 6004, 6006 and 9019, Local Rules 6004-1 and 6006-1, and the Guidelines.   The consummation of the transactions contemplated by the Motion, this Order, and the Purchase Agreement is legal, valid, and properly authorized under all such provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Guidelines.

B.    **Notice.**  As evidenced by the affidavits of service filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Sale, the Purchase Agreement, the Sale Hearing, the potential assumption and assignment of the Purchased Contracts, the cure payments proposed in respect of each Purchased Contract (each, a "**Cure Cost**"), all transactions contemplated therein or in connection therewith, and all deadlines related thereto, has been provided to all interested persons and entities and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Guidelines.  The aforementioned notices are good, sufficient, and appropriate under the circumstances, and no other or further notice of any of the foregoing is required for entry of this Order.  All interested persons and entities have been provided a reasonable opportunity to object or be heard regarding the relief requested in the Motion.

C.    **Business Justification.**  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for entering into the Purchase Agreement, which provides for the private sale of the Purchased Assets to the Zontivity Buyer. The Debtors have, among other things, determined in their business judgment that, under current circumstances, the benefits of consummating a prompt private sale of the Purchased Assets on the terms and conditions embodied in the Purchase Agreement outweigh any potential benefits of

conducting a further marketing and overbid process for the Purchased Assets.  In light of the

circumstances of these cases, time is of the essence in (i) consummating the Sale and all related

transactions, and (ii) maximizing the value of the Purchased Assets.

**D.      Adequate Marketing.**  As demonstrated by the testimony and other evidence

proffered or adduced at the Sale Hearing and the representations of counsel made on the record at

the Sale Hearing, the Debtors have adequately marketed the Purchased Assets.

**E.      Sale in Best Interests.**  Approval of the Purchase Agreement, the Sale, and all

related transactions at this time, and the actions to be taken by the Debtors and the Zontivity Buyer,

are appropriate under the circumstances of these cases and are in the best interests of the Debtors,

their estates and creditors, and all other parties in interest.  The Debtors have demonstrated good,

sufficient and sound business reasons and justifications for the Zontivity Seller's entry into the

Sale and the performance of its obligations under the Purchase Agreement.

**F.      Good Faith Purchaser.**  The Sale and the transactions contemplated by the

Purchase Agreement are undertaken by the Zontivity Buyer without collusion, at arm's length and

in good faith, within the meaning of section 363(m) of the Bankruptcy Code, and accordingly, the

reversal or modification on appeal of the authorization provided herein to consummate the Sale

shall not affect the validity of the Sale, unless such authorization and consummation of the Sale

are duly and properly stayed pending such appeal.  The Zontivity Buyer will be acting in good

faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions

contemplated by the Purchase Agreement and is a good faith purchaser for value within the

meaning of section 363(m) of the Bankruptcy Code.  As such, the Zontivity Buyer is entitled to all

of the protections and immunities afforded under section 363(m) of the Bankruptcy Code.  There

has been no showing that the Debtors or the Zontivity Buyer engaged in any action or inaction that

would cause or permit the transactions to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

G.      **Corporate Authority.** The Zontivity Seller: (i) has full corporate power and authority to execute the Purchase Agreement and all other documents contemplated thereby; (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Purchase Agreement; (iii) has taken all corporate action necessary to authorize and approve the Purchase Agreement and the consummation by the Zontivity Seller of the transactions contemplated thereby; and (iv) needs no consents or approvals, other than those expressly provided for in the Purchase Agreement, which may be waived in accordance with the terms therewith. The Sale of the Purchased Assets has been duly and validly authorized by all necessary corporate action of the Zontivity Seller.

H.      **Free and Clear Findings Required by the Zontivity Buyer.** The Zontivity Buyer would not have entered into the Purchase Agreement and would not consummate the Sale if the sale of the Purchased Assets to the Zontivity Buyer was not, pursuant to section 363(f) of the Bankruptcy Code, free and clear, to the extent permitted by law, of (i) all liens (statutory or otherwise), mortgages, pledges, security interests, charges, and other encumbrances (collectively, the "**Liens**"), and (ii) all claims as defined in section 101(5) of the Bankruptcy Code, including all rights or causes of action (whether in law or in equity), obligations, rights of setoff, demands, restrictions, indemnification claims or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing Date (as defined in the Purchase Agreement) (collectively, the "**Claims**"), except for Permitted Encumbrances and Assumed Liabilities. Except for Permitted Encumbrances and Assumed Liabilities, to the fullest extent permitted by law, the Sale shall be free and clear of, and the Zontivity Buyer shall not be responsible for, any Liens or Claims.

**I.     No Fraudulent Transfer.**  The Purchase Agreement was not entered into with the intent of hindering, delaying, or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia or the laws of any foreign jurisdiction.  The consideration provided by the Zontivity Buyer for the Purchased Assets pursuant to the Purchase Agreement (i) is fair and reasonable; (ii) is the highest and best offer for the Purchased Assets; (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative; and (iv) constitutes reasonably equivalent value and fair consideration for the Purchased Assets.

**J.     Binding and Valid Transfer.**  The transfer of the Purchased Assets to the Zontivity Buyer will be a legal, valid, and effective transfer of the Purchased Assets, and will vest the Zontivity Buyer with all right, title, and interest of the Zontivity Seller to the Purchased Assets free and clear, to the fullest extent permitted by law, of all Liens and Claims other than Permitted Encumbrances and the Assumed Liabilities, as set forth in the Purchase Agreement.  Immediately prior to consummating the Sale, the Purchased Assets constitute property of the Zontivity Seller's estate, good title is vested in the Zontivity Seller's estate within the meaning of section 541(a) of the Bankruptcy Code, and the Zontivity Seller is the sole and rightful owner of the Purchased Assets.  Upon and following the consummation of the Sale, the Zontivity Buyer shall be vested with good and marketable title to the Purchased Assets and shall be the sole and rightful owners of the Purchased Assets.

**K.     Satisfaction of 363(f) Standards.**  The Zontivity Seller may sell the Purchased Assets, to the fullest extent permitted by law, free and clear of all Liens and Claims because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Holders of Liens or Claims, and non-debtor parties to the Purchased Contracts

who consented, who did not object, or who withdrew their objections, to the Motion are deemed

to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  In all cases, each such

person with a Lien or Claim against the Purchased Assets is enjoined from taking any action

against the Zontivity Buyer, the Zontivity Buyer's affiliates, or any agent of the foregoing to

recover any such Lien or Claim.

**L.    Necessity of Order.**  The Zontivity Buyer would not have entered into the Purchase

Agreement and would not consummate the transactions without all of the relief provided for in

this Order.  The consummation of the transactions pursuant to this Order and the Purchase

Agreement is necessary for the Debtors to maximize the value of their estates for the benefit of the

Debtors, their estates and creditors, and all other parties in interest.

**M.    Purchased Contracts.**  The Debtors have demonstrated that it is an exercise of

their sound business judgment for the Debtors to sell, assume, and assign the Purchased Contracts

to the Zontivity Buyer in connection with the consummation of the Sale, and the assumption and

assignment of the Purchased Contracts is in the best interests of the Debtors, their estates and

creditors, and all other parties in interest.  Moreover, the Debtors have secured the consent of MSD

to assign the license agreement, dated as of September 6, 2016, between MSD and the Zontivity

Seller (as amended modified or supplemented, the "**License Agreement**").  The Purchased

Contracts assigned to the Zontivity Buyer are an integral part of the Purchased Assets, and,

accordingly, the assumption and assignment of the Purchased Contracts and the liabilities

associated therewith to the Zontivity Buyer is reasonable, enhances the value of the Debtors'

bankruptcy estates, and does not constitute unfair discrimination.

**N.    Cure and Adequate Assurance.**  Subject to the terms of the Purchase Agreement,

the Debtors or the Zontivity Buyer, as the case may be, have cured or demonstrated the ability to

cure any default with respect to any act or omission that occurred prior to the Closing Date under any of the Purchased Contracts.  The Zontivity Buyer promises to perform the obligations under the Purchased Contracts after the Closing Date shall constitute adequate assurance of their future performance of and under the Purchased Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  All counterparties to the Purchased Contracts who did not timely file an objection to a Cure Cost or an objection to the assumption and assignment of the Purchased Contracts are deemed to consent to the assumption by the applicable Debtor of their respective Purchased Contract and the assignment thereof to the Zontivity Buyer, other than MSD, which will consent to the assignment of the License Agreement.  The Court finds that with respect to all such Purchased Contracts, the payment of Cure Costs is appropriate and is deemed to fully satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code.  Accordingly, all of the requirements of sections 365(b) of the Bankruptcy Code have been satisfied for the assumption and the assignment by the applicable Debtor to the Zontivity Buyer of each of the Purchased Contracts.  To the extent any Purchased Contract is not an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Zontivity Buyer in accordance with the terms of this Order that are applicable to the Purchased Assets.

O.    **Unenforceability of Anti-Assignment Provisions.**  Anti-assignment provisions in any Purchased Contract shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Purchased Contracts to the Zontivity Buyer.  Any such provisions and any other provision in any Purchased Contract that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the Debtors should be deemed and are found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the

Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.

P.    **Final Order.**    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), and 7062, and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

Q.    **Legal and Factual Bases.**    The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein and entry of this Order is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

R.    **Settlement.**    The Debtors have acted in good faith and exercised sound business judgment in connection with the settlement between the Seller and MSD.  The Debtors, the Zontivity Buyer and MSD have agreed as follows, on the Closing (i.e., the date that all conditions to closing of the transactions set forth in the Purchase Agreement are satisfied or waived as more fully set forth in section 2.4 of the Purchase Agreement):  (a) MSD will consent to the assignment of the License Agreement to the Zontivity Buyer; (b) the Debtors will reject the (i) asset purchase agreement, dated as of September 6, 2016, between MSD the Zontivity Seller and Parent (as amended, modified or supplemented, the "**APA**"), (ii) supply agreement, dated as of September 6, 2016, between MSD and the Zontivity Seller (as amended, modified or supplemented, the "**Supply Agreement**"), and (iii) quality agreement, dated as of October 6, 2016, between MSD and the Zontivity Seller (the "**Quality Agreement**," together with the APA, Supply Agreement, and all other agreements (but excluding the License Agreement), that are

contemplated by, or documented or implemented, the sale by MSD to Zontivity Seller of the

Zontivity product line, including, the Transition Services Agreement, dated as of September 6,

2016, between MSD and Zontivity Seller, the "**Rejected Zontivity Agreements**"); (c) the

Zontivity Buyer will pay MSD $375,000 on account of MSD's consent and in settlement of all of

its claims arising under or related to the Rejected Zontivity Agreements against the Debtors,

including any administrative expense claims and all rejection damage claims; and (d) MSD and

the Seller will provide each other mutual releases, is fair and reasonable and is in the best

interests of the Debtors, their respective estates and creditors.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     **Motion is Granted.**  The Motion is granted as set forth herein.

2.     **Objections Overruled.**  Any objections to the entry of this Order or to the relief

granted herein or the relief requested in the Motion (as may be modified herein), including any

objections to Cure Costs or the assumption and assignment of any of the Purchased Contracts, that

have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms

hereof, if any, are hereby denied and overruled on the merits with prejudice.

3.     **Approval.**  The Purchase Agreement, and all the terms and conditions thereof, is

approved.  Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the Zontivity Seller

is authorized to perform its obligations under, and comply with the terms of, the Purchase

Agreement and consummate the Sale and the related transactions pursuant to, and in accordance

with, the terms and conditions of the Purchase Agreement and this Order.  The Zontivity Seller is

authorized to execute and deliver, and empowered to perform under, consummate, and implement,

the Purchase Agreement, together with all additional instruments and documents that are necessary

or appropriate to implement the Purchase Agreement and effectuate the transactions contemplated

therein, and to take all further actions as may reasonably be required by the Zontivity Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Zontivity Buyer or reducing to Zontivity Buyer's possession the Purchased Assets or as may be necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement. Such Purchased Assets shall be transferred to the Zontivity Buyer "as is where is" with all faults in accordance with the Purchase Agreement upon and as of the Closing Date.

4.     **Binding Effect of Order.**  This Order and the Purchase Agreement shall be binding in all respects upon all creditors of, and holders of equity security interests in, any Debtor (including any holders of Liens or Claims), all counterparties to the Purchased Contracts, all successors and assigns of the Zontivity Buyer, each Debtor and its affiliates and subsidiaries, and any trustees appointed in the Debtors' cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code.  This Order and the Purchase Agreement shall not be subject to rejection. Nothing contained in any chapter 11 plan confirmed in the Debtors' cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the Purchase Agreement or this Order.

5.     **General Assignment.**  On and after the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Zontivity Seller's interests in the Purchased Assets and a bill of sale transferring good and marketable title in the Purchased Assets to the Zontivity Buyer free and clear (to the extent permitted by law) of all Liens and Claims except for Permitted Encumbrances and Assumed Liabilities.

6.     **Transfer Free and Clear.**  Except for the Permitted Encumbrances and Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, on the Closing Date

the Purchased Assets shall be transferred to the Zontivity Buyer as required under the Purchase

Agreement, and such transfer shall be, to the fullest extent permitted by law, free and clear of all

Liens or Claims of any Person, with all such Liens or Claims to attach to the net proceeds of the

Sale ultimately attributable to the property against or in which the holder of a Lien or Claim claims

or may claim a Lien or Claim, in the order of their priority, with the same validity, force, and effect

which they now have, subject to any claims and defenses the Debtors may possess with respect

thereto.

7.      **Valid Transfer.**  The transfer of the Purchased Assets to the Zontivity Buyer

pursuant to the Purchase Agreement constitutes a legal, valid, and effective transfer of the

Purchased Assets and shall vest the Zontivity Buyer with all right, title, and interest of the Zontivity

Seller in and to the Purchased Assets free and clear to the fullest extent permitted by law of all

Liens or Claims (other than Permitted Encumbrances and Assumed Liabilities).

8.      **Direction to Release Interests.**  Upon the Closing Date, each of the Debtors'

creditors and any other holder of a Lien or Claim shall be deemed to have released its Lien or

Claim in the Purchased Assets, if any, as such Lien or Claim may have been recorded or may

otherwise exist.  If any person or entity that has filed financing statements, mortgages,

mechanics' liens, *lis pendens*, or other documents or agreements evidencing a Lien or Claim in

the Purchased Assets shall not have delivered to the Debtors prior to the Closing Date, in proper

form for filing and executed by the appropriate parties, termination statements, instruments of

satisfaction, releases of liens and easements, and any other documents necessary for the purpose

of documenting the release of all Liens or Claims that the person or entity has or may assert with

respect to any of the Purchased Assets, (i) the Debtors and/or the Zontivity Buyer are authorized

to execute and file such statements, instruments, releases, and other documents on behalf of the

person or entity with respect to the Debtors or the Purchased Assets, and (ii) the Zontivity Buyer

is authorized to file, register, or otherwise record a certified copy of this Order, which shall

constitute conclusive evidence of the release of all Liens or Claims in the Purchased Assets.

9.        **No Discriminatory Treatment.**  To the extent provided by section 525 of the

Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit,

license, or similar grant relating to the operation of the Purchased Assets sold, transferred, or

conveyed to the Zontivity Buyer on account of the filing or pendency of these cases or the

consummation of the transactions contemplated by the Purchase Agreement.

10.        **Assumption and Assignment of Purchased Contracts.**  Pursuant to sections

105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the

Sale, the applicable Debtor's assumption and assignment to the Zontivity Buyer, and the Zontivity

Buyer's assumption on the terms set forth in the Purchase Agreement, of the Purchased Contracts

is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect

thereto are hereby deemed satisfied, or shall be satisfied.

11.        The Debtors are authorized and empowered in accordance with sections 105(a),

363, and 365 of the Bankruptcy Code to (i) assume and assign to the Zontivity Buyer, effective

upon the Closing Date of the Sale, the Purchased Contracts free and clear of all Liens or Claims to

the fullest extent permitted by law (except for Permitted Encumbrances and the Assumed

Liabilities), and (ii) execute and deliver to the Zontivity Buyer such documents or other

instruments as may be necessary to assign and transfer the Purchased Contracts to the Zontivity

Buyer.

12.        The Purchased Contracts shall be transferred to, and remain in full force and effect

for the benefit of, the Zontivity Buyer in accordance with their respective terms, notwithstanding

any provision in any such Purchased Contracts (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, to the extent permitted by section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Purchased Contracts after such assignment to and assumption by the Zontivity Buyer, except as provided in the Purchase Agreement.

13.    All defaults or other obligations of the Debtors under the Purchased Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured on the Closing Date or as soon thereafter as reasonably practicable to the extent required by the Purchase Agreement and this Order.

14.    Any provision in any Purchased Contract that purports to declare a breach, default or payment right as a result of an assignment in respect of the Debtors is unenforceable, and all Purchased Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Cost, if any.  No sections or provisions of any Purchased Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor party to the Purchased Contract shall have any force and effect with respect to the assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under Bankruptcy Code section 365(f) and/or are otherwise unenforceable under Bankruptcy Code section 365(e) and no assignment of any Purchased Contract pursuant to the terms of the Purchase Agreement shall in any respect constitute a default under any Purchased Contract or require the provision of adequate protection in favor of any non-debtor counterparty to a Purchased Contract.  Other than MSD, which will consent to the assignment of the License Agreement, the non-debtor counterparty to each Purchased Contract shall be deemed to have

- 14 -

consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Zontivity Buyer shall enjoy all of the applicable Debtor's rights and benefits under each such Purchased Contract as of the applicable date of assumption without the necessity of obtaining such non-debtor counterparty's written consent to the assumption or assignment thereof.

15.    The payment of Cure Costs under the Purchase Agreement and this Order (i) cures all monetary defaults existing thereunder as of the assignment of the Purchased Contracts to the Zontivity Buyer in accordance with the terms of the Purchase Agreement; (ii) compensates the applicable non-debtor counterparties for any actual pecuniary loss resulting from such default; and (iii) together with the evidence proffered or adduced at the Sale Hearing and the assumption of the Purchased Contracts by the applicable Debtor and the assignment of the Purchased Contracts to the Zontivity Buyer constitutes adequate assurance of future performance thereof.

16.    If any non-debtor counterparty to a Purchased Contract failed to timely object to the assumption and assignment of its respective Purchased Contract or the Cure Cost proposed in connection with the Motion, such party hereby is forever barred, estopped, and permanently enjoined from raising or asserting against the applicable Debtor, the Zontivity Buyer, or their respective affiliates, or the property of any of them, any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the Purchased Contracts, existing as of the Closing Date, or arising by reason of the consummation of transactions contemplated by the Purchase Agreement, including, the Sale and the assumption and assignment of the Purchased Contracts.  Other than MSD, which will consent to the assignment of the License Agreement, any party that may have had the right to consent to the assignment of a Purchased Contract is deemed to have consented to such assignment for purposes of sections 365(c)(1) or

365(e)(2)(A)(ii) of the Bankruptcy Code and otherwise if such party failed to timely object to the assumption and assignment of such Purchased Contract.

17.     In the event or to the extent a non-debtor counterparty to a Purchased Contract failed to timely object to a Cure Cost, such Cure Cost shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost at any time, and the Cure Cost, when paid, shall completely revive any Purchased Contract to which it relates.

18.     **Governmental Matters.**  Nothing in this Order or the Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a federal governmental unit of the United States under environmental statutes or under police and regulatory statutes or regulations that any entity would be subject to as the operator of property after the date of entry of this Order. Nothing in this Order or the Purchase Agreement authorizes the transfer to the Zontivity Buyer of any licenses, permits, registrations, or other governmental authorizations and approvals without the Zontivity Buyer's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.  Notwithstanding the foregoing sentence, nothing in this Order shall: (i) create for any governmental unit any substantive right that does not already exist under law; or (ii) be deemed or construed to be, an admission of liability by the Debtors.

19.     **Fair Consideration.**  The consideration provided by the Zontivity Buyer for the Purchased Assets under the Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Sale may not be avoided under section 363(n) of the Bankruptcy Code.  The Purchase Agreement was not entered into, and the Sale is not being consummated, with the intent of hindering, delaying, or defrauding

creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any

state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither

the Debtors, the Zontivity Buyer has entered into the Purchase Agreement or any agreement

contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper

purpose. No other person or entity or group of persons or entities has offered to purchase the

Purchased Assets for an amount that would provide greater value to the Debtors and their estates

than the Zontivity Buyer. The Court's approval of the Motion and the Purchase Agreement is in

the best interests of the Debtors, their estates and creditors, and all other parties in interest.

20.    **Good Faith Purchaser.**    The transactions contemplated by the Purchase

Agreement are undertaken by the Zontivity Buyer in good faith, as that term is used in section

363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the

authorization provided herein by this Order to consummate the Sale shall not affect the validity of

the sale of the Purchased Assets to the Zontivity Buyer. The Zontivity Buyer is a purchaser in

good faith of the Purchased Assets, and is entitled to all of the protections afforded by section

363(m) of the Bankruptcy Code. As a good faith purchaser of the Purchased Assets, the Zontivity

Buyer has not entered into an agreement with any potential bidders, and has not colluded with any

potential bidders or any other parties interested in the Purchased Assets, and, therefore, neither the

Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action

against the Zontivity Buyer on any such grounds, and the Sale may not be avoided pursuant to

section 363(n) of the Bankruptcy Code.

21.    **Failure to Specify Provisions.**    The failure to specifically include any particular

provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness

of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

22.     **Amendment.**  The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, *provided that* any such modifications, amendments, or supplements are not inconsistent with this Order.

23.     **No Stay or Order.**  Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Debtors and the Zontivity Buyer are authorized to close the transactions immediately upon entry of this Order.  Time is of the essence in closing the transactions referenced herein, and the Debtors and the Zontivity Buyer intend to close the transactions as soon as practicable.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

24.     **Appointment of Trustee.**  The provisions of the Purchase Agreement and this Order may be specifically enforced in accordance with the Purchase Agreement notwithstanding the appointment of any chapter 7 or chapter 11 trustee after the Closing Date.

25.     **Time Calculations.**  All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

26.     **Provisions Nonseverable.**  The provisions of this Order are nonseverable and mutually dependent.

27.     **Settlement.**  The following agreement is approved under Bankruptcy Rule 9019: on the Closing Date, (a) MSD will consent to assumption by Aralez Pharmaceuticals Trading DAC and to the assignment of the License Agreement to the Zontivity Buyer; (b) the APA, Supply

Agreement and Quality Agreement shall be deemed rejected pursuant to section 365 of the Bankruptcy Code; and (c) the Zontivity Buyer shall pay MSD $375,000 by wire transfer to an account designated by MSD on account of its consent and in settlement of all of its claims against the Debtors arising under or related to the Rejected Zontivity Agreements, including any and all administrative expense claims and rejection damage claims.

28.    Upon and subject to the occurrence of the Closing, each of the Debtors, on behalf of itself, its bankruptcy estate, and each of its members, affiliates, successors and assigns, and all other persons or entities claiming through it (a) releases and discharges MSD and its affiliates, predecessors, successors, assigns, directors, officers, principals, partners, managers, members, employees, representatives, attorneys, agents or related entities of the foregoing (collectively, the "**MSD Released Parties**") from any and all actions, causes of action, suits, rights, claims, demands, defenses, rights of setoff or recoupment or counterclaims of any kind or nature whatsoever against any of the MSD Released Parties, in law or in equity, whether known or unknown, contingent or accrued, liquidated or unliquidated, in each case from the beginning of time through the date of the Closing based in whole or in part on any act, omission, transaction, event, other occurrence or thing in any way arising under or relating to the License Agreement, the Rejected Zontivity Agreements, or the transactions effected thereby, or these Chapter 11 cases, and that could have been asserted against the MSD Released Parties, including, by way of example and not in limitation, all causes of action under the Bankruptcy Code (collectively, the "**Debtor Released Claims**"), and (b) shall not, directly or indirectly, sue, or commence, knowingly aid or prosecute or cause to be commenced, knowingly aided or prosecuted any claim, action, suit or proceeding, or authorize any other person or entity to commence or prosecute any claim, action,

suit or proceeding, against any of the MSD Released Parties in respect of any Debtor Released Claims.

29.      Upon and subject to the occurrence of the Closing and receipt by MSD of $375,000 from the Zontivity Buyer, MSD, on behalf of itself and each of its members, affiliates, successors and assigns, and all other persons or entities claiming through it (a) releases and discharges each of the Debtors and their respective affiliates, predecessors, successors, assigns, directors, officers, principals, partners, managers, members, employees, representatives, attorneys, agents or related entities of the foregoing (collectively, the "**Debtor Released Parties**") from any and all actions, causes of action, suits, rights, claims, demands, defenses, rights of setoff or recoupment or counterclaims of any kind or nature whatsoever against any of the Debtor Released Parties, in law or in equity, whether known or unknown, contingent or accrued, liquidated or unliquidated, in each case from the beginning of time through the date of the Closing based in whole or in part on any act, omission, transaction, event, other occurrence or thing in any way arising under or relating to the License Agreement, the Rejected Zontivity Agreements, or the transactions effected thereby, or these Chapter 11 cases, and that could have been asserted against the Debtor Released Parties (collectively, the "**MSD Released Claims**"), and (b) shall not, directly or indirectly, sue, or commence, knowingly aid or prosecute or cause to be commenced, knowingly aided or prosecuted any claim, action, suit or proceeding, or authorize any other person or entity to commence or prosecute any claim, action, suit or proceeding, against any of the Debtor Released Parties in respect of any MSD Released Claims.

30.      The releases set forth in the immediately preceding two paragraphs shall not release the Debtors, the Zontivity Buyer, and MSD of, or impair or affect, their respective obligations set forth in paragraph 27 above nor shall the releases affect the respective rights and

obligations of MSD and the Zontivity Buyer under the License Agreement.  The releases set forth in the immediately preceding two paragraphs shall not be construed as a release of any claims arising from or related to the gross negligence or willful misconduct of the MSD Released Parties or the Debtor Released Parties.

31.     **Cardinal Matters.**  Effective as of the Closing Date and subject to the occurrence of the Closing, as defined in the Purchase Agreement, the Debtors will assign to the Zontivity Buyer the Cardinal Health Contracts (as such term is defined in the *Stipulation and Order Among Certain of the Debtors, Toprol Acquisition LLC and Cardinal Health 105, Inc., Regarding Assumption and Assignment of Executory Contracts* [Docket No. 547]) solely with respect to Zontivity, in accordance with the terms set forth in the Purchase Agreement.  Cardinal Health is authorized to setoff and/or recoup mutual undisputed debts between the Debtors and Cardinal Health that arose prior to the Closing under the Cardinal Health Contracts in the ordinary course of business to the extent permitted under the Cardinal Health Contracts and applicable law or as otherwise agreed in writing between the parties.  The Debtors and Cardinal Health will reconcile any amounts that may be owed in the ordinary course resulting from any embedded chargebacks, chargebacks, refunds, claims, and/or credits that have accrued as a result of any goods purchased by Cardinal Health pre or post-petition but sold post-petition, and upon such final reconciliation, each party will pay the other any amounts which may be owed.

32.     **Retention of Jurisdiction.**  This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, and to adjudicate, if necessary, all disputes concerning or relating in any way to the Sale.

33.    **Inconsistencies with Prior Orders, Pleadings or Agreements.**    To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale.  To the extent there is any inconsistency between the terms of this Order and the terms of the Purchase Agreement, the terms of this Order shall govern and control.

**IT IS SO ORDERED.**
Dated:  May 7, 2019
       New York, New York

**_____/s/ Martin Glenn_____**
MARTIN GLENN
United States Bankruptcy Judge

## Exhibit 1

**Purchase Agreement**

*EXECUTION VERSION*

# ASSET PURCHASE AGREEMENT

**by and between**

**Aralez Pharmaceuticals Trading DAC**

**and**

**Toprol Acquisition LLC**

**Dated as of April 12, 2019**

# TABLE OF CONTENTS

ARTICLE 1        DEFINITIONS ................................................................................................1

    1.1    Certain Defined Terms ................................................................................1
    1.2    Construction ...............................................................................................15

ARTICLE 2        SALE AND PURCHASE OF ASSETS; LIABILITIES................................16

    2.1    Sale of Purchased Assets ...........................................................................16
    2.2    Liabilities ..................................................................................................17
    2.3    Consideration .............................................................................................17
    2.4    Closing .......................................................................................................18
    2.5    Reserved.....................................................................................................20

ARTICLE 3        REPRESENTATIONS AND WARRANTIES.............................................20

    3.1    Representations and Warranties of Seller ..................................................20
    3.2    Representations and Warranties of Buyer...................................................28
    3.3    Exclusivity of Representations ..................................................................29

ARTICLE 4        PRE-CLOSING COVENANTS ..................................................................30

    4.1    Ordinary Course of Business .....................................................................30
    4.2    Access and Information ..............................................................................32
    4.3    Obligation to Consummate the Transaction ..............................................33
    4.4    Reasonable Assurances...............................................................................33

ARTICLE 5        ADDITIONAL COVENANTS....................................................................33

    5.1    Cooperation in Litigation and Investigations.............................................34
    5.2    Further Assurances.....................................................................................34
    5.3    Publicity.....................................................................................................35
    5.4    Confidentiality ...........................................................................................36
    5.5    Post-Closing Access...................................................................................38
    5.6    Regulatory Transfers..................................................................................39
    5.7    Regulatory Responsibilities.......................................................................39
    5.8    Further Obligations ....................................................................................39
    5.9    Commercialization.....................................................................................40
    5.10   Certain Tax Matters ...................................................................................40
    5.11   Accounts Receivable and Payable .............................................................42
    5.12   Wrong Pockets ...........................................................................................42
    5.13   Right of Reference .....................................................................................43
    5.14   Insurance ....................................................................................................43
    5.15   [Reserved] ..................................................................................................43
    5.16   [Reserved] ..................................................................................................43
    5.17   Purchased Domain Name Obligations and Restrictions ............................43
    5.18   Third Party Investigational Studies............................................................43

i

5.19    Bankruptcy Court Approval..........................................................................43
5.20    Seller Not Party to Other Agreement...........................................................44
5.21    No Successor Liability..................................................................................44
5.22    Service of Approval Motion .........................................................................44
5.23    Approval and Copies of Pleadings...............................................................45
5.24    Assumption and Assignment of Contracts....................................................45
5.25    Technology Transfer ....................................................................................45

ARTICLE 6        [RESERVED] .............................................................................45

ARTICLE 7        CONDITIONS PRECEDENT ....................................................45

7.1     Conditions to Obligations of Buyer and Seller ....................................45
7.2     Conditions to Obligations of Buyer ......................................................46
7.3     Conditions to Obligations of Seller ......................................................46
7.4     Frustration of Closing Conditions.........................................................47

ARTICLE 8        NO SURVIVAL OF REPRESENTATIONS, WARRANTIES AND PRE-
                 CLOSING COVENANTS ...........................................................47

8.1     No Survival ...........................................................................................47
8.2     No Recourse ..........................................................................................47

ARTICLE 9        TERMINATION ........................................................................48

9.1     Termination............................................................................................48
9.2     Procedure and Effect of Termination.....................................................50

ARTICLE 10       MISCELLANEOUS ..................................................................51

10.1    Governing Law, Jurisdiction, Venue and Service ................................51
10.2    Notices ..................................................................................................51
10.3    No Benefit to Third Parties ...................................................................52
10.4    Waiver and Non-Exclusion of Remedies...............................................53
10.5    Expenses ...............................................................................................53
10.6    Assignment ...........................................................................................53
10.7    Amendment ...........................................................................................53
10.8    Severability ...........................................................................................53
10.9    Equitable Relief ....................................................................................53
10.10   Damages Waiver....................................................................................54
10.11   English Language...................................................................................54
10.12   Bulk Sales Statutes................................................................................54
10.13   Representation by Counsel ....................................................................54
10.14   Counterparts...........................................................................................54
10.15   Entire Agreement...................................................................................55
10.16   Bankruptcy Court Approval...................................................................55

ii

## SCHEDULES

| | |
|---|---|
| Schedule 1.1.57 | Excluded Contracts |
| Schedule 1.1.77 | Licensed Trademarks |
| Schedule 1.1.99 | Permitted Encumbrances |
| Schedule 1.1.114 | Purchased Domain Names |
| Schedule 1.1.116 | Purchased Patents |
| Schedule 1.1.119 | Purchased Regulatory Approvals |
| Schedule 1.1.121 | Purchased Trademarks |
| Schedule 1.1.133 | Seller's Knowledge |
| Schedule 2.2.1(a) | Purchased Contracts (Purchased Assets) |
| Schedule 2.4.2(a)(iii) | Purchased Assets Delivery Schedule |
| Schedule 3.1.3 | Consents, Permits and Authorizations |
| Schedule 3.1.6 | Purchased Assets |
| Schedule 3.1.6(a) | Title and Contractual Rights in the Purchase Assets |
| Schedule 3.1.9 | Compliance with Law |
| Schedule 3.1.12(c) | Intellectual Property; Purchase and Licensed Intellectual Property |
| Schedule 3.1.12(d) | Intellectual Property; No Encumbrances |
| Schedule 3.1.14 | Transferred Inventory |
| Schedule 3.1.15 | Regulatory Matters |
| Schedule 4.1 | Ordinary Course of Business |
| Schedule 5.18 | Third Party Investigational Studies |
| Schedule 5.25 | Tech Transfer Liabilities |

## EXHIBITS

| | |
|---|---|
| Exhibit A-1 | Form of Bill of Sale and Assignment and Assumption Agreement |
| Exhibit A-2 | Form of Patent Assignment |
| Exhibit A-3 | Form of Domain Name Assignment |
| Exhibit A-4 | Form of Trademark Assignment |
| Exhibit B-1 | Form of Buyer FDA Transfer Letters |
| Exhibit C-1 | Form of Seller FDA Transfer Letters |
| Exhibit D | Form of Approval Order |

US_138272717v12

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and executed as of April 12, 2019 (the "**Execution Date**"), by and between Aralez Pharmaceuticals Trading DAC, an Irish designated activity company ("**Seller**") and Toprol Acquisition LLC, a Delaware limited liability company ("**Buyer**").  Seller and Buyer are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

**WHEREAS**, on August 10, 2018 (the "**Petition Date**"), Seller and certain of its U.S. Affiliates (the "**Debtors**") sought relief under Chapter 11 of Title 11, §§ 101-1532 et al. of the United States Code (as amended, the "**Bankruptcy Code**") by filing cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, Seller is engaged in the Product Business (as defined below);

**WHEREAS**, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, certain assets and rights associated with the Product Business and the Product (as defined below), upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Purchased Assets and Assumed Liabilities (each as defined below) are assets and liabilities of Seller which are to be sold and assumed pursuant to the Approval Order (as defined below) approving such sale pursuant to section 363 of the Bankruptcy Code, free and clear of all Encumbrances (as defined below) and Liabilities (as defined below) except Assumed Liabilities and Permitted Encumbrances (as defined below), which order will include the authorization for the assumption and assignment of certain executory contracts and liabilities thereunder under section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth herein and in accordance with other applicable provisions of the Bankruptcy Code; and

**WHEREAS**, at the Closing, Seller (or certain of its Affiliates) and Buyer (or certain of its Affiliates) intend to enter into the Ancillary Agreements (as defined below).

**NOW, THEREFORE**, in consideration of the mutual benefits to be derived from this Agreement, the representations, warranties, conditions, agreements and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

**1.1    Certain Defined Terms**.  As used herein, the following terms shall have the following meanings:

**1.1.1**    [Reserved].

**1.1.2**    "**Accounts Payable**" means all amounts that, in accordance with GAAP as applied by Seller and its Affiliates on a consistent basis, constitute, as of the Closing Date,

accounts payable and other indebtedness due and owed by Seller or any of its Affiliates to any Third Party arising from sales of the Product by or on behalf of Seller or its Affiliates prior to the Closing Date.

      **1.1.3**   "**Accounts Receivable**" means all amounts that, in accordance with GAAP as applied by Seller and its Affiliates on a consistent basis, constitute, as of the Closing Date, accounts receivable, notes receivable and other indebtedness due and owed by any Third Party to Seller or any of its Affiliates arising from sales of the Product by or on behalf of Seller or its Affiliates prior to the Closing Date.

      **1.1.4**   "**Act**" means the United States Federal Food, Drug, and Cosmetic Act.

      **1.1.5**   "**Adverse Event**" means, with respect to the Product, any undesirable, untoward or noxious event or experience associated with the use, or occurring during or following the administration, of the Product in humans, occurring at any dose, whether or not expected and whether or not considered related to or caused by the Product, including such an event or experience as occurs in the course of the use of the Product in professional practice, in a clinical trial, from overdose, whether accidental or intentional, from abuse, from withdrawal or from a failure of expected pharmacological or biological therapeutic action of the Product, and including those events or experiences that are required to be reported to the FDA under 21 C.F.R. Sections 312.32, 314.80 or 600.80, as applicable, or to any foreign Governmental Authority under corresponding applicable Law outside the United States.

      **1.1.6**   "**Affiliate**" means, with respect to a Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such first Person.  For purposes of this definition, "control" and, with correlative meanings, the terms "controlled by" and "under common control with" mean (a) the possession, directly or indirectly, of the power to direct the management or policies of a business entity, whether through the ownership of voting securities, by contract relating to voting rights or corporate governance, or otherwise or (b) the ownership, directly or indirectly, of more than fifty percent (50%) of the voting securities or other ownership interest of a business entity (or, with respect to a limited partnership or other similar entity, its general partner or controlling entity).

      **1.1.7**   "**Agreement**" has the meaning set forth in the preamble hereto.

      **1.1.8**   "**Allocation**" has the meaning set forth in Section 2.3.5.

      **1.1.9**   "**Ancillary Agreements**" means the Bill of Sale, the Patent Assignment, the Domain Name Assignment, the Trademark Assignment, the TSA Amendment and any other agreements, certificates and other instruments delivered pursuant to or contemplated by this Agreement.

      **1.1.10**   "**Appointee**" has the meaning set forth in Section 9.1.4.

      **1.1.11**   "**Apportioned Obligations**" has the meaning set forth in Section 5.10.1(c).

      **1.1.12**   "**Approval Motion**" has the meaning set forth in Section 5.19.1.

2

**1.1.13**    "**Approval Order**" has the meaning set forth in <u>Section 5.19.1</u>.

**1.1.14**    "**Assumed Liabilities**" has the meaning set forth in <u>Section 2.2.1</u>.

**1.1.15**    "**Bankruptcy Code**" has the meaning set forth in the recitals.

**1.1.16**    "**Bankruptcy Court**" has the meaning set forth in the recitals.

**1.1.17**    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

**1.1.18**    [Reserved].

**1.1.19**    "**Bill of Sale**" means the Bill of Sale in substantially the form attached as <u>Exhibit A-1</u>.

**1.1.20**    "**Bulk Inventory**" means all inventory of the Product in formulated, tested and released form that is owned by Seller or any of its Affiliates.

**1.1.21**    "**Business Day**" means any day other than Saturday, Sunday or a day on which banking institutions in New York, New York are permitted or obligated by Law to remain closed.

**1.1.22**    "**Buyer**" has the meaning set forth in the preamble hereto and means Toprol Acquisition LLC and, where appropriate, including its Affiliates.

**1.1.23**    "**Buyer Confidential Information**" has the meaning set forth in <u>Section 5.4.2</u>.

**1.1.24**    "**Buyer FDA Transfer Letters**" means the letter to FDA in substantially the form attached as <u>Exhibit B-1</u>, accepting the transfer of rights to the Purchased Regulatory Approvals issued by FDA from Seller.

**1.1.25**    "**Buyer Material Adverse Effect**" means any event, fact, condition, occurrence, change or effect that prevents or materially impedes or delays the consummation by Buyer of the transactions contemplated by this Agreement or the Ancillary Agreements.

**1.1.26**    "**Buyer Permitted Purpose**" has the meaning set forth in <u>Section 5.4.3</u>.

**1.1.27**    "**Buyer Regulatory Documentation**" means, with respect to the Product, all (a) documentation and materials referred to in clause (a) or (b) of the definition of Purchased Regulatory Documentation that are created following the Closing and (b) data (including clinical and pre-clinical data) referenced in any of the documentation and materials referred to in the preceding clause (a).

**1.1.28**    [Reserved].

**1.1.29**    "**Calendar Quarter**" means the respective periods of three (3) consecutive calendar months ending on March 31, June 30, September 30 and December 31, except that the first Calendar Quarter under this Agreement shall commence on the Closing Date

3

and end on the first March 31, June 30, September 30 or December 31 to occur after the Closing Date.

**1.1.30** "**Calendar Year**" means each successive period of twelve (12) calendar months commencing on January 1 and ending on December 31, except that the first Calendar Year of this Agreement shall commence on the Closing Date and end on December 31 of the year in which the Closing Date occurs.

**1.1.31** "**Chapter 11 Cases**" has the meaning set forth in the recitals.

**1.1.32** "**Closing**" has the meaning set forth in Section 2.4.1.

**1.1.33** "**Closing Date**" means the date on which the Closing occurs.

**1.1.34** "**Combination Product**" means any pharmaceutical product containing (a) vorapaxar sulfate and (b) one or more other pharmaceutically active ingredients.

**1.1.35** "**Confidential Information**" has the meaning set forth in Section 5.4.1.

**1.1.36** "**Confidentiality Agreement**" means the Confidentiality Agreement, dated July 13, 2018, by and between Deerfield Partners, L.P., Deerfield Private Design Fund III, L.P. and Old API Wind-down Ltd. (formerly known as Aralez Pharmaceuticals Inc.).

**1.1.37** "**Confidentiality Period**" has the meaning set forth in Section 5.4.2.

**1.1.38** "**Contract**" means any contract, agreement, lease, sublease, license, sublicense or other legally binding commitment or arrangement.

**1.1.39** "**Control**" means, and, with any correlative meanings with respect to any Regulatory Approval, Purchased Intellectual Property, Licensed Intellectual Property or Purchased Regulatory Documentation, possession of the right, whether directly or indirectly, and whether by ownership, license or otherwise, to assign or grant a license, sublicense or other right to or under such Regulatory Approval, Purchased Intellectual Property, Licensed Intellectual Property or Purchased Regulatory Documentation, as provided for herein or in any Ancillary Agreement without violating the terms of any Contract or other arrangement with any Third Party.

**1.1.40** "**Copyright**" means copyrights and rights in copyrightable works, copyright registrations, or any application therefor and all extensions, restorations, reversions and renewals of any of the foregoing, in each case, in the Territory.

**1.1.41** "**Cure Costs**" shall mean the Merck Payment and the Liabilities and obligations that must be paid or otherwise satisfied to cure all of the Debtors' defaults under the Purchased Contracts necessary for the assumption thereof and assignment to Buyer pursuant to section 365 of the Bankruptcy Code, as provided herein and in the Approval Order.

**1.1.42** "**Cure Costs Cap**" has the meaning set forth in Section 5.2.2.

**1.1.43** "**Debtors**" has the meaning set forth in the recitals.

US_138272717v12

**1.1.44**    [Reserved].

**1.1.45**    [Reserved].

**1.1.46**    [Reserved].

**1.1.47**    [Reserved].

**1.1.48**    "**Disclosing Party**" has the meaning set forth in <u>Section 5.4.1</u>.

**1.1.49**    "**Disclosure Schedules**" means the disclosure schedules of Seller delivered by Seller pursuant to this Agreement.

**1.1.50**    [Reserved].

**1.1.51**    "**Domain Name Assignment**" means the Domain Name Assignment, in substantially the form attached as <u>Exhibit A-3</u>.

**1.1.52**    "**Domain Names**" means any and all internet or global computing network addresses or locations, including all generic top-level domains ("**gTLDs**") and country code top-level domains ("**ccTLDs**").

**1.1.53**    "**Encumbrance**" means any mortgage, lien (statutory or otherwise), license, pledge, security interest, charge, hypothecation, restriction, claim of ownership, conditional sales or other security arrangement, collateral assignment, preference, encroachment, right of first refusal, title defect or other encumbrance.

**1.1.54**    "**End Date**" has the meaning set forth in <u>Section 9.1.2</u>.

**1.1.55**    "**Enforceability Exceptions**" has the meaning set forth in <u>Section 3.1.2(a)</u>.

**1.1.56**    "**Excluded Assets**" means all assets, property, rights and interests of Seller and its Affiliates other than the Purchased Assets, including (a) all Intellectual Property and Intellectual Property rights of Seller and its Affiliates other than the Purchased Intellectual Property; (b) all employees, real property and tangible personal property of Seller or any of its Affiliates (but excluding the Purchased Regulatory Documentation, the Purchased Product Promotional Materials, the Purchased Product Records, and the Transferred Inventory); (c) all Accounts Receivable; (d) all Manufacturing-related assets of Seller or any of its Affiliates other than the Licensed Know-How; (e) all refunds, claims for refunds or rights to receive refunds from any Taxing Authority with respect to any and all Taxes paid or to be paid by Seller or any of its Affiliates (including any and all Taxes paid or to be paid by any of Seller's Affiliates on behalf of Seller other than refunds of Taxes allocated to Buyer pursuant to <u>Section 5.10.1</u> which refunds shall be paid to or refunded to Buyer); (f) all insurance policies and insurance Contracts insuring the Purchased Assets, together with any claim, action or other right Seller or any Affiliate of Seller may have for insurance coverage under any past or present policies and insurance Contracts insuring the Purchased Assets; (g) the original global safety database relating to the Product; (h) any rights or interests relating to the Product, the Product Business, or the Seller Business, in each

5

case to the extent used exclusively for the marketing, promotion, distribution and sale of the Product outside of the Territory as of the Closing Date, which includes all Purchased Assets (as such term is defined in the Merck Purchase Agreement) to the extent used for the marketing, promotion, distribution and sale of the Product outside of the Territory as of the Closing Date; (i) all Excluded Items; and (j) all Excluded Assets (as such term is defined in the Merck Purchase Agreement), but excluding, in each case, the Purchased Assets.

**1.1.57** "**Excluded Contracts**" means any Contract of Seller or its Affiliates that relates primarily to the Purchased Assets and is not a Purchased Contract, including those listed on Schedule 1.1.57.

**1.1.58** "**Excluded Items**" means any and all (a) books, documents, records, files and other items prepared in connection with or relating to the negotiation and consummation of the transactions contemplated by this Agreement or the Ancillary Agreements or otherwise prepared in connection with the divestiture of the Purchased Assets and the evaluation of strategic alternatives, including all (i) bids received from Third Parties and analyses relating to the Product or the Product Business, (ii) confidentiality, joint defense or similar agreements with prospective purchasers of the Product or Product Business, and (iii) strategic, financial or Tax analyses relating to the divestiture of the Purchased Assets, the Assumed Liabilities, the Product and the Product Business; (b) trade secrets not primarily related to the Product Business; (c) attorney work product, attorney-client communications and other items protected by established legal privilege, unless the books and records can be transferred without losing such privilege or such books and records relate primarily to the Product; (d) human resources and any other employee books and records; (e) financial, Tax and accounting records to the extent not primarily related to the Product; (f) subject to compliance with Section 5.2, items to the extent applicable Law prohibits their transfer or where transfer thereof would subject Seller or its Affiliates to any liability; and (g) electronic mail.

**1.1.59** "**Excluded Liabilities**" means all Liabilities of Seller or any of its Affiliates other than the Assumed Liabilities. For the avoidance of doubt, Excluded Liabilities shall include (a) (i) Liabilities relating to Taxes of Seller or any of its Affiliates for any Tax period, (ii) Taxes relating to the Purchased Assets or the Product Business attributable to periods ending on or prior to the Closing Date, *provided* that Apportioned Obligations shall be allocated between Buyer and Seller as provided in Section 5.10.1 hereof, and (iii) Taxes for which Seller or any of its Affiliates is liable by reason of being or having been part of a consolidated, combined, unitary or similar Tax group, or as a transferee or successor, or under any Contract or otherwise; (b) all Liabilities arising out of claims, including product liability or similar claims, of Third Parties in respect of the marketing, promotion or sale of the Product (whether or not defective) prior to the Closing, or the use after the Closing of any Product sold prior to the Closing, all Liabilities relating to any returns, rebates or chargebacks of any unit of Product sold prior to Closing, and all Liabilities arising out of claims of Third Parties due to or relating to any recall of any unit of Product sold prior to Closing, including all Liabilities for any credits, rebates, refunds or other amounts payable in respect of any such recalled unit of Product; (c) all Liabilities arising out of, resulting from, or relating to any Excluded Assets; (d) all accrued receipts and Accounts Payable arising out of the operation or conduct of the Product Business prior to the Closing, *provided* that nothing in this clause (d) affects any obligation hereunder to pay any Cure Costs; (e) all indebtedness of Seller and its Affiliates; (f) all Liabilities arising out of, resulting from, or relating

US_138272717v12

to any unit of Product sold prior to the Closing or the Purchased Assets to the extent arising prior to the Closing; (g) all Liabilities related to any employee or other service provider of Seller and its Affiliates; and (h) any Liabilities in respect of Cure Costs in excess of the Cure Costs Cap.

**1.1.60** "**Execution Date**" has the meaning set forth in the preamble hereto.

**1.1.61** "**Exploit**," "**Exploited**" **and** "**Exploitation**" mean to import, use, have used, sell, offer for sale, have sold, commercialize, register, hold or keep (whether for disposal or otherwise), transport, distribute, promote, market, Manufacture, have Manufactured or otherwise dispose of.

**1.1.62** "**FDA**" means the United States Food and Drug Administration and any successor agency thereto.

**1.1.63** "**Final Order**" means an order or judgment of the Bankruptcy Court entered by the clerk of the Bankruptcy Court or such other court on the docket in the Chapter 11 Cases or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the applicable Bankruptcy Court, or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure or a similar rule of such other court of competent jurisdiction; *provided* that with respect to the U.S. Bankruptcy Court, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

**1.1.64** "**Fraud**" means actual and intentional fraud by any Person with respect to the subject matter of the representations and warranties contained in this Agreement, as interpreted by New York courts applying New York Law. For the avoidance of doubt, "Fraud" does not include constructive fraud or any torts based on negligence or recklessness.

**1.1.65** "**Fundamental Reps**" means the representations and warranties set forth in <u>Section 3.1.1</u> (*Entity Status*), <u>Section 3.1.2</u> (*Authority*), <u>Section 3.1.4</u> (*No Broker*), <u>Section 3.1.6(a)</u> (*Purchased Assets*), <u>Section 3.2.1</u> (*Corporate Status*), <u>Section 3.2.2</u> (*Authority*) and <u>Section 3.2.4</u> (*No Broker*).

**1.1.66** "**GAAP**" means United States Generally Accepted Accounting Principles.

**1.1.67** "**Governmental Authority**" means any supranational, international, federal, state or local court, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, including FDA.

7

**1.1.68** "**IND**" means an Investigational New Drug Application submitted in accordance with 21 C.F.R. Part 312.

**1.1.69** [Reserved].

**1.1.70** "**Intellectual Property**" means all intellectual property rights in any jurisdiction throughout the world, including (a) patents and patent applications; (b) copyrights, moral rights (or other similar rights), copyright registrations and applications for copyright registration; (c) designs, design registrations, design registration applications; (d) names, trade names, business names, corporate names, domain names, social media accounts, website names and worldwide web addresses, common law trademarks, trademark registrations, trademark applications, unregistered trademarks, service marks, trade dress and logos, slogans, and other similar designations of source or origin; (e) rights in computer programs (whether in source code, object code, or other form), algorithms, databases, compilations and data, technology supporting the foregoing, and all documentation, including user manuals and training materials, related to any of the foregoing; and (f) trade secrets and all other confidential information, know-how, inventions and proprietary processes.

**1.1.71** "**IRS**" means the Internal Revenue Service.

**1.1.72** "**Law**" means any domestic or foreign, federal, state or local statute, law, treaty, judgment, ordinance, rule, administrative interpretation, regulation, order or other requirement having the force of law of any Governmental Authority.

**1.1.73** "**Liabilities**" means any debts, liabilities, obligations, commitments, claims or complaints, whether absolute or contingent, accrued or unaccrued, asserted or unasserted, known or unknown, fixed or contingent, determined or determinable or otherwise (including all adverse reactions, recalls, product and packaging complaints or other liabilities), whether arising under any Law, Order, Contract or otherwise, and whether or not the same would be required to be reflected in financial statements or disclosed in the notes thereto.

**1.1.74** [Reserved].

**1.1.75** "**Licensed Intellectual Property**" means the Licensed Trademarks and the Licensed Know-How.

**1.1.76** "**Licensed Know-How**" means the data, information and documents used by or on behalf of Seller or its Affiliates as of the Closing Date for the Manufacture of the Product that are not generally known and are Controlled by Seller or its Affiliates as of the Closing Date.

**1.1.77** "**Licensed Trademarks**" means the Trademarks that are Controlled by Seller and that are used by Seller or any Seller's Affiliates primarily in connection with the Product Business, and which are listed on Schedule 1.1.77.

**1.1.78** "**Litigation**" means any claim, action, arbitration, mediation, hearing, proceeding, suit (whether civil, criminal, administrative, or investigative or appellate proceeding), warning letter, or notice of violation.

8

**1.1.79** "**Manufacture**," "**Manufactured**" and "**Manufacturing**" means all activities related to the production, manufacture, processing, filling, finishing, packaging, labeling, shipping and holding of the Product or any intermediate thereof, quality assurance and quality control testing thereof prior to the distribution of the Product.

**1.1.80** "**Material Adverse Effect**" means an event, fact, condition, occurrence, change, development, circumstance or effect that, individually or in the aggregate with all other such events, facts, conditions, occurrences, changes, developments, circumstances or effects, (a) has had, or would reasonably be expected to have, a material adverse effect on the business, operations, results of operations or condition (financial or otherwise) of the Product Business, the Purchased Assets or the Assumed Liabilities or (b) that prevents or materially impedes or delays the ability of Seller to consummate the transactions contemplated by this Agreement and the Ancillary Agreements prior to the End Date; *provided*, *however*, that for the purposes of clause (a) above, none of the following, and no event, fact, condition, occurrence, change, development, circumstance or effect to the extent resulting from the following, shall be deemed (individually or in combination) to constitute, or shall be taken into account in determining whether there has been, a "Material Adverse Effect": (i) political or economic conditions or conditions affecting the capital or financial markets generally, including the worsening of any existing conditions; (ii) conditions generally affecting any industry or industry sector in which the Product Business operates or competes or in which the Product is Manufactured or Exploited, including increases in operating costs; (iii) any change in GAAP or applicable Law; (iv) any hostility, act of war, sabotage, terrorism or military actions, or any escalation of any of the foregoing; (v) any hurricane, flood, tornado, earthquake or other natural disaster or force majeure event; (vi) the public announcement, execution or delivery of this Agreement or the pendency or consummation of the transactions contemplated hereby; (vii) the failure of the Product Business to achieve any financial projections, predictions, forecasts or estimates of revenues for any period (*provided* that the underlying causes of such failure shall not be excluded unless otherwise excluded pursuant to this definition); (viii) any act required to be taken under this Agreement or the failure to take any act prohibited by this Agreement; (ix) the public announcement or pendency of this Agreement, the transactions contemplated hereby, the Chapter 11 Cases, including the impact of such announcement or pendency on the relationship of Seller with any supplier, distributor, customer, partner or similar relationship or any loss of employees resulting therefrom; and (x) any act required to be taken under this Agreement or the failure to take any act prohibited by this Agreement.

**1.1.81** "**Merck**" means MSD International GmbH (as assignee of Schering-Plough (Ireland) Unlimited Company successor to Schering-Plough (Ireland) Company).

**1.1.82** "**Merck License Agreement**" means that certain License Agreement, by and between Merck (and/or any permitted assignee) and Seller, dated as of September 6, 2016.

**1.1.83** "**Merck Payment**" means the payment to be made to Merck on the Closing Date by Buyer in the amount of $375,000.

**1.1.84** "**Merck Purchase Agreement**" means that certain Asset Purchase Agreement by and between Merck, Seller and Parent, dated September 6, 2016.

9

**1.1.85** "**Merck Supply Agreement**" means that certain Supply Agreement by and between Merck and Seller, dated September 6, 2016.

**1.1.86** "**NDA**" means a New Drug Application as defined in the Act.

**1.1.87** "**NDC**" means "National Drug Code," which is the ten-digit or eleven-digit code registered by a company with the FDA with respect to a pharmaceutical product.

**1.1.88** "**Notice**" has the meaning set forth in Section 10.2.

**1.1.89** "**Order**" means any writ, judgment, edict, decree, injunction, ruling, order or other binding obligation, pronouncement or determination of any Governmental Authority having the force of Law.

**1.1.90** "**Ordinary Course of Business**" means the operation of the Product Business by Seller and its Affiliates in the usual and customary way and consistent with their past practices from January 1, 2018 through the Petition Date.

**1.1.91** "**Parent**" means Old API Wind-down Ltd. (formerly known as Aralez Pharmaceuticals Inc.).

**1.1.92** "**Party**" or "**Parties**" has the meaning set forth in the preamble hereto.

**1.1.93** "**Patent Assignment**" means the Patent Assignment, in substantially the form attached as Exhibit A-2.

**1.1.94** "**Patent Rights**" means all patents, filed, draft and unfiled patent applications, applications for reissues, and invention disclosures, including provisional and non-provisional patent applications, design registrations, design registration applications, industrial designs, industrial design applications and industrial design registrations, and including any and all divisions, continuations, continuations in part, extensions, substitutions, renewals, registrations, revalidations, reversions, reexaminations, reissues, additions or supplementary protection certificates and the like, of or to any of the foregoing items, and all rights and priorities afforded under any applicable Law with respect thereto.

**1.1.95** "**Payee**" has the meaning set forth in Section 5.10.

**1.1.96** "**Payer**" has the meaning set forth in Section 5.10.

**1.1.97** "**Payments**" has the meaning set forth in Section 5.10.

**1.1.98** "**Permit**" means any permit, license, registration, certificate, franchise, authorization, permit, certification, variance, exemption, order or approval.

**1.1.99** "**Permitted Encumbrance**" means any (a) Encumbrance for Taxes not yet due or delinquent; (b) Encumbrance imposed by Law that does not or would not be reasonably expected to materially detract from the current value of, or materially interfere with, the present use and enjoyment of any Purchased Asset subject thereto or affected thereby in the Ordinary

Course of Business; (c) right, title or interest of a licensor or licensee under a license, including any licenses granted to Seller under the Merck License Agreement; and (d) Encumbrances disclosed on <u>Schedule 1.1.99(d)</u>.

      **1.1.100** "**Person**" means any individual, partnership, limited partnership, limited liability company, joint venture, syndicate, sole proprietorship, corporation, unincorporated association, trust, trustee, executor, administrator or other legal personal representative, or any other legal entity, including a Governmental Authority.

      **1.1.101** "**Petition Date**" has the meaning set forth in the recitals.

      **1.1.102** "**Pharmaceutical Laws**" has the meaning set forth in <u>Section 3.1.15</u>.

      **1.1.103** "**Post-Closing Tax Period**" has the meaning set forth in <u>Section 5.10.1(c)</u>.

      **1.1.104** "**Pre-Closing Period**" has the meaning set forth in <u>Section 4.2.1</u>.

      **1.1.105** "**Pre-Closing Tax Period**" has the meaning set forth in <u>Section 5.10.1(c)</u>.

      **1.1.106** "**Pre-Petition First Lien Obligations**" means all amounts outstanding under that certain Second Amended and Restated Facility Agreement, dated as of December 7, 2015, by and among Deerfield Private Design Fund III, L.P., Deerfield Partners, L.P., Pozen Inc., Parent and Aralez Pharmaceuticals Canada Inc. (as the same has been and may be amended, modified, restated or otherwise supplemented from time to time) immediately prior to the commencement of the Chapter 11 Cases, to the extent allowed and secured as provided by a Final Order of the Bankruptcy Court.

      **1.1.107** "**Product**" means the pharmaceutical product containing vorapaxar sulfate as the active pharmaceutical ingredient described in NDA #204886.

      **1.1.108** "**Product Business**" means the Exploitation of the Product in the Territory, but excluding the research, development, registration, storage, use, transport, import and export of the Product in the Territory in support of the Exploitation of the Product outside of the Territory.

      **1.1.109** [Reserved].

      **1.1.110** "**Purchase Price**" has the meaning set forth in Section 2.3.1(b).

      **1.1.111** "**Purchased Assets**" has the meaning set forth in <u>Section 2.1.1</u>.

      **1.1.112** "**Purchased Contracts**" has the meaning set forth on <u>Section 2.1.1(a)</u>.

      **1.1.113** "**Purchased Copyrights**" means the Copyrights in the Territory that are Controlled by Seller and that are used by Seller or any of Seller's Affiliates primarily in connection with the Product Business to the extent included in any Purchased Product Promotional Materials.

US_138272717v12

**1.1.114** "**Purchased Domain Names**" means the Domain Names listed in Schedule 1.1.114.

**1.1.115** "**Purchased Intellectual Property**" means the Purchased Patents, Purchased Trademarks, Purchased Copyrights and Purchased Domain Names.

**1.1.116** "**Purchased Patents**" means the Patent Rights that are Controlled by Seller which are listed on Schedule 1.1.116.

**1.1.117** "**Purchased Product Promotional Materials**" means, to the extent in the possession of Seller or any of its Affiliates, "advertisements," as set forth by the FDA in 21 C.F.R. Section 202.1(k)(1) and "labeling," as set forth in 21 U.S.C. Section 321(m) and by the FDA in 21 C.F.R. Section 202.1(k)(2), promotional and media materials (including an electronic copy of all such promotional materials), website content found through the Purchased Domain Names (to the extent otherwise constituting Purchased Assets), sales training materials, medical response information and standard response letters, if any, existing customer and wholesaler lists, co-pay cards, other marketing data and materials, trade show materials (including displays), sample kits and detail kits, and videos, including materials containing clinical data, if any, in each case, (a) to the extent used primarily for the marketing, promotion, distribution and sale of the Product in the Territory as of the Closing Date and (b) excluding (i) all other Intellectual Property rights of Seller, its Affiliates, or their respective licensors depicted or contained therein and (ii) the Excluded Items, in each case, in the form currently maintained by Seller (e.g., electronic).  For clarity, other than Samples, Purchased Product Promotional Materials are comprised solely of the Purchased Copyrights transferred hereunder and the Licensed Trademarks licensed under the Merck License Agreement.

**1.1.118** "**Purchased Product Records**" means all books and records (including records of call center activity) relating primarily to the Product Business (other than the Purchased Regulatory Documentation and Purchased Product Promotional Materials) to the extent (a) actually used by Seller or any of its Affiliates in the Exploitation of the Product in the Territory or (b) owned, maintained and in the possession or Control of Seller or any of its Affiliates and reasonably necessary or used to Exploit the Product in the Territory as Exploited by or on behalf of Seller or any of its Affiliates as of the Closing Date, but excluding, in all cases, the Excluded Items and all other Intellectual Property rights of Seller, its Affiliates, or their respective licensors depicted or contained therein.

**1.1.119** "**Purchased Regulatory Approvals**" means the Regulatory Approvals listed on Schedule 1.1.119, in each case, in the form currently maintained by Seller (e.g., electronic).

**1.1.120** "**Purchased Regulatory Documentation**" means, with respect to the Product, all (a) documentation comprising the Purchased Regulatory Approvals and associated Regulatory Submissions, (b) correspondence and reports primarily related to the Product in the Territory and necessary to, or otherwise limiting the ability to, commercially distribute, sell or market the Product in the Territory as of the Closing Date submitted to or received from Governmental Authorities (including minutes and official contact reports relating to any communications with any Governmental Authority) and, to the extent related primarily to the

12

Territory, relevant supporting documents with respect thereto, including all regulatory drug lists, materials submitted to the FDA under FDA Form 2253, final versions of advertising and promotion materials, and adverse drug experience reports (periodic and expedited) and Adverse Events files, and (c) data (including commercial, clinical and pre-clinical data) referenced in any of the foregoing that relates primarily to the Product in the Territory, in each case ((a) and (b)), to the extent in the possession or Control of Seller or any of its Affiliates, but excluding, in all cases, the Excluded Items, and in each case, in the form currently maintained by Seller (e.g., electronic).

**1.1.121** "**Purchased Trademarks**" means the Trademarks in the Territory that are Controlled by Seller which are listed in Schedule 1.1.121.

**1.1.122** "**Receiving Party**" has the meaning set forth in Section 5.4.1.

**1.1.123** "**Regulatory Approval**" means, with respect to the Product, any and all approvals (including NDAs and supplements and amendments thereto and INDs), licenses, registrations (except manufacturing establishment registrations) or authorizations of any Governmental Authority necessary to commercially distribute, sell or market the Product in the Territory, including, where applicable in the Territory, post-approval marketing authorizations and labeling approvals.

**1.1.124** "**Regulatory Submissions**" means NDAs, including all amendments and supplements, and any other submissions made to the FDA to support the issuance of a Regulatory Approval.

**1.1.125** "**Representatives**" means a Party's officers, directors, employees, agents, attorneys, consultants, advisors, financing sources and other representatives.

**1.1.126** "**Retained Financial Records**" has the meaning set forth in Section 5.5.

**1.1.127** "**Samples**" means units of Product to be provided to licensed health care professionals in the Territory, free of charge, for dispensing, in turn, to patients for the purpose of promoting the sale of Product in accordance with applicable Laws, excluding those Samples stored at QPharma, Inc.

**1.1.128** "**Seller**" has the meaning set forth in the preamble hereto.

**1.1.129** "**Seller Business**" means the Exploitation of the Product (or any pharmaceutical product containing the same active ingredient as the Product) outside of the Territory and the Manufacture of the Product worldwide.

**1.1.130** "**Seller Confidential Information**" has the meaning set forth in Section 5.4.3.

**1.1.131** "**Seller FDA Transfer Letters**" means the letter to the FDA in the form attached as Exhibit C-1, transferring the rights to the Purchased Regulatory Approvals issued by the FDA to Buyer.

13

1.1.132 "**Seller Permitted Purpose**" has the meaning set forth in <u>Section 5.4.2</u>.

1.1.133 "**Seller's Knowledge**" means the actual knowledge, after reasonable inquiry, of those individuals listed on <u>Schedule 1.1.133</u>.

1.1.134 "**SK BioTek**" means SK BioTek Ireland Limited.

1.1.135 "**SKU**" means stock keeping unit.

1.1.136 [Reserved].

1.1.137 "**Subject Products**" means, collectively, (a) the Product, (b) any Combination Products and (c) any line extensions, synthetic versions, other administration forms, presentations, dosages, formulations, improvements or next generation products for or of any Product or Combination Product, whether prescription or over-the-counter.

1.1.138 "**Superior Proposal**" means a bona fide written offer to purchase, directly or indirectly, all or substantially all of the Purchased Assets which Seller determines in good faith, after consultation with its outside legal counsel and financial advisors, is on terms and conditions more favorable to the bankruptcy estate of Seller than those contemplated by this Agreement, taking into account all material financial, regulatory, legal and other aspects of such proposal, including any cash component thereof, any financing thereof, any conditions thereto and the likelihood and timing of consummation and any other aspects of such proposal as Seller and its Affiliates deem relevant.

1.1.139 "**Tax Return**" means any return, declaration, report, claim for refund, information return or statement relating to Taxes, including any schedule or attachment thereto, filed or maintained, or required to be filed or maintained, in connection with the calculation, determination, assessment or collection of any Tax and includes any amended returns required as a result of examination adjustments made by the IRS or other Taxing Authority.

1.1.140 "**Taxes**" means all taxes of any kind, and all charges, fees, customs, levies, duties, imposts, required deposits or other assessments, including all federal, state, local or foreign net income, capital gains, gross income, gross receipt, property, franchise, sales, use, value added, excise, withholding, payroll, employment, social security, workers compensation, unemployment, occupation, capital stock, transfer, gains, windfall profits, net worth, asset, transaction and other taxes, and any interest, penalties or additions to tax with respect thereto, imposed upon any Person by any Taxing Authority or other Governmental Authority under applicable Law.

1.1.141 "**Taxing Authority**" means any Governmental Authority or any quasi-governmental body exercising tax regulatory authority.

1.1.142 "**Tech Transfer**" has the meaning set forth in <u>Section 5.25</u>.

1.1.143 "**Territory**" means the United States of America and Canada, including its territories and possessions.

14

**1.1.144** "**Third Party**" means any Person other than Seller, Buyer and their respective Affiliates and permitted successors and assigns.

**1.1.145** "**Trademark**" means any word, name, symbol, color, product shape, designation or device or any combination thereof that functions as a source identifier, including any trademark, trade dress, brand mark, service mark, trade name, brand name, product configuration, logo or business symbol, whether or not registered.

**1.1.146** "**Trademark Assignment**" means the Trademark Assignment, in substantially the form attached as <u>Exhibit A-4</u>.

**1.1.147** "**Transfer Taxes**" has the meaning set forth in <u>Section 5.10.2(a)</u>.

**1.1.148** "**Transferred Inventory**" means, as of the date hereof, all Bulk Inventory and all inventory listed on <u>Schedule 3.1.14</u>.

**1.1.149** "**TSA Amendment**" means the Amendment to the Transitional Services Agreement, by and between Seller and New American Therapeutics, Inc. to be entered into on the Closing Date.

**1.2**    **Construction**.  Except where the context otherwise requires, wherever used, the singular includes the plural, the plural the singular, the use of any gender shall be applicable to all genders and the word "or" is used in the inclusive sense (and/or).  The captions and headings of this Agreement are for convenience of reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision contained in this Agreement.  The terms "include," "includes" and "including" mean "include, without limitation," "includes, without limitation," and "including, without limitation" and do not limit the generality of any description preceding such term.  The language of this Agreement shall be deemed to be the language mutually chosen by the Parties and no rule of strict construction shall be applied against either Party.  Unless otherwise specified or where the context otherwise requires, (a) references in this Agreement to any Article, Section, Schedule or Exhibit are references to such Article, Section, Schedule or Exhibit of this Agreement; (b) references in any Section to any clause are references to such clause of such Section; (c) "hereof," "hereto," "hereby," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (d) references to a Person are also to its permitted successors and assigns; (e) references to a Law include any amendment or modification to such Law and any rules, regulations or legally binding guidelines issued thereunder, in each case, as in effect at the relevant time of reference thereto; (f) references to any agreement, instrument or other document in this Agreement refer to such agreement, instrument or other document as originally executed or, if subsequently amended, replaced or supplemented from time to time, as so amended, replaced or supplemented and in effect at the relevant time of reference thereto; (g) "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if"; and (h) references to monetary amounts are denominated in United States Dollars.  The Parties have participated jointly in the negotiation and drafting of this Agreement and in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no

15

presumption or burden of proof shall arise favoring or disfavoring any Party (or any Affiliate thereof) by virtue of the authorship of any of the provisions of this Agreement.

## ARTICLE 2
## SALE AND PURCHASE OF ASSETS; LIABILITIES

**2.1    Sale of Purchased Assets**.

**2.1.1**    Purchase and Sale of Purchased Assets.  Upon the terms and subject to the conditions of this Agreement and the Ancillary Agreements, including the method and timing of delivery applicable to tangible Purchased Assets as set forth in Section 2.3.6 at and effective as of the Closing, Seller shall (or shall cause its applicable Affiliates to) sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase and accept from Seller (or such Affiliates), all rights and interests of Seller or its Affiliates in and to the following (collectively, the "**Purchased Assets**"), in each case free and clear of any and all liens, claims and Encumbrances (other than Permitted Encumbrances):

(a)    all rights and interests of Seller or its Affiliates under the Contracts set forth on Schedule 2.1.1(a), as such Schedule may be updated by mutual agreement of Seller and Buyer not less than five Business Days prior to the entry of the Approval Order to include rights and interests under any written Contracts relating to the Product Business entered into by Seller or its Affiliates after the Execution Date in accordance with Section 4.1, excluding the Excluded Assets (the "**Purchased Contracts**");

(b)    the Purchased Regulatory Approvals;

(c)    the Purchased Regulatory Documentation;

(d)    the Purchased Product Promotional Materials;

(e)    the Purchased Intellectual Property;

(f)    the Purchased Product Records;

(g)    the Transferred Inventory; provided, however, that, on or before the 45th day following the Closing, Buyer shall identify any Bulk Inventory that has an expiration date of 12 months or less from the Closing, which inventory shall be disposed of by Seller at Seller's or its Affiliates' sole cost and expense; and

(h)    any other assets, properties, rights and interests of Seller and its Affiliates that primarily relate to and are used in the Product Business (other than any Excluded Assets).

**2.1.2**    Excluded Assets.  Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreement, (a) Buyer shall not acquire the Excluded Assets pursuant to this Agreement or any Ancillary Agreement, (b) the Purchased Assets shall not include the Excluded Assets, and (c) Seller and its Affiliates shall retain the Excluded Assets following the Closing Date.

2.1.3    Reserved.

**2.2    Liabilities**.

2.2.1    Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall assign to Buyer and Buyer shall assume from Seller or its Affiliates and agree to pay and discharge when due the following Liabilities (collectively, but excluding the Excluded Liabilities, the "**Assumed Liabilities**"):

(a)    all Liabilities under or relating to the Purchased Assets or the Product Business, in each case only to the extent arising on or after the Closing Date, and expressly excluding Liabilities resulting from Seller's operation of the Product Business prior to the Closing;

(b)    all Liabilities under or relating to the Subject Products arising on or after the Closing Date, including all product liability, warranty or guaranty obligations with respect thereto, and further including only those rebate obligations under the Purchased Contracts arising from and after the Closing Date – it being understood, and for the avoidance of doubt, that any rebate obligations under the Purchased Contracts arising before the Closing Date are not Assumed Liabilities – and expressly excluding Liabilities resulting from Seller's Manufacturing or sale of the Subject Products prior to the Closing; provided, that, for the avoidance of doubt, (1) a Liability resulting from sale of a Subject Product after the Closing Date shall be an Assumed Liability even if the Subject Product was Manufactured prior to Closing, and (2) a Liability resulting from the Manufacturing of the Subject Product before the Closing Date shall not be Assumed Liability even if the Subject Product was sold after the Closing Date;

(c)    all Liabilities related to the Tech Transfer set forth on Schedule 5.25; and

(d)    all Cure Costs up to the Cure Costs Cap.

2.2.2    Excluded Liabilities.  Notwithstanding anything to the contrary in this Agreement or any Ancillary Agreement, Buyer shall not assume any Liabilities of Seller or any of its Affiliates other than the Assumed Liabilities, and the Excluded Liabilities shall remain the sole obligation and responsibility of Seller and its Affiliates.

**2.3    Consideration**.

2.3.1    Purchase Price.  Upon the terms and subject to the conditions of this Agreement, in consideration of the conveyances contemplated under Section 2.1, at the Closing, Buyer shall:

(a)    assume the Assumed Liabilities; and

(b)    cause and/or provide a credit bid in an aggregate amount equal to $3,000,000 (the "**Purchase Price**") with such credit bid allocated against the Purchase Price as a dollar-for-dollar credit on account of the Pre-Petition First Lien Obligations.  For the avoidance of doubt, other than in respect of Cure Costs (including the Merck Payment), there shall be no cash consideration paid by Buyer.

17

2.3.2    Reserved.

2.3.3    Reserved.

2.3.4    Reserved.

2.3.5    Allocation of Consideration.  Buyer shall allocate the Purchase Price (and the Assumed Liabilities, to the extent properly taken into account under applicable Tax Laws) among the Purchased Assets in accordance with applicable Tax Laws (the "**Allocation**") prior to or within 90 days following the Closing and shall deliver to Seller a copy of such Allocation promptly after such determination.  Seller shall have the right to review and raise any reasonable objections in writing to the Allocation during the 10-day period after its receipt thereof.  If Seller disagrees with respect to any item in the Allocation, the Parties shall negotiate in good faith to attempt to resolve the dispute.  The Parties agree to execute and file all of their own Tax Returns and prepare all of their own financial statements and other instruments on the basis of the Allocation.  If the Allocation is disputed by any Governmental Authority, the Party receiving notice of such dispute will promptly notify the other Party and the Parties will use their best efforts to sustain the Allocation.

2.3.6    Transferred Inventory.  Within 3 days following the Closing, Seller shall (or shall cause its applicable Affiliates to) transfer, convey and assign the Transferred Inventory to Buyer, and Buyer shall accept from Seller (or such Affiliates), the Transferred Inventory pursuant to Schedule 2.4.2(a)(iii).  For the avoidance of doubt, possession of and all right, title and interest in the Transferred Inventory shall pass from Seller to Buyer at Closing.

2.4    **Closing**.

2.4.1    Closing.  Pursuant to the terms and subject to the conditions of this Agreement, the closing of the transactions contemplated hereby (the "**Closing**") shall take place at the New York office of Willkie Farr & Gallagher LLP, at 10:00 a.m. prevailing New York time, on a Business Day not later than three Business Days following satisfaction of all conditions (other than those that by their terms are to be satisfied or taken at the Closing) set forth in Article 7 (or, to the extent permitted by applicable Law, waived by the Party entitled to the benefits thereof), or such other time and place as Buyer and Seller may agree to in writing.  The Closing shall be deemed to have occurred at 12:01 a.m., Eastern Time, on the Closing Date, such that Buyer shall be deemed the owner of the Purchased Assets on and after the Closing Date.

2.4.2    Closing Deliveries.

(a)    Except as otherwise indicated below, at the Closing, Seller shall deliver the following to Buyer:

(i)    each of the Ancillary Agreements to which Seller or any of its Affiliates is a party, validly executed by a duly authorized officer of Seller or its applicable Affiliate;

18

(ii) a receipt acknowledging receipt of the Purchase Price in satisfaction of Buyer's obligations pursuant to Section 2.3.1(a), validly executed by a duly authorized representative of Seller;

(iii) the tangible Purchased Assets; *provided* that (A) delivery shall, unless the Parties otherwise mutually agree, be to the locations and on the time frames set forth on Schedule 2.4.2(a)(iii), and (B) Seller may retain copies of the Purchased Regulatory Documentation and the Purchased Product Records included within the Purchased Assets and the Purchased Contracts (and, for the avoidance of doubt, prior to delivering or making available any files, documents, instruments, papers, books and records containing Purchased Product Records or constituting Purchased Regulatory Documentation to Buyer, Seller shall be entitled to redact from such files, documents, instruments, papers, books and records any information to the extent that it does not relate to the Product Business);

(iv) the Seller FDA Transfer Letter;

(v) a schedule listing each Purchased Contract and the Cure Cost associated with such Purchased Contract;

(vi) a true and complete copy of the Approval Order;

(vii)    a certificate, dated as of the Closing Date, validly executed by a duly authorized officer of Seller, certifying that all of the conditions set forth in Section 7.2.1, Section 7.2.2 and Section 7.2.3 have been satisfied;

(viii) the Bill of Sale, duly executed by Seller;

(ix)   the Patent Assignment, duly executed by Seller;

(x) the Domain Name Assignment, duly executed by Parent, who is the registrant of the Purchased Domain Names prior to the conveyance thereof contemplated in this Agreement and the Domain Name Assignment, and Seller;

(xi)   the Trademark Assignment, duly executed by Seller; and

(xii)  the TSA Amendment, duly expected by Seller

(b)    At the Closing, Buyer shall deliver the following to Seller:

(i)   each of the Ancillary Agreements to which Buyer or any of its Affiliates is a party, validly executed by a duly authorized officer of Buyer or its applicable Affiliate;

(ii)    the Buyer FDA Transfer Letter;

(iii)    the Bill of Sale, duly executed by Buyer;

(iv)    the Patent Assignment, duly executed by Buyer;

19

(v)      the Domain Name Assignment, duly executed by Buyer;

(vi)      the Trademark Assignment, duly executed by Buyer;

(vii)      the TSA Amendment, duly executed by Buyer; and

(viii)      evidence reasonably satisfactory to Seller of Buyer's payment of any Cure Costs up to the Cure Costs Cap.

**2.5      Reserved**.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

**3.1      Representations and Warranties of Seller**.   Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows, with each such representation and warranty subject to such exceptions, if any, as are set forth in the corresponding section of the Disclosure Schedules.   Disclosures in any section or paragraph of the Disclosure Schedules shall be deemed disclosure with respect to any other sections or paragraphs of this Agreement to the extent that it is reasonably apparent from a reading of such disclosure that such disclosure is applicable to such other sections or paragraphs.

**3.1.1**      <u>Entity Status</u>.   Seller is a designated activities company duly organized and validly existing under the Laws of Ireland.   Seller and its applicable Affiliates are duly qualified to do business and in good standing (to the extent such concept is recognized by the applicable jurisdiction) in each jurisdiction in which the ownership of the Purchased Assets or operation of the Product Business so requires, except to the extent the failure to be so qualified to do business or be in good standing would not reasonably be expected to constitute a Material Adverse Effect.

**3.1.2**      <u>Authority</u>.

(a)      Seller has the requisite corporate power and authority to (i) own, use and operate the Purchased Assets and to carry on the Product Business as now being conducted and (ii) enter into this Agreement and the Ancillary Agreements to which it is a party, and, subject to the entry of the Approval Order, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.   The execution and delivery of this Agreement and the Ancillary Agreements to which Seller is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate actions of Seller.   This Agreement (assuming the due authorization, execution and delivery hereof by Buyer) constitutes, and each Ancillary Agreement to which it will be a party, when executed and delivered by Seller (assuming the due authorization, execution and delivery thereof by each other Person thereto) and subject to the entry of the Approval Order, will constitute, the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or similar Laws of general application affecting or relating to the enforcement of creditors' rights generally, and subject to equitable principles of general applicability, whether considered in a proceeding at law or in equity (the "**Enforceability Exceptions**").

20

(b)    Each Affiliate of Seller that will enter into an Ancillary Agreement has the requisite entity power and authority to perform its obligations under each Ancillary Agreement to which it will be a party and to consummate the transactions contemplated thereby. The execution and delivery of the Ancillary Agreements to which any Affiliate of Seller will be a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary organizational actions of such Affiliate.  Each Ancillary Agreement, when executed and delivered by an Affiliate of Seller that will be a party thereto (assuming the due authorization, execution and delivery thereof by each other party thereto), will constitute the valid and legally binding obligation of such Affiliate, enforceable against such Affiliate in accordance with its terms, subject to entry of the Approval Order and the Enforceability Exceptions.

**3.1.3**    <u>Non-Contravention</u>.  The execution, delivery and performance by Seller of this Agreement and of each Ancillary Agreement to which it is or will be a party and the execution, delivery and performance by each Affiliate of Seller of each Ancillary Agreement to which such Affiliate is or will be a party do not and will not (a) violate the constitution, certificate of incorporation, certificate of formation, bylaws, operating agreement or comparable organizational documents of Seller or such Affiliate, as applicable, (b) violate any Law applicable to Seller or such Affiliate, as applicable, the Product Business or the Purchased Assets, (c) subject to obtaining the consents, Permits and authorization, giving the notices and making the filings referred to herein, (i) violate, breach or constitute a default under or result in the termination or cancellation or acceleration of any right or obligation of Seller or any Affiliate thereof under; require any other notice, consent or waiver under; or result in a loss of any material benefit under, any Contract or Permit to which Seller or such Affiliate is a party or to which any of the Purchased Assets or the Licensed Intellectual Property are subject, and which, in each case, is necessary for the conduct of the Product Business, or (ii) (A) violate any Order to which Seller or any of its Affiliates is subject relating to the Product Business, or (B) require on the part of Seller or any of its Affiliates any filing with, or any authorization, consent or approval of, any Governmental Authority, or (d) result in any Encumbrance (other than a Permitted Encumbrance) on any Purchased Assets, except, in the case of (b) or (c), for such violations, breaches, defaults or terminations that would not reasonably be expected to be material to the Product Business or the Purchased Assets.  Notwithstanding the foregoing, Buyer acknowledges and agrees that the foregoing and the entirety of the transaction described in the Agreement is subject to entry of the Approval Order by the Bankruptcy Court.

**3.1.4**    <u>No Broker</u>.  There is no broker, finder, financial advisor or other Person acting or who has acted on behalf of Seller or any of its Affiliates that is entitled to receive any brokerage or finder's or financial advisory fee from Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement or any Ancillary Agreement.

**3.1.5**    <u>No Litigation; Consents</u>.

(a)    (i) As of the Execution Date, there is no Litigation pending or, to Seller's Knowledge, threatened against Seller or any of its Affiliates before any Governmental Authority in respect of the Product Business or the Purchased Assets or the transactions contemplated by this Agreement and the Ancillary Agreements, and (ii) there is no Order to which Seller or any of its Affiliates is subject in respect of the Product Business or the Purchased Assets or the transactions contemplated by this Agreement and the Ancillary Agreements, except, in each

21

case ((i) and (ii) immediately above), for such Litigation and Orders that would not reasonably be expected to be material to the Product Business or the Purchased Assets.

(b)    Except for (i) entry of the Approval Order and, as applicable, the expiration or waiver of the Bankruptcy Court of the applicable 14-day period set forth in Rule 6004(h) of the Bankruptcy Code, (ii) notice to counterparties to Purchased Contracts being assumed and assigned, (iii) Merck's consent regarding assignment of the Merck License Agreement, (iv) consents, Permits or authorizations that if not received, or declarations, filings or registrations that if not made, would not materially and adversely impact the Product Business or the Purchased Assets, (v) consents, permits, authorizations, declarations, filings or registrations that have become applicable solely as a result of the specific regulatory status of Buyer or its Affiliates and (vi) items disclosed in Schedule 3.1.5(b), no notice to, filing with, permit of, authorization of, exemption by, or consent of, any Governmental Authority or other Person is required for Seller or any of its Affiliates to consummate the transactions contemplated hereby or by the Ancillary Agreements.

**3.1.6**    Purchased Assets.

(a)    Seller has, or its Affiliates have, good title to, or valid contract rights in, as applicable, the Purchased Assets free and clear of any and all liens, claims and/or Encumbrances other than Permitted Encumbrances.

(b)    Subject to the Approval Order and other than (i) Accounts Receivable, cash and other working capital items, (ii) employees engaged in the Product Business (and assets related to such employees), (iii) Tax attributes and goodwill associated with the Product Business, (iv) information technology and other corporate assets and rights, (v) entity-specific licenses, (vi) managed care, distribution and other commercial contracts, (vii) Parent or any of its subsidiaries' Intellectual Property, and (viii) other assets that are immaterial to the conduct of the Product Business, the Purchased Assets constitute the entire right, title and interest owned by Seller or any of its Affiliates in assets relating primarily to the Product or the Product Business as currently conducted.  Other than as set out in Schedule 3.1.6, the Purchased Assets constitute all assets necessary and sufficient for the conduct of the Product Business in all material respects as has been conducted by Seller and its Affiliates since January 1, 2018 and as presently conducted by Seller and its Affiliates, other than (A) Accounts Receivable, cash and other working capital items, (B) employees engaged in the Product Business (and assets related to such employees), (C) Tax attributes and goodwill associated with the Product Business, (D) information technology and other corporate assets and rights, (E) entity-specific licenses, (F) managed care, distribution and other commercial contracts and (G) Parent or any of its subsidiaries' Intellectual Property.

**3.1.7**    Financial Information.

(a)    Schedule 3.1.7 sets forth (i) a statement of assets and liabilities attributable to the Product as of March 31, 2019 and (ii) a statement of income attributable to the Product by gross margin, for (x) the years ended December 31, 2018 and 2017 and (y) for the three (3) months ended March 31, 2019.

US_138272717v12

(b)    Seller has implemented and maintains a system of internal controls that is designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of its consolidated financial statements for external purposes.

(c)    Other than as set forth on Schedule 3.1.7, Seller has no Liabilities with respect to the Product Business except (i) those which are adequately reflected or reserved against in the statement of assets and liabilities set forth on Schedule 3.1.7 and (ii) those which have been incurred in the Ordinary Course of Business since March 31, 2019 and which are not, individually or in the aggregate, material in amount.

**3.1.8**    Contracts.  Each of the Purchased Contracts is in full force and effect and constitutes a legal, valid and binding agreement of Seller or an Affiliate of Seller and, to Seller's Knowledge, each other party thereto, enforceable in accordance with its terms, subject to the Enforceability Exceptions.  Other than any breach or default arising from the filing of the Chapter 11 Cases, Seller is not and, to Seller's Knowledge, no other party thereto is, in material breach or material default in the performance, observance or fulfillment of any obligation or covenant contained in any Purchased Contract.  As of the Execution Date, Seller has not provided to or received from any other party to a Purchased Contract written notice of any such alleged default. As of the Execution Date, Seller has not given any written notice to a Third Party that is a party to any Purchased Contract that it intends to terminate such Purchased Contract and has not received any written notice from any such Third Party stating that such Third Party intends to terminate or materially reduce its business with Seller under any Purchased Contract.  True, correct and complete copies of all Purchased Contracts have been made available to Buyer.

**3.1.9**    Compliance with Law. Seller and its Affiliates, with respect to the operation of the Product Business, are, and since January 1, 2017 have been, in material compliance with all Laws applicable to the Product Business and the Purchased Assets, including (a) any applicable Laws governing the development, testing, approval, Manufacture, sale, marketing, promotion, import, export or distribution of drugs and the purchase or prescription of or reimbursement for drugs by any Governmental Authority, private health plan or other Person, and (b) the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7(b)), the False Claims Act (42 U.S.C. § 3729 et seq.), the U.S. Foreign Corrupt Practices Act of 1977 (15 U.S.C. § 78 et seq.), the UK Bribery Act 2010, any other applicable anticorruption or anti-bribery Laws applicable to Seller or its Affiliates with respect to the operation of the Product Business, the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq., 42 U.S.C. § 300jj et seq.; 42 U.S.C. § 17901 et seq.), to the extent applicable, and any comparable foreign, state or local Laws. Since January 1, 2017, neither Seller nor any of its Affiliates has received any written warning letter, notice of adverse finding, or notice of deficiency, or similar communication of any alleged violation of any Law with respect to, the Product Business, the Manufacture of the Product or the Purchased Assets or the Assumed Liabilities.

**3.1.10**    Environmental Matters.  Seller and its Affiliates have conducted the Product Business in material compliance with all applicable environmental Laws. The operations conducted by Seller and its Affiliates are currently being conducted under all environmental, health and safety Permits and other authorizations required under all applicable environmental Laws to operate the Product Business as it is currently being operated, except for such Permits the failure of which to obtain has not had, and would not reasonably be expected to have, a

23

Material Adverse Effect. All such Permits are in full force and effect. No material penalty has been assessed and no investigation or review is pending or, to Seller's Knowledge, threatened by any Governmental Authority with respect to any alleged failure by Seller or any of its Affiliates to comply with any applicable environmental Law or to have any material environmental, health or safety Permit required under any applicable environmental Law in connection with the operation of the Product Business. To Seller's Knowledge, there are no past or present facts, circumstances or conditions, including the release of any hazardous materials, that could reasonably be expected to result in a material claim under applicable environmental Laws against Seller or any of its Affiliates or the Product Business. Seller has made available to Buyer prior to the execution of this Agreement all material environmental audits, assessments and documentation regarding environmental matters pertaining to, or the environmental condition of, the Product Business or the Purchased Assets or the compliance (or non- compliance) by Seller and its Affiliates with any applicable environmental Laws with respect to the Product Business and the Purchased Assets, to the extent such audits, assessments and documentation are in Seller's or any of its Affiliates' possession or are reasonably accessible to Seller or any of its Affiliates.

**3.1.11**    Reserved.

**3.1.12**    Intellectual Property.

(a)    As of the Execution Date, to Seller's Knowledge, no Litigation is currently pending and Seller has not since August 1, 2018, received any written notice by any Third Party alleging that (i) the Product, or the conduct of the Product Business, as currently conducted, infringes (or in the past infringed) any intellectual property rights of such Third Party or (ii) any of the Licensed Trademarks is invalid or unenforceable (but excluding any non-final office actions issued by any Governmental Authority).

(b)    To Seller's Knowledge, neither the operation of the Product Business as currently conducted, nor the Exploitation of the Product, in each case, as currently Exploited in the Territory, infringes or misappropriates any Intellectual Property rights of any Person. Nothwithstanding anything to the contrary in this Agreement, this Section 3.1.12(b) and Section 3.1.12(f) constitutes the sole representation and warranty of Seller under this Agreement with respect to any actual or alleged infringement, misappropriation or other violation of any Intellectual Property.

(c)    Schedule 3.1.12(c) sets forth a correct and complete list of all registered Purchased Intellectual Property and registered Licensed Intellectual Property indicating, for each such item of Purchased Intellectual Property and Licensed Intellectual Property, the owner, registration, patent or application number (as applicable) and the applicable filing jurisdiction. Except as set forth in Schedule 3.1.12(c), Seller is the owner of record of all Purchased Intellectual Property. All Purchased Intellectual Property is, to Seller's Knowledge, subsisting, valid and enforceable.

(d)    Except as set forth in Schedule 3.1.12(d), at Closing Seller will own, directly and exclusively, all right, title and interest in and to, free and clear of all Encumbrances

24

(other than Permitted Encumbrances), or will have a valid and exclusive right to use, the Purchased Intellectual Property and the Licensed Intellectual Property.

(e)    Seller has taken reasonable commercial measures in accordance with industry practice to maintain the secrecy of any of the Intellectual Property that it considers to be trade secrets or confidential information.

(f)    To Seller's Knowledge, no Person is infringing upon or otherwise violating any of the Licensed Trademarks.

(g)    Seller is not a party to any Contract or subject to any Order that in any way limits or restricts any of the Purchased Intellectual Property or Licensed Intellectual Property other than non-exclusive and implied licenses entered into in the Ordinary Course of Business with customers, suppliers and distributors.  To Seller's Knowledge, the consummation of the transactions contemplated by this Agreement will not materially impair any rights in or to any Purchased Intellectual Property or Licensed Intellectual Property, or grant to any Person any rights in or to any Purchased Intellectual Property or Licensed Intellectual Property other than Buyer.  To Seller's Knowledge, all of the Purchased Intellectual Property and Licensed Intellectual Property owned by Seller is fully transferable, alienable and licensable without any material payment to any Person and without any material restriction, other than (i) potential Cure Costs set forth on Schedule 2.1.1(a) and the Merck Payment, and (ii) licenses granted by Seller in the Ordinary Course of Business, including the Purchased Contracts.

### 3.1.13   Tax Matters.

(a)    Seller and its Affiliates have timely paid all Taxes which will have been required to be paid by them, the non-payment of which would result in an Encumbrance on any Purchased Asset, would otherwise adversely affect the Product Business or would result in Buyer becoming liable or responsible therefor;

(b)    Seller and its Affiliates have withheld or collected (or caused to be withheld or collected) all Taxes relating to the Purchased Assets required to be withheld or collected, the non-withholding of which would result in an Encumbrance on any Purchased Asset or would otherwise adversely affect the Product Business or would result in Buyer becoming liable or responsible therefor;

(c)    As of the Execution Date, none of Seller or its Affiliates has received notice of any claimed or proposed assessment, deficiency or other adjustment for Taxes against Seller or any of its Affiliates which, if not satisfied or resolved, would result in an Encumbrance on the Purchased Assets that would survive the Closing Date or in Liability  of Buyer or its Affiliates as a transferee of or successor to the Purchased Assets;

(d)    Seller has established, in accordance with generally accepted accounting principles applied on a basis consistent with that of preceding periods, adequate reserves for the payment of, and will timely pay, all Taxes which arise from or with respect to the Purchased Assets or the operation of the Product Business and are incurred or attributable to the Pre-Closing Tax Period, the non-payment of which would result in an Encumbrance on any

25

Purchased Asset, would otherwise adversely affect the Product Business or would result in Buyer becoming liable therefor;

(e)    There are no Encumbrances for Taxes upon any of the Purchased Assets, except for Permitted Encumbrances; and

(f)    There are no Tax indemnification, allocation or sharing agreements currently in effect which could result in any Liabilities for Taxes the non-payment of which could result in an Encumbrance on any Purchased Asset, could otherwise adversely affect the Product Business or could result in Buyer becoming liable therefor.

**3.1.14**    Transferred Inventory.  Schedule 3.1.14 sets forth a complete and accurate list of the Transferred Inventory as of the date hereof, including (a) the quantity of each item, listed by SKU, of Transferred Inventory as of such date, (b) the remaining shelf life thereof as of such date, and (c) the cost of such Transferred Inventory.  Except as set forth on Schedule 3.1.14 of the Disclosure Schedules, the Transferred Inventory is usable or saleable in the Ordinary Course of Business.  None of the Transferred Inventory is obsolete or expired.  No quantities of Transferred Inventory are held on a consignment basis.  All Transferred Inventory is owned by Seller free and clear of any lien, claim, or other Encumbrance other than Permitted Encumbrances.

**3.1.15**    Regulatory Matters.

(a)    Seller, or an Affiliate of Seller, possesses all material licenses, franchises, permits, certificates, approvals or other similar authorizations issued by applicable Governmental Authorities and affecting or relating to the operation of the Product Business, including the Purchased Regulatory Approvals and associated Regulatory Submissions.  The Purchased Regulatory Approvals are valid and are in full force and effect, and none of the Purchased Regulatory Approvals will be terminated as a result of the transactions contemplated by this Agreement.  As of the Execution Date, no proceeding is pending or, to Seller's Knowledge, threatened regarding the validity, withdrawal, material modification or revocation of any Purchased Regulatory Approval.  As of the Execution Date, neither Seller nor its Affiliates has received any written communication from any Governmental Authority threatening to withdraw, materially modify or suspend any Purchased Regulatory Approval.  Neither Seller nor any of its Affiliates is in material violation of the terms of any Purchased Regulatory Approval.  Seller, or an Affiliate of Seller, has completed and filed all material reports, documents, claims, Permits, fees and notices required by any Governmental Authority to maintain the Purchased Regulatory Approvals.  Neither Seller nor, to Seller's Knowledge, any director, officer, employee, or agent of Seller or an Affiliate of Seller has made an untrue statement of a material fact or fraudulent statement to the FDA, failed to disclose a material fact required to be disclosed to the FDA, or committed an act, made a statement, or failed to make a statement that, at the time such disclosure was made, would reasonably be expected to provide a basis for the FDA to invoke its policy respecting "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities," set forth in 56 Fed. Reg. 46191 (Sept. 10, 1991).  With respect to the Product, Seller is in compliance in all material respects with the U.S. Federal Food, Drug and Cosmetic Act, as amended, and the rules and regulations promulgated thereunder, and any state Laws in the United States that apply to the manufacture, development, testing, safety, efficacy approval, marketing, sale, promotion, distributions, import or export of pharmaceutical products ("**Pharmaceutical Laws**").  Neither

26

Seller nor any of its Affiliates has received any written, or, to Seller's Knowledge, other notice from the FDA or any other Governmental Authority alleging noncompliance with any Pharmaceutical Law.

(b)    Since October 31, 2016, there has not been any product recall or market withdrawal or replacement conducted by or on behalf of Seller concerning the Product or, to Seller's Knowledge, any product recall, market withdrawal or replacement conducted by or on behalf of any Third Party as a result of any alleged defect in the Product.  Seller has made available to Buyer copies of material complaints and notices of alleged defect or adverse reaction with respect to the Product that have been received in writing by Seller and its Affiliates since October 31, 2016.  Since October 31, 2016, all material documents, declarations, listings, registrations, notices, reports or submissions, including Adverse Event or other safety reports, required to be filed by Seller and any Affiliate of Seller with respect to the Product have been so filed on a timely basis, were in material compliance with applicable Laws when filed, and were complete and accurate in all material respects when filed.

(c)    None of Seller, any Affiliate of Seller or, to Seller's Knowledge, any Third Party engaged by Seller in connection with the Manufacture of the Product for distribution and sale in the Territory has received since October 31, 2016, or is subject to any warning letter, or notice of deficiency, with respect to any facility Manufacturing the Product for distribution and sale in the Territory.

(d)    To Seller's Knowledge, all preclinical and clinical investigations or trials sponsored by or conducted on behalf of Seller in connection with the Product have been conducted in material compliance with applicable Pharmaceutical Laws, including requirements thereunder and Laws restricting the use and disclosure of individually identifiable health information.  As of the Execution Date, except as set forth on Schedule 3.1.15, there are no ongoing clinical trials or clinical trial commitments related to the Product and Seller has properly completed and closed- out all clinical trials related to the Product.

**3.1.16**   Debarred Personnel.  None of Seller or any of its Affiliates or employees or, to Seller's Knowledge, any consultant engaged by Seller or any of its Affiliates who has undertaken activities for or on behalf of the Product Business, has been debarred or deemed subject to debarment pursuant to Section 306 of the Act nor, to Seller's Knowledge, are any such Persons the subject of a conviction described in such section.

**3.1.17**   Product Liability.  Since January 1, 2017, no product liability, warranty or similar claims by any Third Party against Seller or any of its Affiliates (whether based on contract or tort and whether relating to personal injury including death, property damage or economic loss) have been initiated and no such claims are pending or, to Seller's Knowledge, threatened, in each case, with respect to the Product Business.

**3.1.18**   Insurance.  There are no claims related to the Product Business, the Purchased Assets or the Assumed Liabilities pending under any insurance policies covering the Product Business as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights.

27

**3.2**      **Representations and Warranties of Buyer**.   Buyer represents and warrants to Seller, as of the date hereof and as of the Closing Date, as follows, with each such representation and warranty subject to such exceptions, if any, as are set forth in the corresponding section of the Buyer Disclosure Schedules.   Disclosures in any section or paragraph of the Buyer Disclosure Schedules shall be deemed disclosure with respect to any other sections or paragraphs of this Agreement to the extent that it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other sections or paragraphs:

**3.2.1**    <u>Corporate Status</u>.   Each of Buyer and each Affiliate of Buyer that is specified to be a party to any Ancillary Agreement is a legal entity duly organized, validly existing and in good standing (to the extent such concept is recognized by the applicable jurisdiction) under the Laws of the jurisdiction of its organization or incorporation.

**3.2.2**    <u>Authority</u>.

(a)    Buyer has the requisite limited liability company power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.   The execution and delivery of this Agreement and Ancillary Agreements to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by the necessary limited liability company actions of Buyer.   This Agreement (assuming the due authorization, execution and delivery hereof by Seller) constitutes and each Ancillary Agreement to which Buyer will be a party, when executed and delivered by Buyer (assuming the due authorization, execution and delivery thereof by each other Person thereto), will constitute, the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to the Enforceability Exceptions.

(b)    Each Affiliate of Buyer that will enter into an Ancillary Agreement has the requisite entity power and authority to perform its obligations under each Ancillary Agreement to which it will be a party and to consummate the transactions contemplated thereby. The execution and delivery of the Ancillary Agreements to which any Affiliate of Buyer will be a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary organizational actions of such Affiliate.   Each Ancillary Agreement, when executed and delivered by an Affiliate of Buyer that is a party thereto (assuming the due authorization, execution and delivery thereof by each other Person thereto), will constitute the valid and legally binding obligation of such Affiliate, enforceable against such Affiliate in accordance with its terms, subject to the Enforceability Exceptions.

**3.2.3**    <u>Non-Contravention</u>.   The execution, delivery and performance by Buyer of this Agreement and of each Ancillary Agreement to which it will be a party and the execution, delivery and performance by each Affiliate of Buyer of each Ancillary Agreement to which such Affiliate is a party do not and will not (a) violate the certificate of incorporation or bylaws, or comparable organizational documents, of Buyer or such Affiliate, as applicable, (b) violate any Law applicable to Buyer or such Affiliate, as applicable, or (c) subject to obtaining the consents, Permits and authorizations, (i) violate any Order to which Buyer or any of its Affiliates is subject or (ii) require on the part of Buyer any filing with, or any authorization, consent or approval of, any Governmental Authority, except, in the case of (b) or (c), for such violations, breaches,

28

defaults or terminations that would not reasonably be expected to constitute a Buyer Material Adverse Effect.

3.2.4    <u>No Broker</u>.  There is no broker, finder, financial advisor or other Person acting or who has acted on behalf of Buyer or its Affiliates that is entitled to receive any brokerage or finder's or financial advisory fee from Seller or any of its Affiliates in connection with the transactions contemplated by this Agreement or any Ancillary Agreement.

3.2.5    <u>Solvency</u>.  After giving effect to the transactions contemplated hereby, assuming the accuracy of the representations and warranties set forth in <u>Section 3.1</u>, Buyer will not (i) be insolvent (because (A) Buyer's financial condition is such that the sum of its debts is greater than the fair value of its assets, (B) the present fair saleable value of Buyer's assets will be less than the amount required to pay Buyer's probable liability on its debts as they become absolute and matured or (C) Buyer is unable to pay all of its debts as and when they become due and payable), (ii) have unreasonably small capital with which to engage in its business or (iii) have incurred or plan to incur debts beyond its ability to pay as they become absolute and matured.

3.2.6    <u>Compliance with Applicable Law</u>.  Buyer is aware of applicable Laws relating to marketing, distribution and sale of the Product in the Territory, and can legally import, export, store, market, distribute and sell the Product in the Territory immediately following the transfer of the Purchased Regulatory Approval to Buyer.

3.3    **Exclusivity of Representations**.

3.3.1    Buyer acknowledges and agrees that, except for the express representations and warranties contained in <u>Section 3.1</u> or in any Ancillary Agreement, (a) Seller has made no representation or warranty whatsoever herein or otherwise related to the transactions contemplated hereby or by the Ancillary Agreements and (b) Buyer has not relied on any representation or warranty, express or implied, in connection with the transactions contemplated hereby or by the Ancillary Agreements.  Without limiting the generality of the foregoing, Buyer acknowledges and agrees that, except as expressly provided in this Agreement, Buyer is acquiring the Purchased Assets and assuming the Assumed Liabilities and the Transferred Inventory on an "as is, where is" basis without any express or implied warranties, either in fact or by operation of law, by statute or otherwise, including any warranty as to quality, the fitness for a particular purpose, merchantability, condition of the Purchased Assets or as to any other matter except as otherwise expressly represented or warranted by Seller under this Agreement or any Ancillary Agreement.  Buyer acknowledges that it has been permitted access to the books and records related to the Product Business that it has desired or requested to see and review, and that it has had an opportunity to meet with employees of Seller and its Affiliates to discuss the Product Business, the Product, the Purchased Assets and the Assumed Liabilities.  Buyer acknowledges and agrees that it shall have no claim or right to indemnification with respect to any information, documents, or materials furnished to or for Buyer by Seller or any of its Affiliates or any of their respective officers, directors, employees, agents or advisors, including any information, documents, or material made available to Buyer in any "data room," management presentation, or any other form in connection with the transactions contemplated by this Agreement or any Ancillary Agreement unless such information is expressly included in a representation or warranty made by Seller in this Agreement or an Ancillary Agreement.  Buyer has received and

29

may continue to receive from Seller and its Affiliates certain estimates, projections, plans, budgets and other forecasts for the Product Business. Buyer acknowledges that these estimates, projections, forecasts, plans and budgets, and the assumptions on which they are based, were prepared for specific purposes and may vary significantly from each other. Further, Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections, forecasts, plans and budgets, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections, forecasts, plans and budgets so furnished to it (including the reasonableness of the underlying assumptions) and that Buyer is not relying on any estimates, projections, forecasts, plans or budgets made available or otherwise furnished by Seller or its Affiliates, and Buyer shall not, and shall cause its Affiliates not to, hold any such Person liable with respect thereto (whether in warranty, contract, tort (including negligence or strict liability) or otherwise). Notwithstanding the foregoing, nothing in this <u>Section 3.3</u> shall in any way limit or restrict Buyer's ability to rely on the representations and warranties of Seller made under this Agreement or any Ancillary Agreement.

3.3.2    Seller acknowledges and agrees that, except for the express representations and warranties contained in <u>Section 4.2</u> or in any Ancillary Agreement, Buyer has made no representation or warranty whatsoever herein or otherwise related to the transactions contemplated hereby or by the Ancillary Agreements and Seller has not relied on any representation or warranty, express or implied, in connection with the transactions contemplated hereby or by the Ancillary Agreements.

# ARTICLE 4
# PRE-CLOSING COVENANTS

**4.1    Ordinary Course of Business**.

4.1.1    During the Pre-Closing Period, except (u) as set forth on <u>Schedule 4.1</u> or as otherwise contemplated by this Agreement or any Ancillary Agreement, (v) as required by applicable Law, (w) as required by the terms of any agreement binding upon Seller or its Affiliates as of the Execution Date, (x) for any actions taken by Seller that are reasonably required to consummate the transactions contemplated by this Agreement or any Ancillary Agreement, (y) for actions taken by Seller or its Affiliates as a result of or in connection with the Chapter 11 Cases, or (z) as Buyer shall otherwise consent in writing, which consent shall not be unreasonably withheld, conditioned or delayed, (i) Seller shall, and shall cause its Affiliates to, conduct the Product Business in the Ordinary Course of Business and (ii) Seller shall not, and shall cause its Affiliates not to, take any of the following actions:

(a)    other than sales or other dispositions of inventory of Product in the Ordinary Course of Business, pledge, sell, lease, transfer, license, assign or otherwise make subject to an Encumbrance (other than any Permitted Encumbrance) any Purchased Asset;

(b)    sublicense the Licensed Trademarks;

(c)    enter into, terminate (or fail to exercise any rights of renewal), amend, cancel or waive any material right or remedy under any Purchased Contract or any Contract relating to the Product Business that would constitute a Purchased Contract (including any

30

Contract providing for a royalty or deferred payment of any kind to be paid to a Third Party in respect of the Product or the Product Business (solely in the Territory)) at the Closing;

(d)    discharge, settle, compromise, satisfy or consent to any entry of any judgment with respect to any claim that (A) results in any restriction on the conduct of the Product Business, (B) results in a monetary Liability that constitutes an Assumed Liability of the Product Business or a Liability that will be borne by Buyer or (C) waive, release or assign any material claims or rights of Seller or its Affiliates against Third Parties with respect to the Product Business;

(e)    other than the Tech Transfer, enter into any financing or guarantee arrangement, agreement or undertaking with any customer of the Product Business or any financial institution, leasing company or similar business, which would constitute an Assumed Liability;

(f)    other than in the Ordinary Course of Business (A) offer any rebates, discounts, promotions or credits, to customers with respect to the Product (solely in the Territory), or (B) make any change to any promotional programs or in the manner in which Seller generally extends rebates, discounts or credit to, or otherwise similarly deal with, customers with respect to the Product (solely in the Territory);

(g)    vary any inventory practices or vary product delivery timelines other than in an immaterial respect to customers of the Product Business with respect to the Product (including inventory held by or on behalf of any of Seller's or its Affiliates' wholesalers), including bundling current and future orders for the Product or otherwise accelerating sales or delivery of Product into any period prior to the Closing, *provided* that nothing herein shall prevent Seller or its Affiliates from satisfying orders placed by customers of the Product Business in the Ordinary Course of Business so long as the satisfaction thereof complies with this Section 4.1.1(g);

(h)    initiate any Litigation material to the Product Business or the Purchased Assets;

(i)    delay payment of any undisputed or not-allowed account payable or other Liability of the Product Business, in each case, which accrued after the Petition Date, beyond its due date, specifically excluding payables that are routinely delayed in cases like the Chapter 11 Cases;

(j)    accelerate the collection of Accounts Receivable, including through incremental discounting, changes in invoicing terms or other similar practices;

(k)    other than in the Ordinary Course of Business, take any action or fail to take any action which action or failure to act would result in the material loss or reduction in value of the Purchased Intellectual Property;

(l)    enter into any "non-compete," "non-solicit" or similar agreement that would restrict the Product Business following the Closing;

(m)    make any material changes in accounting methods, principles or practices, except as required by changes in GAAP; or

US_138272717v12

(n)    enter into any Contract to do any of the foregoing (a) through (m).

**4.1.2**    Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the Product Business prior to the Closing, and nothing contained in this Agreement is intended to give Seller or its Affiliates, directly or indirectly, the right to control or direct Buyer's operations.  Prior to the Closing, each of Buyer, on the one hand, and Seller and its Affiliates, on the other hand, shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Affiliates' respective operations (in the case of Seller and its Affiliates, subject to any requirements under the Bankruptcy Code of applicable rules or law).

**4.2**    **Access and Information**.

**4.2.1**    During the period commencing on the Execution Date and ending on the earlier to occur of (a) the Closing and (b) the termination of this Agreement in accordance with Article 8 (the "**Pre-Closing Period**"), Seller shall, and shall cause its Affiliates and Representatives to, afford Buyer and its Representatives, (i) continued reasonable access to Seller employees to discuss the Product Business, (ii) access, upon reasonable prior notice during normal business hours, to the properties, assets, books and records, agreements, documents, data and files, to the extent such properties, assets, book and records, agreements, documents, data and files constitute Purchased Assets, (iii) continued reasonable access to Seller officers, employees, advisors, agents or other Representatives to discuss financial and operating data and other information reasonably requested by Buyer and (iv) and continued access through an electronic data room to the historical financial records and Contracts of Seller, in each case of clauses (i) through (iv) to the extent related to the Product Business (other than the Excluded Assets); *provided*, *however*, that such access shall not unreasonably disrupt Seller's ordinary course operations in any material respect.  Notwithstanding anything to the contrary contained in this Agreement, Seller shall not be required to disclose any information or provide any such access if such disclosure or access could, in Seller's reasonable judgment, (i) violate applicable Law, or any binding agreement entered into prior to the Closing Date (including any confidentiality agreement with a Third Party to which Seller is a  party), (ii) jeopardize any attorney/client privilege or other established legal privilege or (iii) disclose any trade secrets; *provided* that in each case, Seller shall: (A) give reasonable notice to Buyer of the fact that it is restricting or otherwise prohibiting access to any documents or information pursuant to this Section 4.2.1, (B) inform Buyer with sufficient detail of the reason for such restriction or prohibition, and (C) use its commercially reasonable efforts to cause the documents or information that are subject to such restriction or prohibition to be provided in a manner that would not reasonably be expected to violate such restriction or prohibition.  All requests for information made pursuant to this Section 4.2.1 shall be directed to such person or persons as is designated by Seller, and Buyer shall not directly or indirectly contact any officer, director, employee, agent or Representative of Seller or any of its Affiliates without the prior approval of such designated person(s).

**4.2.2**    Buyer acknowledges and agrees that (a) certain records may contain information relating to Seller or its Affiliates, but not relating to the Product Business (and, notwithstanding the inclusion of such information in such records, such information shall not constitute Purchased Assets), and that Seller and its Affiliates may retain copies thereof and (b)

prior to making any records available to Buyer, Seller or its Affiliates may redact any portions thereof that do not relate to the Product Business.

        **4.2.3**    During the Pre-Closing Period, Seller hereby agrees that Buyer and its Affiliates and Representatives may contact any licensor, licensee, competitor, supplier, distributor or customer of Seller with respect to the Product, the Purchased Assets, the Product Business, this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby for purposes of establishing a direct relationship with each such party in respect of the Product Business that would become effective at or after the Closing; *provided* that (a) Buyer shall provide Seller reasonable advance notice of such contact, (b) any written communications shall be reasonably satisfactory to Seller and (c) Seller will participate in any meetings and conferences (including teleconferences) if reasonably requested by Buyer or Seller.

        **4.2.4**    During the Pre-Closing Period, each Party shall (a) subject to applicable Law, reasonably cooperate with one another to prepare to transition the Product Business to Buyer and (b) promptly notify the other Party of any event, condition, fact, circumstance, occurrence, transaction or other item of which such Party becomes aware during the Pre-Closing Period that would reasonably be expected to constitute a breach of any representation or warranty or a breach in any material respect of any covenant set forth herein, in each case, that has caused or would reasonably be expected to cause any condition to the obligations of such Party to effect the transactions contemplated by this Agreement not to be satisfied at Closing; provided that any such notification shall not be deemed to have cured any inaccuracy in or breach of any such representation, warranty or covenant, including for purposes of the termination rights contained herein or determining whether the conditions set forth in <u>Article 7</u> have been satisfied.

    **4.3**    **Obligation to Consummate the Transaction**.  Each of the Parties agrees that, subject to this <u>Section 4.3</u> and <u>Section 4.4</u>, it shall use its commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to the extent permissible under applicable Law, to consummate and make effective the transactions contemplated by this Agreement and to ensure that the conditions set forth in <u>Article 7</u> are satisfied, insofar as such matters are within the control of either of them.

    **4.4**    **Reasonable Assurances**.  Buyer and Seller each shall not, and each shall cause its Affiliates not to, enter into any transaction or any Contract to effect any transaction (including any merger or acquisition) that would reasonably be expected to make it more difficult, or to increase the time required, to: (a) avoid the entry of, the commencement of Litigation seeking the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order that would materially delay or prevent the consummation of the transactions contemplated hereby or (b) obtain all authorizations, consents, orders and approvals of Governmental Authorities necessary for the consummation of the transactions contemplated by this Agreement.

# ARTICLE 5
## ADDITIONAL COVENANTS

**5.1** **Cooperation in Litigation and Investigations**.  Subject to <u>Section 5.4</u> and except as set forth in any Ancillary Agreement, from and after the Closing Date, Buyer and Seller shall reasonably cooperate with each other in the defense or prosecution of any Litigation, examination or audit instituted prior to the Closing or that may be instituted thereafter against or by either Party relating to or arising out of the conduct of the Product Business or the Exploitation or Manufacture of the Product prior to or after the Closing (other than Litigation between Buyer and Seller or their respective Affiliates arising out of the transactions contemplated hereby or by the Ancillary Agreements, with respect to which applicable rules of discovery shall apply).  In connection therewith, and except as set forth in any Ancillary Agreement, from and after the Closing, each of Seller and Buyer shall make available to the other during normal business hours and upon reasonable prior written notice, but without unreasonably disrupting its business, all records relating primarily to the Purchased Assets, the Licensed Intellectual Property, the Assumed Liabilities or the Excluded Liabilities held by it and reasonably necessary to permit the defense or investigation of any such Litigation, examination or audit (other than Litigation between Buyer and Seller or their respective Affiliates arising out of the transactions contemplated hereby or by the Ancillary Agreements, with respect to which applicable rules of discovery shall apply), and shall, and cause its Affiliates to, preserve and retain all such records for the length of time contemplated by its standard record retention policies and schedules; *provided* that neither Party shall be required to make available such documents if such disclosure could, in such Party's reasonable discretion, (a) violate applicable Law or any binding agreement (including any confidentiality agreement to which such Party or any of its Affiliates is a party), (b) jeopardize any attorney/client privilege or other established legal privilege or (c) disclose any trade secrets (provided that, with respect to clauses (a)–(c), such Party shall use commercially reasonable efforts to obtain any required consents or waivers and take such other reasonable action (such as the entry into a joint defense agreement or other arrangement to avoid loss of attorney-client privilege) to permit such access).  The Party requesting such cooperation shall pay the reasonable out-of-pocket costs and expenses of providing such cooperation (including reasonable and documented legal fees and disbursements) incurred by the Party providing such cooperation and by its Representatives.

**5.2** **Further Assurances**.

**5.2.1** Each of Seller and Buyer shall, at any time or from time to time after the Closing, at the reasonable request and expense of the other, execute and deliver to the other all such instruments and documents or further assurances as the other may reasonably request in order to (a) vest in Buyer all of Seller's right, title and interest in and to the Purchased Assets as contemplated hereby, (b) effectuate Buyer's assumption of the Assumed Liabilities and (c) grant to each Party all rights contemplated herein to be granted to such Party under the Ancillary Agreements; *provided*, *however*, that after the Closing, (i) apart from such foregoing customary further assurances, neither Seller nor Buyer shall have any other obligations except as specifically set forth and described herein or in the Ancillary Agreements and (ii) the foregoing shall not limit the ability of Seller to wind up its affairs and close the Chapter 11 Cases.

**5.2.2** If any approval, consent or waiver required to assume and assign the Purchased Contracts and other Purchased Assets to Buyer shall not have been obtained prior to the Closing, Seller and its Affiliates shall use commercially reasonable efforts to assume and assign the Purchased Contracts and other Purchased Assets to Buyer, including using commercially reasonable efforts to facilitate any negotiations with the counterparties to such

34

Purchased Contracts and to obtain an order (which shall be the Approval Order) containing a finding that the proposed assignment to and assumption of the Purchased Contracts by Buyer satisfied all applicable requirements of section 365 of the Bankruptcy Code. At the Closing (i) Seller shall, pursuant to the Approval Order, assume and assign to Buyer each of the Purchased Contracts that is capable of being assumed and assigned and (ii) Buyer shall pay all Cure Costs (if any) up to an aggregate amount of $2,500,000 (the "**Cure Costs Cap**"), in each case in connection with such assumption and assignment, and assume and discharge when due the Assumed Liabilities (if any) under the Purchased Contracts. Buyer shall pay the Merck Payment (and no additional amounts) to Merck in accordance with the settlement with Merck reflected in the Approval Order, which Merck Payment shall constitute a dollar-for-dollar reduction to the Cure Costs Cap. Seller shall reject all contracts (other than the Merck License Agreement, as amended, modified or supplemented) contemplated, or documented or implemented, by the sale by Merck to Seller of the Product. Except as to Purchased Contracts assigned pursuant to section 365 of the Bankruptcy Code or the Approval Order, anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a Third Party, would constitute a breach or in any way adversely affect the rights of Buyer or Seller thereunder, and Seller, at Buyer's expense, shall use its commercially reasonable efforts to obtain any such required consent(s) as promptly as possible. If such consent is not obtained or such assignment is not attainable pursuant to section 365 of the Bankruptcy Code or the Approval Order, or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, then Seller, to the maximum extent permitted by applicable Law, shall act after the Closing, at Buyer's request, as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by applicable Law, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer. Seller may not agree to pay any amount to obtain any consent of a third party without Buyer's prior written consent. All obligations of Seller under this Section 5.2.2 shall expire on the date that is three (3) months after the Closing Date; provided that nothing herein shall limit the ability of Seller to wind up its affairs and close the Chapter 11 cases.

**5.2.3** Prior to the Closing, Buyer shall cooperate with Seller, upon the reasonable request of Seller, in any reasonable manner in connection with Seller obtaining any necessary approval, consent or waiver; *provided* that such cooperation shall not include any requirement of Buyer or any of its Affiliates to pay money to any Third Party, commence any Litigation or offer or grant any accommodation (financial or otherwise) to any Third Party in connection with such efforts.

**5.3** **Publicity**. Except for advising the Bankruptcy Court generally as to status of the sale of the Product Business to Buyer, which shall be permitted, no public announcement related to this Agreement or the transactions contemplated herein will be issued without the joint approval of Seller and Buyer, which approval shall not be unreasonably withheld, conditioned or delayed, except in any public disclosure which either Seller or Buyer, on the written advice of counsel, believes is required by applicable Law, the Chapter 11 Cases, a Governmental Authority, or by any stock exchange on which its securities or those of its Affiliates are listed. If either Party, in its good faith judgment, believes any additional disclosure regarding this Agreement or any Ancillary Agreement is required, such Party shall use its commercially reasonable efforts to consult with the

US_138272717v12

other Party and its Representatives, and consider in good faith any revisions proposed by the other Party or its Representatives, as applicable, prior to making (or prior to any of its Affiliates making) such disclosure, and shall limit such disclosure to only that information which is legally required to be disclosed. Notwithstanding the foregoing, without the approval of the other Party, Buyer and Seller and their respective Affiliates may, following the Execution Date and subject to the other terms and conditions of this Agreement (including Section 5.4), (a) communicate with Governmental Authorities, with the Bankruptcy Court and with their customers, suppliers, distributors or other Persons engaged in the Product Business, regarding this Agreement, the Ancillary Agreements and the transactions contemplated hereby or by the Ancillary Agreements, including in order to obtain consents of or from any such Person necessary or desirable to effect the consummation of the transactions contemplated hereby or by the Ancillary Agreements, and (b) make public announcements and engage in public communications regarding this Agreement, the Ancillary Agreements and the transactions contemplated hereby or by the Ancillary Agreements (in the case of this clause (b), to the extent such announcements or communications are consistent with a communications plan agreed upon by Seller and Buyer or the Parties' prior public communications made in compliance with this Section 5.3). The Parties shall make a joint press release announcing the execution of this Agreement in a mutually acceptable form.

   **5.4    Confidentiality**.

   **5.4.1**    The Confidentiality Agreement shall govern the respective rights and obligations of the Parties and their respective Affiliates and Representatives with respect to Confidential Information (as defined in the Confidentiality Agreement) during the Pre-Closing Period. The Confidentiality Agreement, solely with regard to Confidential Information that relates to the Product Business, the Purchased Assets or the Assumed Liabilities shall expire and be of no further force and effect upon the Closing. From and after the Closing, all Confidential Information (other than Confidential Information that does not relate to the Product Business, the Purchased Assets or the Assumed Liabilities) provided by one Party (or its Representatives or Affiliates) (collectively, the "**Disclosing Party**") to the other Party (or its Representatives or Affiliates) (collectively, the "**Receiving Party**") shall be subject to and treated in accordance with the terms of this Section 5.4. As used in this Section 5.4, "**Confidential Information**" means (a) all information disclosed to the Receiving Party by the Disclosing Party in connection with this Agreement or any Ancillary Agreement, including all information with respect to the Disclosing Party's licensors, licensees or Affiliates, (b) all information disclosed to the Receiving Party by the Disclosing Party under the Confidentiality Agreement and (c) all memoranda, notes, analyses, compilations, studies and other materials prepared by or for the Receiving Party to the extent containing or reflecting the information in the preceding clause (a) or (b). Notwithstanding the foregoing, Confidential Information shall not include information that, in each case:

          (i)  was already known to the Receiving Party other than under an obligation of confidentiality, at the time of disclosure by the Disclosing Party;

          (ii) was generally available to the public or otherwise part of the public domain at the time of its disclosure to the Receiving Party;

          (iii)became generally available to the public or otherwise part of the public domain after its disclosure to the Receiving Party other than through any act or omission

US_138272717v12

of the Receiving Party or its Affiliates or representatives in breach of this Agreement or the Confidentiality Agreement;

(iv) is subsequently disclosed to the Receiving Party by a Third Party not acting in violation of obligations of confidentiality with respect thereto; or

(v) is subsequently independently discovered or developed by the Receiving Party or its Affiliates or representatives without the aid, application or use of Confidential Information.

5.4.2    From and after the Closing, (a) all Confidential Information obtained by Seller (or its Affiliates or Representatives) from Buyer (or its Affiliates or Representatives), and (b) all Confidential Information relating exclusively to the Product Business, Purchased Assets and/or the Assumed Liabilities (other than Confidential Information relating to the Licensed Intellectual Property) (collectively, the "**Buyer Confidential Information**") shall be deemed to be Confidential Information disclosed by Buyer to Seller (or its Affiliates or Representatives) for purposes of this Section 5.4 and during the period from the Closing through the tenth (10th) anniversary of the Closing Date (the "**Confidentiality Period**") shall be used by Seller (or its Affiliates or Representatives) solely as required to (i) perform their respective obligations or exercise or enforce their respective rights under this Agreement, any Ancillary Agreement, or any other agreement related to the Product pursuant to which Seller or any of its Affiliates obtains rights to the Licensed Intellectual Property or (ii) based on the advice of counsel comply with applicable Law or its or its Affiliates' respective regulatory, stock exchange, Tax or financing reporting requirements (each of (i) through (ii), a "**Seller Permitted Purpose**"), and for no other purpose.  Until the expiration of the Confidentiality Period, Seller shall not disclose, or permit the disclosure of, any of the Buyer Confidential Information to any Person except those Persons to whom such disclosure is necessary in connection with any Seller Permitted Purpose and who are advised of the confidential nature of the Confidential Information and directed to comply with the confidentiality and non-use obligations under this Section 5.4.  Seller shall treat, and will cause its Affiliates and the Representatives of Seller or any of its Affiliates to treat, the Buyer Confidential Information as confidential, using the same degree of care as Seller normally employs to safeguard its own confidential information from unauthorized use or disclosure, but in no event less than a reasonable degree of care.  Seller shall be responsible for any use or disclosure of Buyer Confidential Information by any of Seller's Affiliates or Representatives that would breach this Section 5.4 if such Affiliate or Representative was a party hereto.

5.4.3    During the Confidentiality Period, all Confidential Information obtained by Buyer (or its Affiliates or Representatives) from Seller (or its Affiliates or Representatives) other than the Buyer Confidential Information (the "**Seller Confidential Information**") shall be used by Buyer (or its Affiliates or Representatives)  solely as required to (a) perform their respective obligations or exercise or enforce their respective rights and remedies under this Agreement or any Ancillary Agreement, (b) conduct the Product Business or, (c) based on the advice of counsel, comply with applicable Law or its or its Affiliates' respective regulatory, stock exchange, Tax or financing reporting requirements (each of (a), (b) and (c), a "**Buyer Permitted Purpose**"), and for no other purpose.  Until the expiration of the Confidentiality Period, Buyer shall not disclose, or permit the disclosure of, any Seller Confidential Information to any Person except those Persons to whom such disclosure is necessary in connection with a Buyer Permitted

37

Purpose and who are advised of the confidential nature of the Seller Confidential Information and directed to comply with the confidentiality and non-use obligations under this <u>Section 5.4</u>. Buyer shall treat, and will cause its Affiliates and the Representatives of Buyer or any of its Affiliates to treat, Seller Confidential Information as confidential, using the same degree of care as Buyer normally employs to safeguard its own confidential information from unauthorized use or disclosure, but in no event less than a reasonable degree of care. Buyer shall be responsible for any use or disclosure of Seller Confidential Information by any of Buyer's Affiliates or Representatives that would breach this <u>Section 5.4</u> if such Affiliate or Representative was a party hereto. Notwithstanding anything to the contrary contained in this Agreement, Buyer may disclose the terms and conditions of this Agreement and amounts received pursuant to this Agreement to the extent necessary to comply with its reporting obligations under applicable securities Laws.

          **5.4.4**    In the event either Party is requested pursuant to, or required by, applicable Law to disclose any of the other Party's Confidential Information (i.e., Seller Confidential Information or Buyer Confidential Information, as applicable), it will notify the other Party in a timely manner so that such Party may seek a protective order or other appropriate remedy at such Party's expense or, in such Party's sole discretion, waive compliance with the confidentiality provisions of this Agreement. Each Party will cooperate in all reasonable respects in connection with any reasonable actions to be taken for the foregoing purpose. In any event, the Party requested or required to disclose such Confidential Information may furnish it as requested or required pursuant to applicable Law (subject to any such protective order or other appropriate remedy) without liability hereunder, *provided* that such Party furnishes only that portion of the Confidential Information which such Party is advised by an opinion of its counsel is legally required, and such Party exercises reasonable efforts to obtain reliable assurances that confidential treatment will be accorded such Confidential Information.

          **5.4.5**    Nothing in this <u>Section 5.4</u> shall be construed as preventing or in any way inhibiting either Party from complying with applicable Law governing activities and obligations undertaken pursuant to this Agreement or any Ancillary Agreement in any manner which it reasonably deems appropriate.

          **5.5**    **Post-Closing Access**. For a period of three (3) months after the Closing, or so long as performance is possible, whichever is shorter, the Parties shall use reasonable efforts to provide the other party with reasonable access to the books and records in such parties' possession or control to the extent necessary for the preparation of financial statements, regulatory filings in respect of periods ending on or prior to the Closing, or in connection with any legal proceedings and administration of the Chapter 11 Cases, at the cost of the other Party, in each case to the extent related to the transactions contemplated by this Agreement. Either Party may notify the other Party in writing that it intends to destroy all such books and records and offer the other Party the right to take possession of the same. If a Party does not notify the other party of its intention to take possession of all such books and records, and actually takes possession thereof within twenty-one (21) days after receipt of the notice, and if the other Party did make such books and records available in good faith so as to enable the notifying party to take possession thereof within such time frame, the other party may destroy such books and records. Notwithstanding anything set forth in this Agreement, Seller shall not destroy, and shall cause the U.S. Debtors to refrain from destroying, all financial books and records relating to the Product Business or the Product,

sufficient to permit carve-out financial statement audits to be performed (the "**Retained Financial Records**") without the express prior written consent of Buyer; *provided*, *however*, that Seller may, in its sole discretion and at any time or from time to time, in lieu of retaining the Retained Financial Records, transfer such Retained Financial Records to Buyer at Buyer's sole cost and expense.

**5.6    Regulatory Transfers**.  Buyer and Seller shall (a) cooperate with one another and use their respective commercially reasonable efforts to complete, execute and file with the applicable Governmental Authorities all documentation required to effect the transfer of the Purchased Regulatory Approvals as soon as reasonably practicable following the Closing; and (b) without limiting the foregoing, promptly file the Buyer FDA Transfer Letter and the Seller FDA Transfer Letter, respectively, with FDA.  Transfer of title to the Purchased Regulatory Approvals and associated Regulatory Submission shall be effective as of the Closing.  For clarity, Buyer shall be responsible for all reasonable out-of-pocket costs incurred in connection with any regulatory transfers contemplated in this <u>Section 5.6</u> and in <u>Section 5.7</u>, including costs arising from procurement of certain ancillary documents, registration file transfer, document transfer, archive copying and document legalization.

**5.7    Regulatory Responsibilities**.

**5.7.1**    <u>NDC</u>.  Promptly following the date hereof, Buyer shall initiate the process to obtain its own NDC for the Product and shall have in place all reasonable resources such that sales of the Product in the Territory can be accomplished under the NDCs of Buyer.  Following the Closing Date, Buyer and its Affiliates shall be permitted to distribute or sell any Product in the Territory labeled with Seller's NDC until such Product has been sold in full.

**5.7.2**    <u>Other Regulatory Responsibilities</u>.  Except as required by a Party to comply with applicable Law or to exercise its rights and obligations hereunder or under any Ancillary Agreement, from and after the Closing, Buyer shall have the sole right and responsibility for (and shall bear the cost of) preparing, obtaining and maintaining all Regulatory Approvals, and for conducting communications with Governmental Authorities of competent jurisdiction, for the Subject Products in the Territory.

**5.8    Further Obligations**.

**5.8.1**    <u>Medical and Other Inquiries</u>.  Except to the extent otherwise provided in this Agreement or any Ancillary Agreement, from and after the Closing Date, Buyer (a) shall be responsible for handling and responding to all customer complaints and inquiries (including medical and non-medical inquiries) related to the Product used, marketed, distributed or sold in the Territory and (b) shall be responsible for all correspondence and communication with physicians and other healthcare professionals in the Territory relating to the Product.

**5.8.2**    <u>Product Liability Claims</u>.  As soon as it becomes aware, each Party shall give the other Party prompt written notice of any defect or alleged defect in the Product, any injury alleged to have occurred as a result of the use or application of the Product, and any circumstances that may give rise to Litigation or Liability relating to the Product, or recall or market withdrawal of the Product or regulatory action that reasonably would be expected to adversely affect the Exploitation or Manufacture of the Product or result in any Liability for either

Party, specifying, to the extent the Party has such information, the time, place and circumstances thereof and the names and addresses of the Persons involved. Each Party also shall furnish promptly to the other Party copies of all documents received in respect of any Litigation arising out of such alleged defect, injury or regulatory action; *provided* that neither Party shall be required to furnish such documents if such disclosure could, in such Party's reasonable discretion, (a) violate applicable Law or any binding agreement entered into prior to the Closing Date (including any confidentiality agreement to which such Party is a party), *provided* that such Party uses commercially reasonable efforts to obtain waivers thereof, (b) jeopardize any attorney/client privilege or other established legal privilege, or (c) disclose any trade secrets or other Confidential Information.

**5.9    Commercialization**. Except to the extent otherwise provided in this Agreement or any Ancillary Agreement, from and after the Closing Date, (a) Buyer, at its own cost and expense, shall be responsible for and have sole discretion over the commercialization, marketing strategy, promotion, distribution and sale of the Product in the Territory and shall independently determine and set prices for the Product in the Territory, including the selling price, volume discounts, rebates and similar matters; (b) Buyer or its Affiliates shall be responsible for receiving and processing all orders, undertaking all invoicing, collection and receivables, and providing all customer service related to the sale of the Product in the Territory; and (c) Buyer or its Affiliates shall be responsible for receiving and processing all orders, undertaking all invoicing, collection and receivables, and providing all customer service related to the sale of the Product in the Territory.

**5.10    Certain Tax Matters**.

**5.10.1    Withholding Taxes**. The amounts payable by one Party (the "**Payer**") to another Party (the "**Payee**") pursuant to this Agreement or any Ancillary Agreement ("**Payments**") shall not be reduced on account of any Taxes unless required by applicable Law. The Payee alone shall be responsible for paying any and all Taxes (other than withholding Taxes required to be paid by the Payer and Transfer Taxes and Apportioned Obligations, which shall be treated in accordance with Section 5.10.1) levied on account of, or measured in whole or in part by reference to, any Payments it receives. The Payer shall deduct or withhold from the Payments any Taxes that it is required by applicable Law to deduct or withhold, and all such amounts deducted and withheld shall be treated for all purposes of this Agreement as having been paid to Payee. Notwithstanding the foregoing, if the Payee is entitled under any applicable Tax treaty to a reduction of rate of, or the elimination of, or recovery of, applicable withholding Tax, it shall timely deliver to the Payer or the appropriate Governmental Authority (with the assistance of the Payer to the extent that this is reasonably required and is expressly requested in writing) the prescribed forms necessary to reduce the applicable rate of withholding or to relieve the Payer of its obligation to withhold Tax, and the Payer shall apply the reduced rate of withholding, or dispense with the withholding, as the case may be, to the extent it complies with the applicable Tax treaty. If, in accordance with the foregoing, the Payer withholds any amount, it shall make timely payment to the proper Taxing Authority of the withheld amount, and send to the Payee proof of such payment as soon as reasonably practicable.

**5.10.2    Transfer Taxes and Apportioned Obligations**.

(a)    All amounts payable hereunder or under any Ancillary Agreement are exclusive of all recordation, transfer, documentary, excise, sales, value added, use, stamp, conveyance or other similar Taxes imposed or levied by reason of, in connection with or attributable to this Agreement and the Ancillary Agreements or the transactions contemplated hereby and thereby (collectively, "**Transfer Taxes**").  Buyer and Seller shall each be responsible for the payment of fifty percent (50%) of all Transfer Taxes, and shall pay all amounts due and owing in respect of any Transfer Taxes, these amounts in addition to the sums otherwise payable, at the rate in force at the due time for payment or such other time as is stipulated under applicable Law.

(b)    Reserved.

(c)    All personal property and similar ad valorem obligations (other than, for the avoidance of doubt, Transfer Taxes) levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "**Apportioned Obligations**") shall be apportioned between Seller and Buyer based on the number of days of such taxable period ending on the Closing Date (such portion of such taxable period, the "**Pre-Closing Tax Period**") and the number of days of such taxable period after the Closing Date (such portion of such taxable period, the "**Post-Closing Tax Period**").  Seller shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Post-Closing Tax Period.

(d)    Apportioned Obligations and Transfer Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable Law.  The paying Party shall be entitled to reimbursement from the non-paying Party in accordance with Section 5.10.2(a) or Section 5.10.2(c), as the case may be.  Upon payment of any such Apportioned Obligation or Transfer Tax, the paying Party shall present a statement to the non-paying Party setting forth the amount of reimbursement to which the paying Party is entitled under Section 5.10.2(a) or Section 5.10.2(c), as the case may be, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed.  The non-paying Party shall make such reimbursement promptly but in no event later than ten (10) calendar days after the presentation of such statement.

**5.10.3**   Cooperation and Exchange of Information.  Each of Seller and Buyer shall (a) provide the other with such assistance as may reasonably be requested by the other (subject to reimbursement of reasonable out-of-pocket expenses) in connection with the preparation of any Tax Return, audit or other examination by any Taxing Authority or judicial or administrative proceeding relating to Liability for Taxes in connection with the Product Business or the Purchased Assets, (b) retain and provide the other with any records or other information that may be relevant to such Tax Return, audit or examination, proceeding or determination, (c) upon the other's request (subject to reimbursement of reasonable out of pocket expense), use their commercially reasonable efforts to obtain any certificate or other document from any Taxing Authority or any other Person as may be necessary to mitigate, reduce or eliminate any applicable Transfer Tax and (d) inform the other of any final determination of any such audit or examination, proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period.

US_138272717v12

**5.10.4**    Survival of Covenants.  The covenants contained in this Section 5.10 shall survive until 30 days after the expiration of the applicable statute of limitations (including extensions thereof).

**5.11**    **Accounts Receivable and Payable**.

**5.11.1**    Accounts Receivable.  The Parties acknowledge and agree that all Accounts Receivable outstanding on the Closing Date shall remain the property of Seller or its Affiliates and shall be collected by Seller or its Affiliates subsequent to the Closing.  In the event that, subsequent to the Closing, Buyer or an Affiliate of Buyer receives any payments from any obligor with respect to an Account Receivable, then Buyer shall, within thirty (30) days after receipt of such payment, remit the full amount of such payment to Seller.  In the case of the receipt by Buyer of any payment from any obligor of both Seller and Buyer, then, unless otherwise specified by such obligor, such payment shall be applied first to amounts owed to Buyer with the excess, if any, remitted to Seller.  In the event that, subsequent to the Closing, Seller or any of its Affiliates receives any payments from any obligor with respect to an account receivable of Buyer for any period after the Closing, then Seller shall, within 30 days after receipt of such payment, remit the full amount of such payment to Buyer.  In the case of the receipt by Seller of any payment from any obligor of both Seller and Buyer, then, unless otherwise specified by such obligor, such payment shall be applied equitably to Seller and Buyer based on the amounts owed by such obligor to Seller and Buyer.

**5.11.2**    Accounts Payable.  In the event that, subsequent to the Closing, Buyer or an Affiliate of Buyer receives any invoices from any Third Party that is for the account of Seller pursuant to this Agreement or any Ancillary Agreement with respect to any account payable of the Product Business outstanding prior to the Closing, then Buyer shall, within 30 days after receipt of such invoice, provide such invoice to Seller.  In the event that, subsequent to the Closing, Seller or any of its Affiliates receives any invoices from any Third Party with respect to any account payable of Buyer or any of its Affiliates for any period after the Closing, then Seller shall, within 30 days after receipt of such invoice, provide such invoice to Buyer.

**5.12**    **Wrong Pockets**.

**5.12.1**    Assets.  Without limiting Section 5.2, if either Buyer or Seller becomes aware that any of the Purchased Assets has not been transferred to Buyer or that any of the Excluded Assets has been transferred to Buyer, it shall promptly notify the other and the Parties shall, as soon as reasonably practicable, ensure that such property is transferred, at the expense of Seller and with any necessary prior Third Party consent or approval, to (a) Buyer, in the case of any Purchased Asset which was not transferred to Buyer at the Closing; or (b) Seller, in the case of any Excluded Asset which was transferred to Buyer at the Closing.

**5.12.2**    Payments.  If, on or after the Closing Date, either Party shall receive any payments or other funds due to the other pursuant to the terms of this Agreement or any Ancillary Agreement, then the Party receiving such funds shall, within 30 days after receipt of such funds, forward such funds to the proper Party.  The Parties acknowledge and agree that there is no right of offset regarding such payments and a Party may not withhold funds received from Third Parties

42

for the account of the other Party in the event there is a dispute regarding any other issue under this Agreement or any of the Ancillary Agreements.

**5.13    Right of Reference**.  Promptly following Seller's request therefore, Buyer shall provide to Seller copies of the Buyer Regulatory Documentation or Purchased Regulatory Documentation as shall be reasonably requested by Seller solely for purposes of exercising Seller's or its Affiliates' respective rights or performing its or their respective obligations under this Agreement or any Ancillary Agreement.

**5.14    Insurance**.  As of the Closing Date, the coverage under all insurance policies related to the Purchased Assets (including the Product) shall continue in force only for the benefit of Seller and its Affiliates and not for the benefit of Buyer or its Affiliates.  Buyer agrees to arrange for its own insurance policies with respect to the Purchased Assets covering all periods and agrees not to seek, through any means, to benefit from any of the insurance policies maintained by Seller or its Affiliates which may provide coverage for claims relating in any way to the Purchased Assets prior to the Closing.

**5.15    [Reserved]**.

**5.16    [Reserved]**.

**5.17    Purchased Domain Name Obligations and Restrictions**.

**5.17.1**    Promptly following the Closing, Seller shall and shall cause Parent to, at Buyer's sole cost and expense, take such action as may be reasonably necessary, or as reasonably requested by Buyer, to effectuate the assignment and transfer of the Purchased Domain Names to Buyer, including unlocking the Purchased Domain Names, securing and forwarding to Buyer transfer authorization codes for the Purchased Domain Names, and completing such automated website procedures and documentation as may be required by the registrar of the Purchased Domain Names to release and transfer possession and control of the Purchased Domain Names to Buyer.

**5.18    Third Party Investigational Studies**.  Buyer shall assume the third party investigational studies existing as of the Closing Date included on Schedule 5.18.  Such studies shall be assigned to Buyer at Closing and Buyer shall be responsible for any and all costs and expenses due as of the Closing Date or that arise from such studies on or after such date.

**5.19    Bankruptcy Court Approval**.

**5.19.1**    Promptly following the execution of this Agreement, and in no event later than the third Business Day following the Execution Date, the Debtors shall file with the Bankruptcy Court a motion in form and substance reasonably satisfactory to Buyer (the "**Approval Motion**") for entry of an order substantially in the form of Exhibit D, authorizing and approving, *inter alia*, the sale of the Purchased Assets of Seller to Buyer on the terms and conditions set forth herein, free and clear of all Encumbrances (other than Permitted Encumbrances and to the extent set forth therein), and the assumption and assignment of the Purchased Contracts to Buyer (as amended, modified, or supplemented, the "**Approval Order**").

43

**5.19.2**  Seller shall use its commercially reasonable efforts, and shall cooperate, assist and consult with Buyer, to secure the entry of the Approval Order.  Buyer will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Approval Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Buyer of its obligations under this Agreement and all other agreements, instruments, certificates and other documents to be entered into or delivered in connection with the transactions contemplated by this Agreement and demonstrating that Buyer is a good faith buyer under section 363(m) of the Bankruptcy Code.  Except as otherwise set forth herein, nothing in any Chapter 11 plan or any order confirming or implementing such plan in the Chapter 11 Cases shall limit, impair, modify, compromise, abrogate, or otherwise adversely affect Buyer's rights under this Agreement, the Approval Order, or any relief granted and findings set forth in the Approval Order.

**5.19.3**  If the Approval Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for leave to appeal, reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Approval Order or such other order), and this Agreement has not otherwise been terminated pursuant to <u>Section 9.1.3</u>, Seller shall, at Seller's expense, take such steps to reasonably defend such appeal, petition or motion and shall use its commercially reasonable efforts to obtain an expedited resolution of any such appeal petition or motion.

**5.20    Seller Not Party to Other Agreement**.  Seller represents that as of the date of this Agreement, Seller is not a party to or bound by any agreement with respect to a possible Superior Proposal with respect to the Product Business or Purchased Assets, and agrees that it will not become a party to or bound by any such agreement hereafter other than any such agreement that may come to exist as part of the bidding and sale process approved by the Bankruptcy Court or as otherwise expressly permitted by this Agreement.

**5.21    No Successor Liability**.  Buyer and Seller intend that, upon the Closing, Buyer shall not be deemed to: (a) be the successor of or successor employer to Seller, including with respect to any collective bargaining agreement or employee plan; (b) have, *de facto* or otherwise, merged with or into Seller; (c) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller; or (d) be liable for any acts or omissions of Seller in the conduct of the Product Business or arising under or related to the Purchased Assets or the Assumed Liabilities. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Buyer shall not be liable for any lien, claim, or other Encumbrances against Seller or any of its Affiliates, and that Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or whether fixed or contingent, existing or hereafter arising, with respect to the Product Business, the Purchased Assets or any Liabilities of Seller or any of its Affiliates arising on or prior to the Closing Date, in each case other than in connection with Permitted Encumbrances and Assumed Liabilities.

**5.22    Service of Approval Motion**.  Seller shall comply (or obtain an order waiving compliance) with all requirements under the Bankruptcy Code, Bankruptcy Rules and any other applicable Law or rule in connection with obtaining approval of the transactions contemplated by

this Agreement. Seller shall serve on all required Persons, including, without limitation: (i) all Persons who are known to possess or assert a claim, lien, or other Encumbrance against or interest in the Purchased Assets; (ii) all applicable Governmental Authorities; (iii) all Persons required by any order of the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules; and (iv) any other Persons that Buyer reasonably may request, the Approval Motion and any notice of the motions, hearings, or orders necessary to comply with Seller's obligations to consummate the transactions contemplated by this Agreement.

5.23    **Approval and Copies of Pleadings**. Seller shall provide Buyer with drafts of all documents, motions, or orders, filings or pleadings and supporting documents that Seller proposes to file with the Bankruptcy Court that relate to the Agreement and the consummation of the transactions contemplated hereby prior to filing them with the Bankruptcy Court. All motions, applications, petitions, schedules, supporting papers and forms of orders not otherwise agreed to under this Agreement prepared by Seller and relating to the transactions contemplated by this Agreement to be filed on behalf of Seller after the date hereof must be in form and substance reasonably satisfactory to Buyer.

5.24    **Assumption and Assignment of Contracts**. At the Closing (i) Seller shall, pursuant to the Approval Order, assume and assign to Buyer each of the Purchased Contracts and (ii) Buyer shall pay all Cure Costs (if any) up to the Cure Costs Cap, in each case in connection with such assumption and assignment. Seller may, subject to Section 9.1.11, pay any and all Cure Costs in excess of the Cure Costs Cap in connection with such assumption and assignment. Except as to Purchased Contracts assigned pursuant to section 365 of the Bankruptcy Code or the Approval Order, anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a Third Party, would constitute a breach or in any way adversely affect the rights of Buyer or Seller thereunder, and Seller, at Seller's expense, shall use its commercially reasonable efforts to obtain any such required consent(s) as promptly as possible.

5.25    **Technology Transfer**. Buyer shall bear sole responsibility for (a) fulfilling Seller's and its Affiliates' obligations to effect the transfer of technology from Merck to Seller and the transfer of manufacturer as set forth in Section 5 of the Merck Supply Agreement (the "**Tech Transfer**") and (b) all costs and expenses associated with the foregoing set forth on Schedule 5.25 and any other future costs, expenses, obligations or liabilities that may arise with respect thereto.

**ARTICLE 6**
**[RESERVED]**

**ARTICLE 7**
**CONDITIONS PRECEDENT**

7.1    **Conditions to Obligations of Buyer and Seller**. The obligations of Buyer and Seller to complete the transactions contemplated by this Agreement are subject to the satisfaction at or prior to the Closing of the following conditions:

7.1.1    No Adverse Law; No Injunction. No Law shall have been enacted, entered, promulgated or enforced by any Governmental Authority of competent jurisdiction that

prohibits or makes illegal the consummation of all or any part of the transactions contemplated by this Agreement or the Ancillary Agreements, and no Order restraining, enjoining or otherwise preventing the consummation of the transactions contemplated hereby shall be in effect; and

      **7.1.2**   <u>Bankruptcy Court Order</u>.  The Bankruptcy Court shall have entered the Approval Order, and such Order shall be in full force and effect and shall be a Final Order.

      **7.2**    **Conditions to Obligations of Buyer**.  The obligation of Buyer to complete the transactions contemplated by this Agreement is subject to the satisfaction, or waiver by Buyer, at or prior to the Closing of the following additional conditions:

      **7.2.1**   <u>Representations and Warranties</u>.  The representations and warranties of Seller contained in <u>Section 3.1</u>, other than the Fundamental Reps included in <u>Section 3.1</u>, shall be true and correct (disregarding any materiality or Material Adverse Effect qualifications within such representations and warranties) in all respects at and as of the Closing Date as if made at and as of such date (except that those representations and warranties that address matters only as of a particular date need only be true and correct as of such date), except where the failure to be so true and correct has not had or would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and each Fundamental Rep included in <u>Section 3.1</u> shall be true and correct in all respects at and as of the Closing Date as if made at and as of such date (except that those representations and warranties that address matters only as of a particular date need only be true and correct in all respects as of such date);

      **7.2.2**   <u>Covenants</u>.  Seller shall have performed and complied in all material respects with all covenants, agreements and obligations required to be performed or complied with by it pursuant to this Agreement and any Ancillary Agreement on or prior to the Closing Date;

      **7.2.3**   <u>No Material Adverse Effect</u>.  Between the date hereof and the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect; and

      **7.2.4**   <u>Closing Deliveries</u>.  Seller shall have delivered to Buyer each of the items listed in <u>Section 2.4.2(a)</u>.

      **7.3**    **Conditions to Obligations of Seller**.  The obligation of Seller to complete the transactions contemplated by this Agreement is subject to the satisfaction, or waiver by Seller, at or prior to the Closing of the following additional conditions:

      **7.3.1**   <u>Representations and Warranties</u>.  The representations and warranties of Buyer contained in <u>Section 3.2</u>, other than the Fundamental Reps included in <u>Section 3.2</u>, shall be true and correct (disregarding any materiality or Buyer Material Adverse Effect qualifications within such representations and warranties) in all respects at and as of the Closing Date as if made at and as of such date (except that those representations and warranties that address matters only as of a particular date need only be true and correct as of such date), except where the failure to be so true and correct has not had or would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect and each Fundamental Rep included in <u>Section 3.2</u> shall be true and correct in all respects at and as of the Closing Date as if made at and as of

such date (except that those representations and warranties that address matters only as of a particular date need only be true and correct in all respects as of such date);

    7.3.2 <u>Covenants</u>.  Buyer shall have performed and complied in all material respects with all covenants, agreements and obligations required to be performed or complied with by it pursuant to this Agreement and any Ancillary Agreement on or prior to the Closing Date; and

    7.3.3 <u>Closing Deliveries</u>.  Buyer shall have delivered to Seller each of the items listed in <u>Section 2.4.2(b)</u>.

   **7.4** **Frustration of Closing Conditions**.  With respect to the conditions to Buyer's and Seller's respective obligations to consummate the transactions contemplated by this Agreement as provided hereunder and each such Party's right to terminate this Agreement as provided in <u>Section 9.1</u>, neither Buyer nor any Seller may rely on the failure of any condition set forth in this <u>Article 7</u> to be satisfied if such failure was caused by such Party's material breach, or failure to act in good faith or to use its commercially reasonable efforts to cause the condition to be satisfied to the extent required by this Agreement.

## ARTICLE 8
## NO SURVIVAL OF REPRESENTATIONS, WARRANTIES AND PRE-CLOSING COVENANTS

   **8.1** **No Survival**.  The representations and warranties of the Parties and the covenants and agreements of the Parties that are to be performed prior to the Closing, whether contained in this Agreement or in any agreement or document delivered pursuant to this Agreement, shall not survive beyond the Closing and there shall be no liability following the Closing in respect thereof, whether such liability has accrued prior to or after the Closing, on the part of any Party or any of its officers, directors, equityholders, managers, agents or Affiliates; *provided*, *however*, that this <u>Section 8.1</u> shall not limit (a) any covenant or agreement of the parties that by its terms contemplates performance after the Closing, and such covenants or agreements shall survive until fully performed, and (b) any recovery by any Person in the case of Fraud or willful breach.

   **8.2** **No Recourse**.  Except in the case of Fraud or willful breach, (1) Buyer's sole and exclusive remedy (a) for a breach of any representation or warranty made by Seller herein or in any document delivered pursuant hereto or (b) for a breach of any covenant made by Seller herein or in any document delivered pursuant hereto and required to be performed by Seller on or prior to the Closing shall, in either case, be limited to (i) Buyer's right to terminate this Agreement to the extent permitted pursuant to <u>Section 9.1</u>, in which case Seller shall have not any liability except to the extent expressly provided in <u>Section 9.2.2</u> or (ii) Buyer's right to seek a court to order equitable relief pursuant to <u>Section 10.9</u>; and (2) Seller's sole and exclusive remedy (x) for a breach of any representation or warranty made by Buyer herein or in any document delivered pursuant hereto or (y) for a breach of any covenant made by Buyer herein or in any document delivered pursuant hereto and required to be performed by Buyer on or prior to the Closing, shall, in either case, be limited to (i) Seller's right to terminate this Agreement to the extent permitted pursuant to <u>Section 9.1</u> or (ii) Seller's right to seek a court to order equitable relief pursuant to <u>Section 10.9</u>.

47

## ARTICLE 9
## TERMINATION

**9.1**     **Termination**.  Prior to the Closing, this Agreement shall terminate on the earliest to occur of any of the following events:

**9.1.1**     the mutual written agreement of Buyer and Seller;

**9.1.2**     by written notice delivered by either Buyer or Seller to the other, if the Closing shall not have occurred on or prior to May 31, 2019 (the "**End Date**") (other than due to a breach of any representation or warranty hereunder of the Party seeking to terminate this Agreement or as a result of the failure on the part of such Party to comply with or perform any of its covenants, agreements or obligations under this Agreement and other than as a result of any closing condition in favor of the non-terminating Party not being satisfied, which closing condition has been waived by the non-terminating Party); *provided*, *however*, that (a) Buyer shall not have the right to terminate this Agreement pursuant to this Section 9.1.2 during the pendency of any Litigation brought prior to the End Date by Seller for specific performance of this Agreement and (b) Seller shall not have the right to terminate this Agreement pursuant to this Section 9.1.2 during the pendency of any Litigation brought before the End Date by Buyer for specific performance of this Agreement;

**9.1.3**     by written notice delivered by Buyer to Seller, if (a) the Approval Motion has not been filed with the Bankruptcy Court prior to 11:59 p.m. (prevailing Eastern Time) on the fifth Business Day following execution of this Agreement or (b) or the Bankruptcy Court has not approved and entered the Approval Order prior to 11:59 p.m. (prevailing Eastern Time) on the day that is forty-five (45) days following execution of this Agreement, *provided* that if the Bankruptcy Court requires a bidding process, then such period shall be automatically extended for thirty-five (35) days or such other period as required by the Bankruptcy Court or (c) following entry of the Approval Order, the Approval Order is stayed, reversed, modified, vacated or amended in any respect without the prior written consent of Buyer, and such stay, reversal, modification, vacation or amendment is not eliminated within 14 days;

**9.1.4**     by written notice delivered by Buyer to Seller, if (a) Seller seeks to have the Bankruptcy Court enter an order (or consent to entry of an order) (i) dismissing, or converting the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code, or (ii) appointing a trustee or other Person responsible for operation or administration of Seller or its business or assets, or a responsible officer for any of Seller, or an examiner with enlarged power relating to the operation or administration of Seller or its business or assets (each, an "**Appointee**"), (b) an order of dismissal of the Chapter 11 Cases, conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code, or appointment of an Appointee is entered for any reason;

**9.1.5**     by written notice delivered by Buyer to Seller, if (a) there has been a breach by any Seller of a representation or warranty of Seller contained in this Agreement or (b) there shall be a breach by any Seller of any covenant, agreement or obligation of Seller in this Agreement, and such breach described in clause (a) or (b) would result in the failure of a condition set forth in Section 7.2.1 or Section 7.2.2 that has not been waived by Buyer, or in the case of a breach of any covenant or agreement is not cured upon the earlier to occur of (i) the 20th day after

48

written notice thereof is given by Buyer to Seller and (ii) the day that is two Business Days prior to the End Date; *provided* that Buyer may not terminate this Agreement pursuant to this <u>Section 9.1.5</u> if Buyer has breached any representation, warranty or covenant, agreement or obligation contained in this Agreement that would result in the failure of a condition set forth in <u>Section 7.3.1</u> or <u>Section 7.3.2</u>;

       **9.1.6**    by written notice delivered by Seller to Buyer, if (a) there has been a breach by Buyer of a representation or warranty of Buyer contained in this Agreement or (b) there shall be a breach by Buyer of any covenant, agreement or obligation of Buyer in this Agreement, and such breach described in clause (a) or clause (b) would result in the failure of a condition set forth in <u>Section 7.3.1</u> or <u>Section 7.3.2</u> and has not been waived by Seller, or in the case of a breach of any covenant or agreement is not cured upon the earlier to occur of (i) the 20th day after written notice thereof is given by Seller to Buyer and (ii) the day that is two Business Days prior to the End Date; *provided* that Seller may not terminate this Agreement pursuant to this <u>Section 9.1.6</u> if Seller has breached any representation, warranty or covenant, agreement or obligation contained in this Agreement that would result in the failure of a condition set forth in <u>Section 7.2.1</u> or <u>Section 7.2.2</u>;

       **9.1.7**    by written notice delivered by Seller to Buyer, if (i) all of the conditions set forth in <u>Section 7.1</u> and <u>Section 7.2</u> have been satisfied and remain satisfied (other than those conditions that (a) by their terms are to be satisfied at the Closing or (b) the failure of which to be satisfied is attributable to a breach by Buyer of its representations, warranties, covenants or agreements contained in this Agreement), (ii) Seller has irrevocably confirmed by written notice to Buyer that (A) all conditions set forth in <u>Section 7.3</u> have been satisfied or that it is willing to waive any unsatisfied conditions set forth in <u>Section 7.3</u> and (B) if Buyer performs its obligations hereunder, then Seller is ready, willing and able to cause the Closing to occur, and (iii) the transactions contemplated hereunder shall not have been consummated within five (5) Business Days after delivery of such notice; *provided*, *however*, that such conditions remain satisfied and such confirmation remains in full force and effect at the close of business on such fifth Business Day;

       **9.1.8**    by written notice delivered by Seller to Buyer if, at any time prior to the Closing, Seller receives a Superior Proposal and (a) Seller has provided written notice to Buyer that it is prepared to terminate this Agreement to enter into a Contract with respect to such Superior Proposal, which notice shall include the material terms and conditions of the transaction that constitutes such Superior Proposal (but shall not be required to include the identity of the Person making such Superior Proposal) and (b) Buyer has not made, within five (5) Business Days following receipt of such notice, a binding and irrevocable written and complete proposal that the board of directors of Seller determines in good faith, after consultation with its financial and legal advisors, is in the best interests of Seller's bankruptcy estate such that Seller confirms in writing that it will not pursue such Superior Proposal;

       **9.1.9**    by either Seller or Buyer, by giving written notice of such termination to the other Party, if any court of competent jurisdiction or other Governmental Authority having jurisdiction over the Parties or the Purchased Assets shall have issued an order or judgment or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order or other action shall have become

49

final and non-appealable; *provided*, *however*, in each case, that the right to terminate this Agreement pursuant to this Section 9.1.9 shall not be available to either Party whose breach of any of its representations, warranties, covenants or agreements contained herein has resulted in the circumstances giving rise to the right to terminate this Agreement pursuant to this Section 9.1.9;

> **9.1.10**    by written notice delivered by Buyer to Seller, if Seller fails to oppose (a) the entry of any order that would preclude or impair the consummation of the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement or is otherwise inconsistent therewith, or (b) any request for relief by any Person that would preclude or impair the consummation of the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement or is otherwise inconsistent therewith; or

> **9.1.11**    by either Seller or Buyer, by giving written notice of such termination to the other Party, if, at any time prior to the Closing, the anticipated Cure Costs exceed the Cure Costs Cap, *provided* that in the event Seller provides written notice to Buyer within five days of Closing that it will pay any such excess Cure Costs, Buyer shall have no right of termination under this Section 9.1.11 and any prior termination notice given under this Section 9.1.11 shall be null and void.

> **9.2**    **Procedure and Effect of Termination.**Notice of Termination.    Termination of this Agreement by either Buyer or Seller shall be by delivery of a written notice to the other Party. Such notice shall state the termination provision in this Agreement that such terminating Party is claiming provides a basis for termination of this Agreement.    Termination of this Agreement pursuant to the provisions of Section 9.1 shall be effective upon and as of the date of delivery of such written notice as determined pursuant to Section 9.2.

> **9.2.2**    Effect of Termination.    In the event of the termination of this Agreement pursuant to Section 9.1 by Buyer or Seller, this Agreement shall be terminated and have no further effect, and there shall be no Liability hereunder on the part of Seller, Buyer or any of their respective Affiliates, except that Section 3.3 (*Exclusivity of Representations*), Section 5.3 (*Publicity*), Section 5.4 (*Confidentiality*), this Section 9.2.2 (*Effect of Termination*), Section 9.2.3 (*Withdrawal of Certain Filings*) and Article 10 (*Miscellaneous*) shall survive any termination of this Agreement.    For the avoidance of doubt, in the event of termination of this Agreement pursuant to Section 9.1, the Parties shall not enter into any of the Ancillary Agreements or have any obligations thereunder.    Nothing in this Section 9.2.2 shall relieve either Party of (x) Liability for Fraud or willful breach or (y) subject to Section 9.2.3, Liability resulting from any breaches of this Agreement prior to the termination hereof.

> **9.2.3**    Withdrawal of Certain Filings.    As soon as practicable following a termination of this Agreement for any reason, but in no event more than thirty (30) days after such termination, Buyer or Seller shall, to the extent practicable, withdraw all filings, applications and other submissions relating to the transactions contemplated by this Agreement filed or submitted by or on behalf of such Party, any Governmental Authority or other Person, other than

the Bankruptcy Court or any court in which proceedings related to the transactions contemplated by this Agreement have been filed.

## ARTICLE 10
## MISCELLANEOUS

**10.1**    **Governing Law, Jurisdiction, Venue and Service**.

**10.1.1**    Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of New York, excluding any conflicts or choice of Law rule or principle that might otherwise refer construction or interpretation of this Agreement to the substantive Law of another jurisdiction, and applicable provisions of the Bankruptcy Code.

**10.1.2**    Jurisdiction.  Subject to Section 10.9, the Parties hereby irrevocably and unconditionally consent to the exclusive jurisdiction of the Bankruptcy Court for any action, suit or proceeding (other than appeals therefrom) arising out of or relating to this Agreement, and agree not to commence any action, suit or proceeding (other than appeals therefrom) related thereto except in such court.  The Parties irrevocably and unconditionally waive their right to a jury trial in connection with any, to the extent permitted by Law, Litigation arising out of or relating to this Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby.

**10.1.3**    Venue.  The Parties further hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding (other than appeals therefrom) arising out of or relating to this Agreement in Bankruptcy Court, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in Bankruptcy Court has been brought in an inconvenient forum.

**10.1.4**    Service.  Each Party further agrees that service of any process, summons, notice or document by registered mail to its address set forth in Section 10.2.2 shall be effective service of process for any action, suit or proceeding brought against it under this Agreement in any such court.

**10.2**    **Notices**.

**10.2.1**    Notice Requirements.  Any notice, request, demand, waiver, consent, approval or other communication permitted or required under this Agreement (each, a "**Notice**") shall be in writing, shall refer specifically to this Agreement and shall be deemed given only if delivered by hand or sent by facsimile transmission or by email of a PDF attachment (with transmission confirmed) or by internationally recognized overnight delivery service that maintains records of delivery, addressed to the Parties at their respective addresses specified in Section 10.2.2 or to such other address as the Party to whom notice is to be given may have provided to the other Party at least five days' prior to such address taking effect in accordance with this Section 10.2. Such Notice shall be deemed to have been given as of the date delivered by hand or internationally recognized overnight delivery service or confirmed that it was received by facsimile or email (with receipt confirmed by telephone, or, solely in the case of facsimile, by email or by delivery (in addition to such facsimile) of such communication by internationally

51

recognized overnight delivery service that maintains records of delivery).   Any Notice delivered by facsimile or email shall be confirmed by a hard copy delivered as soon as practicable thereafter. If a notice deemed given upon receipt is given after 5:00 p.m. in the place of receipt (the Parties understand and agree that the foregoing applies only to notice and not to copies), such notice will be deemed given on the next succeeding Business Day.

      **10.2.2**   Address for Notice.

If to Buyer, to:

Toprol Acquisition LLC
c/o Deerfield Management Company, L.P.
780 Third Avenue, 37th Floor
New York, NY 10017
Attention: Bryan Sendrowski
Email: bsendrowski@deerfield.com

with a copy (which shall not constitute effective notice) to:

Katten Muchin Rosenman LLP
525 W. Monroe St.
Chicago, IL 60661
Attention: Mark D. Wood
         Peter A. Siddiqui
Email: mark.wood@kattenlaw.com
      peter.siddiqui@kattenlaw.com

If to Seller, to:

Aralez Pharmaceuticals Trading DAC
c/o Prime Clerk LLC
P.O. Box 329003
Brooklyn, NY 11232

with a copy (which shall not constitute effective notice) to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
Facsimile:  (212) 728-8111
Attention:  Sean M. Ewen
E-mail:  sewen@willkie.com

      **10.3**   **No Benefit to Third Parties**.   The covenants and agreements set forth in this Agreement are for the sole benefit of the Parties and their successors and permitted assigns and they shall not be construed as conferring any rights on any other Persons.

52

**10.4    Waiver and Non-Exclusion of Remedies**.    Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the Party waiving such term or condition.  The waiver by either Party of any right hereunder or of the failure to perform or of a breach by the other Party shall not be deemed a waiver of any other right hereunder or of any other breach or failure by said other Party whether of a similar nature or otherwise.  The rights and remedies provided herein are cumulative and do not exclude any other right or remedy provided by applicable Law or otherwise available except as expressly set forth herein.

**10.5    Expenses**.  Except as otherwise specified herein or in an Ancillary Agreement, and whether or not the Closing takes place, each Party shall bear any costs and expenses incurred by it with respect to the transactions contemplated herein.

**10.6    Assignment**.    Neither this Agreement nor either Party's rights or obligations hereunder may be assigned or delegated by such Party without the prior written consent of the other Party, and any attempted assignment or delegation of this Agreement or any of such rights or obligations by either Party without the prior written consent of the other Party shall be void and of no effect; *provided*, *however*, that either Party may assign all of its rights or obligations hereunder to an Affiliate without the prior written consent of the other Party and Buyer may collaterally assign this Agreement to any lender to Buyer or its Affiliates pursuant to any facilities or agreements under which Buyer or its Affiliates borrow money from time to time without the prior written consent of Seller, but the assigning Party shall remain responsible for all of its obligations hereunder notwithstanding any such assignment.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and permitted assigns.

**10.7    Amendment**.    This Agreement may not be modified, amended, altered or supplemented except upon the execution and delivery of a written agreement executed by both Parties.

**10.8    Severability**.  If any provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of either Party under this Agreement will not be materially and adversely affected thereby, (a) such provision shall be fully severable, (b) this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and (d) in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and reasonably acceptable to the Parties.

**10.9    Equitable Relief**.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that a Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court, this being in addition to any

other remedy to which it is entitled at law or in equity. Each Party hereby waives (a) any requirement that the other Party post a bond or other security as a condition for obtaining any such relief, and (b) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate.

**10.10 Damages Waiver**. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT AS A RESULT OF FRAUD OR TO THE EXTENT PAID OR PAYABLE PURSUANT TO A THIRD PARTY CLAIM, NEITHER BUYER NOR SELLER SHALL BE LIABLE TO THE OTHER, OR THEIR AFFILIATES, FOR ANY CLAIMS, DEMANDS OR SUITS FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, INDIRECT OR MULTIPLE DAMAGES, FOR LOSS OF PROFITS, REVENUE OR INCOME, DIMINUTION IN VALUE OR LOSS OF BUSINESS OPPORTUNITY (WHETHER OR NOT FORESEEABLE AT THE EXECUTION DATE), CONNECTED WITH OR RESULTING FROM ANY BREACH OF THIS AGREEMENT, OR ANY ACTIONS UNDERTAKEN IN CONNECTION HEREWITH, OR RELATED HERETO, INCLUDING ANY SUCH DAMAGES WHICH ARE BASED UPON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE AND MISREPRESENTATION), BREACH OF WARRANTY, STRICT LIABILITY, STATUTE, OPERATION OF LAW OR ANY OTHER THEORY OF RECOVERY.

**10.11 English Language**. This Agreement shall be written and executed in, and all other communications under or in connection with this Agreement shall be in, the English language. Any translation into any other language shall not be an official version thereof, and in the event of any conflict in interpretation between the English version and such translation, the English version shall control.

**10.12 Bulk Sales Statutes**. The Parties hereby waive compliance with the requirements and provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer and any other transactions contemplated by this Agreement.

**10.13 Representation by Counsel**. Each Party represents and agrees with each other that it has been represented by or had the opportunity to be represented by independent counsel of its own choosing, and that it has had the full right and opportunity to consult with its respective attorney(s), that to the extent, if any, that it desired, it availed itself of this right and opportunity, that it or its authorized officers (as the case may be) have carefully read and fully understand this Agreement and the Ancillary Agreements in their entirety and have had them fully explained to them by such Party's respective counsel, that each is fully aware of the contents thereof and their meaning, intent and legal effect, and that it or its authorized officer (as the case may be) is competent to execute this Agreement and has executed this Agreement free from coercion, duress or undue influence.

**10.14 Counterparts**. This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic transmission (including in

54

portable document format (pdf), as a joint photographic experts group (jpg) file, or otherwise) shall be effective as delivery of a manually executed original counterpart of this Agreement.

**10.15  Entire Agreement**.  This Agreement, together with the Schedules and Exhibits expressly contemplated hereby and attached hereto, the Buyer Disclosure Schedules, the Seller Disclosure Schedules, the Ancillary Agreements, the Confidentiality Agreement and the other agreements, certificates and documents delivered in connection herewith or therewith or otherwise in connection with the transactions contemplated hereby and thereby, contain the entire agreement between the Parties with respect to the transactions contemplated hereby or thereby and supersede all prior agreements, understandings, promises and representations, whether written or oral, between the Parties with respect to the subject matter hereof and thereof.    In the event of any inconsistency between any such Schedules and Exhibits and this Agreement, the terms of this Agreement shall govern.

**10.16  Bankruptcy Court Approval**.  Each Party acknowledges and agrees that the Debtors' obligations hereunder are subject to entry of the Approval Order.  Notwithstanding anything herein to the contrary, in the event the Debtors receive any competing proposals to the transactions contemplated herein during the course of seeking entry of the Approval Order, the Debtors may conduct a bidding and auction process as they determine may be appropriate in the exercise of their fiduciary duties and may terminate this Agreement and seek Bankruptcy Court approval of any higher or otherwise better offer that may be received in any such process.

*[Signature page follows]*

US_138272717v12

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Execution Date.

**TOPROL ACQUISITION LLC**

By: _____

Name: Bryan Sendrowski

Title:   President

**ARALEZ PHARMACEUTICALS TRADING DAC**

By: _____

Name:

Title:

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Execution
Date.

**TOPROL ACQUISITION LLC**

By:_____
Name: Bryan Sendrowski
Title:   President

**ARALEZ PHARMACEUTICALS TRADING
DAC**

By:_____
Name: Sanjay Subramanian
Title:   Authorized Person

[Signature Page to Zontivity Asset Purchase Agreement]

**<u>Exhibit A-1 to the Purchase Agreement</u>**

## BILL OF SALE AND
## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Bill of Sale and Assignment and Assumption Agreement (this "**Agreement**") is made and executed as of [●], 2019 by and between Aralez Pharmaceuticals Trading DAC, an Irish designated activity company ("**Aralez Trading DAC**"), Aralez Pharmaceuticals US Inc., a Delaware corporation, Aralez Pharmaceuticals R&D Inc., a Delaware corporation ("**Sellers**") and Toprol Acquisition LLC, a Delaware limited liability company ("**Buyer**").  Sellers and Buyer are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

### RECITALS

**WHEREAS**, Aralez Trading DAC and Buyer have entered into that certain Asset Purchase Agreement, dated as of [●], 2019 (the "**Asset Purchase Agreement**"); and

**WHEREAS**, pursuant to the Asset Purchase Agreement, Aralez Trading DAC has agreed to sell, transfer, convey, assign and deliver the Purchased Assets and transfer the Assumed Liabilities to Buyer and Buyer has agreed to purchase and accept the Purchased Assets and assume the Assumed Liabilities from Sellers.

### AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual benefits to be derived from this Agreement and of the representations, warranties, conditions, agreements and promises contained in the Asset Purchase Agreement, this Agreement and the other Ancillary Agreements, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1. **Definitions**.  Unless otherwise specifically provided herein, capitalized terms used in this Agreement and not otherwise defined herein shall have the respective meanings ascribed thereto in the Asset Purchase Agreement.

2. **Conveyance and Acceptance**.  In accordance with the provisions of the Asset Purchase Agreement, Sellers hereby sell, transfer, convey, assign and deliver to Buyer all of Sellers' right, title and interest in and to the Purchased Assets, and Buyer hereby purchases and accepts the Purchased Assets, in each case, free and clear of any Encumbrances (other than Permitted Encumbrances).

3. **Assumption of Assumed Liabilities**.  Sellers hereby assign to Buyer the Assumed Liabilities, and Buyer hereby unconditionally assumes and agrees to pay and discharge when due the Assumed Liabilities.

4. **Asset Purchase Agreement Control**.  Notwithstanding any other provision of this Agreement to the contrary, nothing contained herein shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including warranties, covenants,

agreements, conditions, representations or in general any of the rights and remedies or any of the obligations of Buyer or Sellers set forth in the Asset Purchase Agreement or any other Ancillary Agreement.  This Agreement is subject to and governed entirely by the terms and conditions of the Asset Purchase Agreement. Nothing contained herein is intended to modify or supersede any of the provisions of the Asset Purchase Agreement or any other Ancillary Agreement.

5.      **Governing Law**.  This Agreement shall be governed by and construed in accordance with the Laws of the State of New York, excluding any conflicts or choice of Law rule or principle that might otherwise refer construction or interpretation of this Agreement to the substantive Law of another jurisdiction.

6.      **Counterparts**.  This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic transmission (including in portable document format (pdf), as a joint photographic experts group (jpg) file or otherwise) shall be effective as delivery of a manually executed original counterpart of this Agreement.

*[Signature page follows]*

      **IN WITNESS WHEREOF**, the Parties have each caused this Agreement to be duly executed as of date first above written.

**ARALEZ PHARMACEUTICALS
TRADING DAC**

By: _____
    Name:
    Title:

**ARALEZ PHARMACEUTICALS US
INC.**

By: _____
    Name:
    Title:

**ARALEZ PHARMACEUTICALS R&D
INC.**

By: _____
    Name:
    Title:

**TOPROL ACQUISITION LLC**

By:_____
      Name:
      Title:

## Exhibit A-2 to the Purchase Agreement

# PATENT ASSIGNMENT

This Patent Assignment (this "**Patent Assignment**") is made as of this [__] day of [__], 2019, by and between Aralez Pharmaceuticals Trading DAC, an Irish designated activity company ("**Seller**"), and Toprol Acquisition LLC, a Delaware limited liability company ("**Buyer**").  Seller and Buyer are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

**WHEREAS**, Seller owns the patents and patent applications listed on <u>Schedule A</u> attached hereto and made a part hereof (collectively referred to herein as the "**Purchased Patents**");

**WHEREAS**, Seller and Buyer have entered into that certain Asset Purchase Agreement, dated as of [__], 2019 (the "**Asset Purchase Agreement**"); and

**WHEREAS**, in accordance with the provisions of the Asset Purchase Agreement, Seller has agreed to sell, transfer, convey, assign and deliver to Buyer, and Buyer has agreed to purchase and accept from Seller the Purchased Patents.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual benefits to be derived from this Patent Assignment and of the representations, warranties, conditions, agreements and promises contained in the Asset Purchase Agreement, this Patent Assignment and the other Ancillary Agreements, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.  **Defined Terms.**  Unless otherwise specifically provided herein, capitalized terms used in this Patent Assignment and not otherwise defined herein shall have the respective meanings ascribed thereto in the Asset Purchase Agreement.

2.  **Conveyance and Acceptance.**  In accordance with the provisions of the Asset Purchase Agreement, Seller hereby sells, transfers, conveys, assigns and delivers to Buyer, its successors, legal representatives, and assigns all right, title and interest in and to the Purchased Patents and Buyer hereby purchases and accepts from Seller the Purchased Patents.

3.  **Recordation.**  Seller hereby authorizes the United States Commissioner of Patents and Trademarks and, as appropriate, the respective patent office or other Governmental Authority in each jurisdiction other than the United States, to record this Patent Assignment.

4.      **Asset Purchase Agreement Controls**.  Notwithstanding any other provision of this Patent Assignment to the contrary, nothing contained herein shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including warranties, covenants, agreements, conditions, representations or, in general any of the rights and remedies, or any of the obligations of Buyer or Seller set forth in the Asset Purchase Agreement.  This Patent Assignment is subject to and governed entirely in accordance with the terms and conditions of the Asset Purchase Agreement. Nothing contained herein is intended to modify or supersede any of the provisions of the Asset Purchase Agreement.

5.      **Further Assurances.**  Seller agrees, at Buyer's expense, to take such further action and to execute and deliver such additional instruments and documents as Buyer may reasonably request to carry out and fulfill the purposes and intent of this Patent Assignment including signing all papers and documents, taking all lawful oaths and doing all acts reasonably necessary or required to be done to perfect the assignment of the Purchased Patents.

6.      **Miscellaneous.**

(a)     **Expenses.** All costs and expenses associated with the conveyance under this Patent Assignment of all right, title and interest of Seller in and to the Purchased Patents, including, without limitation, costs and expenses associated with the recordation of this Patent Assignment, shall be borne solely by Buyer.

(b)     **Counterparts.** This Patent Assignment may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.  Delivery of an executed counterpart of a signature page of this Patent Assignment by facsimile or other electronic transmission shall be effective as delivery of a manually executed original counterpart of this Patent Assignment.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the Parties have duly executed this Patent Assignment, as of the date first above written.

**ARALEZ PHARMACEUTICALS TRADING DAC**

By: _____
      Name:
      Title:

**TOPROL ACQUISITION LLC**

By: _____
      Name:
      Title:

## SCHEDULE A

## PURCHASED PATENTS

| Title | Application Number | Application Date | Status | Country | Patent Number |
|---|---|---|---|---|---|
| Tricyclic Thrombin Receptor Antagonists | 2482858 | 04/14/2003 | Issued | Canada | 2482858 |
| Thrombin Receptor Antagonists | 10/412982 | 04/14/2003 | Issued | U.S. | 7304078 |
| Thrombin Receptor Antagonists | 11/733635 | 04/10/2007 | Issued | U.S. | 7713999 |
| Immediate-Release Tablet Formulations of a Thrombin Receptor Antagonist | 2656395 | 06/29/2007 | Issued | Canada | 2656395 |
| Immediate-Release Tablet Formulations of a Thrombin Receptor Antagonist | 15/066,726 | 03/10/2016 | Abandoned | U.S. | |
| Immediate-Release Tablet Formulations of a Thrombin Receptor Antagonist | 11/771,520 | 06/29/2007 | Abandoned | U.S. | |
| Crystalline Polymorph of a Bisulfate Salt of a Thrombin Receptor Antagonist | 10/755066 | 01/09/2004 | Issued | U.S. | 7235567 |
| Thrombin Receptor Antagonists | 10/671216 | 09/25/2003 | Issued | U.S. | 7488742 |
| Thrombin Receptor Antagonists | 10/457256 | 06/09/2003 | Issued | U.S. | 6894065 |
| Nor-seco Himbacine Derivatives Useful as Thrombin Receptor Antagonists | 09/880222 | 06/13/2001 | Issued | U.S. | 6645987 |
| Synthesis of Diethyl{[5-(3-fluorophenyl)-pyridine-2yl]methyl} phosphonate | 11/824245 | 06/29/2007 | Issued | U.S. | 7687631 |
| Synthesis of Diethyl{[5-(3-fluorophenyl)-pyridine-2yl]methyl} phosphonate | 12/701174 | 02/05/2010 | Issued | U.S. | 8329905 |
| Exo-selective Synthesis of Himbacine Analogs | 13/370768 | 02/10/2012 | Issued | U.S. | 8273790 |
| Exo-selective Synthesis of Himbacine Analogs | 11/330521 | 01/12/2006 | Issued | U.S. | 7772276 |
| Exo-selective Synthesis of Himbacine Analogs | 12/827000 | 06/30/2010 | Issued | U.S. | 8138180 |
| Process for the Preparation of Phosphonate Compounds Useful in the Preparation of Himbacine Analogs | 2875768 | 01/12/2006 | Issued | Canada | 2875768 |
| Exo-and Diastereo-selective Synthesis of Himbacine Analogs | 2594871 | 01/12/2006 | Issued | Canada | 2594871 |
| Exo-and Diastereo-selective Synthesis of Himbacine Analogs | 12/505079 | 07/17/2009 | Issued | U.S. | 7989653 |
| Exo-and Diastereo-selective Synthesis of Himbacine Analogs | 11/331324 | 01/12/2006 | Issued | U.S. | 7605275 |
| Exo-and Diastereo-selective Synthesis of Himbacine Analogs | 13/563136 | 07/31/2012 | Issued | U.S. | 8618314 |
| Exo-and Diastereo-selective | 13/168029 | 06/24/2011 | Issued | U.S. | 8258319 |

| Title | Application Number | Application Date | Status | Country | Patent Number |
|---|---|---|---|---|---|
| Synthesis of Himbacine Analogs | | | | | |
| Synthesis of Himbacine Analogs | 11/330935 | 01/12/2006 | Issued | U.S. | 7541471 |
| Synthesis of Himbacine Analogs | 12/428773 | 04/23/2009 | Issued | U.S. | 7626045 |
| Active Metabolite of a Thrombin Receptor Antagonist | 13/376093 | 04/19/2012 | Issued | U.S. | 8575351 |
| Co-Crystal of the PAR-1 Receptor Antagonist Vorapaxar and Aspirin | 14/905193 | 01/14/2016 | Issued | U.S. | 9604971 |

**<u>Exhibit A-3 to the Purchase Agreement</u>**

# DOMAIN NAME ASSIGNMENT

This Domain Name Assignment (this "**Domain Name Assignment**") is made as of this [__] day of [__], 2019, by and between Old API Wind-down Ltd. (fka Aralez Pharmaceuticals Inc.) ("**Parent**"), Aralez Pharmaceuticals Trading DAC, an affiliate of Parent ("**Seller**"), and Toprol Acquisition LLC, a Delaware limited liability company ("**Buyer**"). Seller, Parent and Buyer are sometimes referred to herein individually as a **"Party"** and collectively as the **"Parties**."

## RECITALS

**WHEREAS**, Parent is the registrant of the internet domain names listed on Schedule A  attached hereto and made a part hereof (collectively, the "**Purchased Domain Names**"); and

**WHEREAS**, Seller and Buyer have entered into that certain Asset Purchase Agreement, dated as of [__], 2019 (the "**Asset Purchase Agreement**"); and

**WHEREAS**, in connection with the Asset Purchase Agreement, Buyer has agreed to acquire from Seller and Parent, and Seller has agreed to cause Parent to sell, transfer, convey, assign and deliver to Buyer, the Purchased Domain Names.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual benefits to be derived from this Domain Name Assignment and of the representations, warranties, conditions, agreements and promises contained in the Asset Purchase Agreement, this Domain Name Assignment and the other Ancillary Agreements, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.    **Definitions.**  Unless otherwise specifically provided herein, capitalized terms used in this Domain Name Assignment and not otherwise defined herein shall have the respective meanings ascribed thereto in the Asset Purchase Agreement.

2.    **Conveyance and Acceptance.** In accordance with the provisions of the Asset Purchase Agreement, Parent hereby sells, transfers, conveys, assigns and delivers to Buyer, its successors, legal representatives, and assigns all right, title and interest in and to the Purchased Domain Names and Buyer hereby purchases and accepts from Parent the Purchased Domain Names.

3.    **Asset Purchase Agreement Controls**.  Notwithstanding any other provision of this Domain Name Assignment to the contrary, nothing contained herein shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including warranties,

29064936.4

covenants, agreements, conditions, representations or, in general any of the rights and remedies, or any of the obligations of Buyer or Seller set forth in the Asset Purchase Agreement.  This Domain Name Assignment is subject to and governed entirely in accordance with the terms and conditions of the Asset Purchase Agreement.  Nothing contained herein is intended to modify or supersede any of the provisions of the Asset Purchase Agreement.

4.    **Further Assurances.** Seller and Parent agree, at Buyer's expense, to take such action as may be reasonably required or necessary to effect the transfer of the Purchased Domain Names to Buyer including, without limitation, releasing any "lock" placed on the Purchased Domain Names, obtaining the authorization code and providing that code to Buyer, confirming the requested transfer upon receipt of a request to do so from the registrar used by Buyer for the Purchased Domain Names, executing and delivering all authorizations necessary to effectuate electronic transfer of the Purchased Domain Names, and executing and delivering all further documents and instruments and to do and cause to be done such further acts and things as may be reasonably necessary to effectuate the assignment and transfer of the Purchased Domain Names to Buyer.  Buyer shall bear all costs charged by any transferring registrar, if any, in connection with the transfer of the Purchased Domain Names to Buyer.

5.    **Miscellaneous.**

(a)    **Expenses.** All costs and expenses associated with the conveyance under this Domain Name Assignment of all right, title and interest of Parent in and to the Purchased Domain Names shall be borne solely by Buyer.

(b)    **Counterparts.** This Domain Name Assignment may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.  Delivery of an executed counterpart of a signature page of this Domain Name Assignment by facsimile or other electronic transmission shall be effective as delivery of a manually executed original counterpart of this Domain Name Assignment.

*[Signature page follows]*

2

29064936.4

**IN WITNESS WHEREOF**, the Parties have duly executed this Domain Name Assignment, as of the day and year first above written.

**ARALEZ PHARMACEUTICALS TRADING DAC**

By: _____
     Name: Christopher Freeland
     Title:  Authorized Person

**OLD API WIND-DOWN LTD. (FKA ARALEZ PHARMACEUTICALS INC.)**

By: _____
     Name:
     Title:

**TOPROL ACQUISITION LLC**

By: _____
     Name:
     Title:

## <u>SCHEDULE A</u>

**PURCHASED DOMAIN NAMES**

| Domain Name |
| --- |
| www.zontivity.com |
| www.zontivityhcp.com |
| www.zontivityrems.biz |
| www.zontivityrems.com |
| www.zontivityrems.info |
| www.zontivityrems.net |
| www.zontivityrems.org |
| www.zontivityrems.us |
| www.zontivitysavings.com |

**Exhibit A-4 to the Purchase Agreement**

## TRADEMARK ASSIGNMENT

This Trademark Assignment (this "**Trademark Assignment**") is made as of this [__] day of [__], 2019, by and between Aralez Pharmaceuticals Trading DAC, an Irish designated activity company ("**Seller**"), and Toprol Acquisition LLC, a Delaware limited liability company ("**Buyer**").  Seller and Buyer are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

**WHEREAS**, Seller is the owner of the trademark registrations and applications in the applicable jurisdictions, in each case, set forth on <u>Schedule A</u>  attached hereto and made part hereof (collectively, the "**Purchased Trademarks**");

**WHEREAS**, Seller and Buyer have entered into that certain Asset Purchase Agreement, dated as of [__], 2019 (the "**Asset Purchase Agreement**"); and

**WHEREAS**, in accordance with the Asset Purchase Agreement, Buyer has agreed to acquire from Seller and Seller has agreed to sell, transfer, convey, assign and deliver to Buyer all of Seller's rights, title and interest in and to the Purchased Trademarks, together with the goodwill of the business associated with and symbolized by the Purchased Trademarks.

**NOW, THEREFORE**, in consideration of the mutual benefits to be derived from this Trademark Assignment and of the representations, warranties, conditions, agreements and promises contained in the Asset Purchase Agreement, this Trademark Assignment and the other Ancillary Agreements, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1. **Defined Terms.** Unless otherwise specifically provided herein, capitalized terms used in this Trademark Assignment and not otherwise defined herein shall have the respective meanings ascribed thereto in the Asset Purchase Agreement.

2. **Conveyance and Acceptance of Purchased Trademarks.**  In accordance with the provisions of the Asset Purchase Agreement, Seller hereby sells, assigns, transfers, conveys and delivers to Buyer (and to Buyer's successors, legal representatives, and assigns), all of its right, title and interest in and to the Purchased Trademarks in the jurisdiction set forth opposite each such Purchased Trademark on Schedule A, including all goodwill associated therewith, and Buyer hereby purchases and accepts from Seller the Purchased Trademarks.

3. **Recordation.**  Seller hereby authorizes Buyer to record this Trademark Assignment with the U.S. Patent and Trademark Office and all other applicable foreign trademark offices or other relevant Governmental Authorities.

4. **Asset Purchase Agreement Controls**.  Notwithstanding any other provision of this Patent Assignment to the contrary, nothing contained herein shall in any way

supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including warranties, covenants, agreements, conditions, representations or, in general any of the rights and remedies, or any of the obligations of Buyer or Seller set forth in the Asset Purchase Agreement.  This Trademark Assignment is subject to and governed entirely in accordance with the terms and conditions of the Asset Purchase Agreement.  Nothing contained herein is intended to modify or supersede any of the provisions of the Asset Purchase Agreement.

5.    **Further Assurances.**  Seller agrees, at Buyer's expense, to take such further action and to execute and deliver such additional instruments and documents as Buyer may reasonably request to carry out and fulfill the purposes and intent of this Trademark Assignment including signing all papers and documents, taking all lawful oaths and doing all acts reasonably necessary or required to be done to perfect the assignment of the Purchased Trademarks.

6.    **Miscellaneous.**

(a)    **Expenses.** All costs and expenses associated with the conveyance under this Trademark Assignment of all right, title and interest of Seller in and to the Purchased Trademarks, including, without limitation, costs and expenses associated with the recordation of this Trademark Assignment, shall be borne solely by Buyer.

(b)    **Counterparts.** This Trademark Assignment may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.  Delivery of an executed counterpart of a signature page of this Trademark Assignment by facsimile or other electronic transmission shall be effective as delivery of a manually executed original counterpart of this Trademark Assignment.

*[Signature page follows]*

- 2 -

**IN WITNESS WHEREOF**, the undersigned have duly executed this Trademark Assignment, as of the date first above written.

**ARALEZ PHARMACEUTICALS TRADING DAC**

By: _____
      Name:
      Title:

**TOPROL ACQUISITION LLC**

By: _____
      Name:
      Title:

[*Signature Page to Trademark Assignment*]

## SCHEDULE A

## PURCHASED TRADEMARKS

| Mark | Country | Status | App. Date / App No. | Reg. Date / Reg. No. | Owner |
|------|---------|--------|---------------------|----------------------|-------|
| ZONTIVITY | Canada | Pending | 10/16/2013<br><br>1648078 | | Aralez Pharmaceuticals Trading DAC |
| ZONTIVITY Two Ribbon Design | Canada | Pending | 05/12/2014<br><br>1676575 | | Aralez Pharmaceuticals Trading DAC |
| ZONTIVITY | United States | Registered | 04/28/2011<br><br>85307417 | 10/28/2014<br><br>4628973 | Aralez Pharmaceuticals Trading DAC |
| ZONTIVITY Two Ribbon Design | United States | Registered | 04/09/2014<br><br>86247658 | 04/28/2015<br><br>4729043 | Aralez Pharmaceuticals Trading DAC |
| ZONTIVITY Two Ribbon Design | United States | Registered | 04/09/2014<br><br>86247665 | 04/28/2015<br><br>4729044 | Aralez Pharmaceuticals Trading DAC |

**<u>Exhibit B-1 to the Purchase Agreement</u>**

[BUYER LETTERHEAD]


[•], 2019

Norman Stockbridge, M.D., Ph.D., Director
Division of Cardiovascular and Renal Products
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD 20705-1266


Attn: FDA: Bridget Kane, Project Manager

**Re:   IND 071384, Sequence [XXX], Serial [XXX]**
     **Zontivity (vorapaxar) 2.08mg dose strength tablets**

**GENERAL CORRESPONDENCE – TRANSFER OF OWNERSHIP**

Dear Dr. Chong:

Reference is made to the IND 071384 for Zontivity (vorapaxar) 2.08mg dose strength tablets, approved on May 8, 2014.

In accordance with 21 CFR § 314.72, we are hereby notifying the FDA that, as of [•], 2019, Aralez Pharmaceuticals Trading DAC has transferred ownership and all rights and responsibilities for IND 071384 to Toprol Acquisition LLC ("Buyer").

Effective on [•], 2019, Buyer accepts all rights and responsibilities regarding IND 071384 in accordance with 21 CFR § 314.72 (a)(2)(i) through (iii).  A full copy of IND 071384, including any amendments, supplements and records required under 21 CFR §314.81, has been received by Aralez as of the date of this letter.

All future correspondence for the IND should be sent to the new Sponsor:

          [BUYER ADDRESS]
          [CONTACT NAME]
          [PHONE]
          [EMAIL]


As Sponsor of IND 071384, Buyer assumes all responsibilities for compliance with the Federal Food, Drug and Cosmetic Act and all implementing regulations (Title 21 of the Code of Federal Regulations).

Buyer assumes responsibility for reporting IND Safety Reports, per CFR 312.32(c)(1)(v) and CFR 312.32(c)(2), to the Agency with respect to this IND.

We trust you will find this information complete. However, if you have any questions or require any further information, please contact me at [CONTACT INFORMATION].

Sincerely,

[BUYER SIGNATURE]

Cc: Aralez/Willkie

[BUYER. LETTERHEAD]

[•], 2019

Norman Stockbridge, M.D., Ph.D., Director
Division of Cardiovascular and Renal Products
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD 20705-1266

Attn: FDA: Bridget Kane, Project Manager

**Re:    NDA 204886, Sequence [0183]**
          **Zontivity (vorapaxar) 2.08mg dose strength tablets**

**GENERAL CORRESPONDENCE – TRANSFER OF OWNERSHIP**

Dear Dr. Chong:

Reference is made to the NDA 204886 for Zontivity (vorapaxar) 2.08mg dose strength Tablets, approved on May 8, 2014.

In accordance with 21 CFR § 314.72, we are hereby notifying the FDA that, as of [•], 2019, Aralez Pharmaceuticals Trading DAC has transferred ownership and all rights and responsibilities for NDA 204886 to Toprol Acquisition LLC ("Buyer").

Effective on [•], 2019, Buyer accepts all rights and responsibilities regarding NDA 204886 in accordance with 21 CFR § 314.72 (a)(2)(i) through (iii).  A full copy of NDA 204886, including any amendments, supplements and records required under 21 CFR §314.81, has been received by Aralez as of the date of this letter.

All future correspondence for the NDA should be sent to the new Sponsor:

[BUYER ADDRESS]
[CONTACT NAME]
[PHONE]
[EMAIL]

As Sponsor of NDA 204886, Buyer assumes all responsibilities for compliance with the Federal Food, Drug and Cosmetic Act and all implementing regulations (Title 21 of the Code of Federal Regulations).

1

Please note that Buyer will have responsibility for reporting Post Marketing 15-day Alert reports, per CFR 314.80(c)(1)(i) and CFR 314.80(c)(1)(ii), to the Agency with respect to this NDA.

We trust you will find this information complete. However, if you have any questions or require any further information, please contact me at [CONTACT INFORMATION].


Sincerely,


[BUYER SIGNATURE]

Cc: Aralez and Willkie

**<u>Exhibit C-1 to the Purchase Agreement</u>**



| | | |
|---|---|---|
| **Global Headquarters**<br>7100 West Credit Avenue<br>Mississauga, Ontario L5N 0E4 | **U.S. Headquarters**<br>400 Alexander Park Drive<br>Princeton, NJ 08540 | **Ireland Headquarters**<br>2 Hume Street<br>Dublin 2, DO2 FT82, Ireland |

[•], 2019

Norman Stockbridge, M.D., Ph.D., Director
Division of Cardiovascular and Renal Products
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD 20705-1266

Attn: FDA: Bridget Kane, Project Manager

**Re:   IND 071384, Sequence [XXX], Serial [XXX]
        Zontivity (vorapaxar) 2.08mg dose strength tablets**

### GENERAL CORRESPONDENCE – TRANSFER OF OWNERSHIP

Dear Dr. Chong:

Reference is made to the IND 071384 for Zontivity (vorapaxar) 2.08mg dose strength tablets, approved on May 8, 2014.

In accordance with 21 CFR § 314.72, we are hereby notifying the FDA that, as of [_], 2019, Aralez Pharmaceuticals Trading DAC has transferred ownership and all rights and responsibilities for IND 071384 to Toprol Acquisition LLC ("Buyer").

Buyer will concurrently notify the FDA of its acceptance of this IND under separate cover. A full copy of IND 071384, including any amendments, supplements and records required under 21 CFR §314.81, has been provided to Buyer as of the date of this letter.

All future correspondence for the IND should be sent to the new Sponsor:

> [•]

> with a copy (which shall not constitute effective notice) to:

> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, NY 10019-6099
> Facsimile:  (212) 728-8111
> Attention:  Sean M. Ewen
> E-mail:  sewen@willkie.com

Accordingly, as Sponsor of IND 071384, Buyer will assume all responsibilities for compliance with the Federal Food, Drug and Cosmetic Act and all implementing regulations (Title 21 of the Code of Federal Regulations).

Please note that Buyer will have responsibility for reporting IND Safety Reports, per CFR 312.32(c)(1)(v) and CFR 312.32(c)(2), to the Agency with respect to this IND.

We trust you will find this information complete. However, if you have any questions or require any further information, please contact me at 570-569-2911 or via e-mail at Jennifer.Sanguedolce@iconplc.com.

Whenever possible, to facilitate communication, please forward a complimentary electronic copy of any formal correspondence to Mapi Agent at the above mentioned secure email address.

Sincerely,

Jennifer Sanguedolce, M.S., RAC
Senior Manager, US Regulatory Affairs
Mapi USA, Inc., an ICON plc company
Phone: 570-569-2911
Fax: 1-859-223-2005
Email: Jennifer.Sanguedolce@iconplc.com



**Global Headquarters**
7100 West Credit Avenue
Mississauga, Ontario L5N 0E4

**U.S. Headquarters**
400 Alexander Park Drive
Princeton, NJ 08540

**Ireland Headquarters**
2 Hume Street
Dublin 2, DO2 FT82, Ireland

[•], 2019

Norman Stockbridge, M.D., Ph.D., Director
Division of Cardiovascular and Renal Products
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD 20705-1266

Attn: FDA: Bridget Kane, Project Manager

**Re:   NDA 204886, Sequence 0182
        Zontivity (vorapaxar) 2.08mg dose strength tablets**

**GENERAL CORRESPONDENCE – TRANSFER OF OWNERSHIP**

Dear Dr. Chong:

Reference is made to the NDA 204886 for Zontivity (vorapaxar) 2.08mg dose strength Tablets, approved on May 8, 2014.

In accordance with 21 CFR § 314.72, we are hereby notifying the FDA that, as of [•], 2019, Aralez Pharmaceuticals Trading DAC has transferred ownership and all rights and responsibilities for NDA 204886 to Toprol Acquisition LLC ("Buyer").

Buyer will concurrently notify the FDA of its acceptance of this NDA under separate cover. A full copy of NDA 204886, including any amendments, supplements and records required under 21 CFR §314.81, has been provided to Buyer as of the date of this letter.

All future correspondence for the NDA should be sent to the new Sponsor:

> [•]

with a copy (which shall not constitute effective notice) to:

> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, NY 10019-6099
> Facsimile:  (212) 728-8111
> Attention:  Sean M. Ewen
> E-mail:  sewen@willkie.com

Accordingly, as Sponsor of NDA 204886, Buyer will assume all responsibilities for compliance with the Federal Food, Drug and Cosmetic Act and all implementing regulations (Title 21 of the Code of Federal Regulations).

Please note that Buyer will have responsibility for reporting Post Marketing 15-day Alert reports, per CFR 314.80(c)(1)(i) and CFR 314.80(c)(1)(ii), to the Agency with respect to this NDA.

We trust you will find this information complete. However, if you have any questions or require any further information, please contact me at 570-569-2911 or via e-mail at Jennifer.Sanguedolce@iconplc.com.

Whenever possible, to facilitate communication, please forward a complimentary electronic copy of any formal correspondence to Mapi Agent at the above mentioned secure email address.

Sincerely,



Jennifer Sanguedolce, M.S., RAC
Senior Manager, US Regulatory Affairs
Mapi USA, Inc., an ICON plc company
Phone: 570-569-2911
Fax: 1-859-223-2005
Email: Jennifer.Sanguedolce@iconplc.com

**Exhibit D to the Purchase Agreement**

**(Proposed Sale Order)**

**Refer to Exhibit A to the Sale Motion**